1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE SALFEN LAW FIRM**
A PROFESSIONAL LAW CORPORATION
CODY B.K. SALFEN, ESQ. (SBN 309228)
111 N. Market Street, Suite 300
San Jose, CA 95113
Telephone:    (408) 724-9996
Fax:          (877) 516-4189
Email:        Cody@SalfenLaw.com

**THE GORDON LAW GROUP**
SAMUEL J. GORDON, ESQ. (SBN 305045)
1885 The Alameda, Suite 210
San Jose, CA 95126
Telephone:    (408) 286-1351
Fax:          (408) 503-0954
Email:        SamuelGordonEsq@gmail.com

*Attorneys for Plaintiff, Julio Arevalo*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Jose Division)

| | |
|---|---|
| JULIO AREVALO,<br><br>                    Plaintiff,<br><br>        v.<br><br>CITY OF PALO ALTO, CITY OF PALO ALTO POLICE DEPARTMENT, PALO ALTO POLICE CHIEF ROBERT JONSEN, PALO ALTO POLICE AGENT THOMAS ALAN DESTEFANO JR., PALO ALTO POLICE SGT. DUJUAN E. GREEN, PALO ALTO POLICE SGT. JOHN ALANIZ, PALO ALTO POLICE OFFICER NICK ENBERG, PALO ALTO | Case No<br><br>COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS<br><br>JURY TRIAL DEMANDED |

1

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

POLICE OFFICER BRIAN CONNELLY, PALO ALTO POLICE OFFICER IAN JOHNSON, PALO ALTO POLICE OFFICER PRIESS, PALO ALTO POLICE LIEUTENANT BEN BECCHETTI, PALO ALTO POLICE DEPARTMENT PUBLIC SAFETY PROGRAM MANAGER/RECORDS MANAGER LISA SCHEFF and DOES 1 thru 75, JOINTLY AND SEVERALLY,

Defendants.

## **NATURE OF THE ACTION**

1)     This action is brought by Plaintiff Julio AREVALO to redress the unlawful, blatant, dishonest, and violent violations of his civil rights, as perpetrated by Defendants, CITY OF PALO ALTO, the PALO ALTO POLICE DEPARTMENT and the other Defendants (numerous PAPD and CITY OF PALO ALTO police officers and employees), known and unknown. Plaintiff Julio AREVALO's Civil Rights and other rights were trampled upon. Defendants committed a handful of other law violations against JULIO.

2) This includes, but is not limited to various rights as guaranteed to Plaintiff under the United States Constitution, his right to be free from unlawful search and seizure, arrest/detention, unreasonable and excessive force, denial of proper medical care, his right to freedom of speech, as protected by 42 U.S.C. 1983 and the United States Constitution, and for associated state intentional tort claims and other state claims arising from a common set of operative facts.

//

//

//

//

/

2

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**INTRODUCTION**

3)      Nope, we're not in Kansas (anymore). In fact, we never were.

4)      We are, however, in the United States of America (*"Land of the Free"*).

5)      We are in the State of California (the "Golden State" where "All Dreams Welcome"[1] *for some*).

6)      We are in Palo Alto, California ("Birthplace of the Silicon Valley"[2])

7)      This is what happens to Latino males in the CITY OF PALO ALTO (in the State of California, in the United States of America) – Latino males who ride their bicycles to donut shops to get a snack and then peacefully walk away from a PAPD officer who has just attempted to unlawfully detain the donut-wielding Latino male:



---

[1] https://industry.visitcalifornia.com/partner-opportunities/campaigns/all-dreams-welcome
[2] https://www.cityofpaloalto.org/visiting/about_palo_alto.asp

3

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





4

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

8)      Prior to JULIO (but dangerously relevant to the present matter of JULIO and PAPD), the United States Department of Justice investigated numerous disturbing constitutional violations (racial profiling, excessive force, dishonesty, etc.) by one of the divisions of a California law enforcement agency that now Defendant PALO ALTO POLICE CHIEF ROBERT JONSEN was *then* working for as a top-cop. And disturbingly similar to Defendant CHIEF JONSEN's current Palo Alto Police Department, including the violent PAPD attack by on-duty PAPD Agent DESTEFANO and other officers of Plaintiff JULIO AREVALO, the United States Department of Justice appropriately reported and concluded that police **"use of force related to obstruction charges raises concerns"** … **"When an officer uses force and arrests someone only for obstruction of justice, it raises the question of what legitimate law enforcement objective was being obstructed. Because of the potential nexus between obstruction and similar arrests and improper uses of force, these uses of force warrant special attention."**[3]

9)      On July 10, 2019, the Plaintiff in this action, Julio AREVALO, was unlawfully and violently detained, arrested, repeatedly assaulted, traumatically injured, and denied proper and timely medical care by on-duty Defendant City of Palo Alto Police Officers. The involved PAPD officers were working/were on duty and operating in the course and scope of their duties as employees of the Defendant CITY OF PALO ALTO POLICE DEPARTMENT ("PAPD") and Defendant CITY OF PALO ALTO.

10.      Despite being knocked unconscious, suffering a traumatic brain injury, suffering lacerations, suffering injuries to his wrist, knees, and legs, and suffering a broken eye socket/orbital bone after being violently attacked by Defendant PAPD Agent THOMAS ALAN DESTEFANO JR. ("DESTEFANO"), JULIO wasn't taken to the hospital until nearly two-hours after he was knocked unconscious and suffered a head injury (along with a fractured orbital bone).

---

[3] https://www.justice.gov/sites/default/files/crt/legacy/2013/06/28/antelope_findings_6-28-13.pdf

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

11. In attempting to conceal and justify their unlawful actions, Agent DESTEFANO, with the assistance of a number of PAPD officers and the oppressive PAPD administration, attempted to concoct a criminal case against JULIO. Agent DESTEFANO blatantly lied in his police report.

12. Despite Agent DESTEFANO and PAPD's effort to falsely inculpate JULIO, the Santa Clara County District Attorney's Office declined to file any criminal charges against JULIO for the July 10, 2019 incident.

13. In an official PAPD memo authored by Agent DESTEFANO's friend, groomsman from DESTEFANO's wedding, and fellow PAPD officer, Defendant PAPD LT. BEN BECCHETTI concluded DESTEFANO's use of force on JULIO was reasonable.

14. For years, Defendant City of Palo Alto Police Department CHIEF ROBERT JONSEN ("JONSEN" or "CHIEF JONSEN") and other high-ranking PAPD and Defendant CITY OF PALO ALTO officials have repeatedly covered up this ugly and illegal pattern and trend. For years, Defendant City of Palo Alto Police Department CHIEF ROBERT JONSEN ("JONSEN" or "CHIEF JONSEN") and other high-ranking PAPD and Defendant CITY OF PALO ALTO officials have encouraged and rewarded Agent DESTEFANO and other PAPD officers who are dishonest, violent, and perpetrate these types of violent and unlawful behaviors under color of law.

15. With the assistance, endorsement and encouragement of Defendant CITY OF PALO ALTO ("CITY" or "PALO ALTO") and Defendant CITY OF PALO ALTO POLICE DEPARTMENT ("PAPD"), PAPD officers, most recently under the direction of CHIEF JONSEN (and less recently, under the PAPD chiefs who came before him) have engaged in a troubling decades long pattern and practice of tolerating, promoting, and encouraging PAPD officers' thuggery, violence, dishonesty, barbarianism, and maiming of innocent individuals like the plaintiff in the present matter.

6

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

16.    By virtue of PAPD's established history of nearly identical violations, the message PAPD and the CITY OF PALO ALTO convey, implicitly and by virtue of their actions, is clear:

   a)   **Civilians beware.** If you are a minority, gay, and/or low-income and you step foot in Palo Alto, your mere presence in Palo Alto could very well be a death sentence, the executioner being the PAPD officer or officers, perhaps Agent DESTEFANO, who happen upon you (many of whom would have been fired years ago if they worked for a *healthy* police agency, but they weren't, due to PAPD's patterns and practices that instead reward and promote this type of dangerous and unlawful behavior).

   b)   **Civilians beware.** If you are on probation for a minor offense and/or you happen to jay-walk, PAPD apparently views this as a death warrant. They may very well terrorize and attack you, without consequence to the involved PAPD police officer perpetrators. More likely than not, those officers will eventually be rewarded and promoted.

   c)   **Attention Future Police Officers.** If you want to violate constitutional rights, severely beat people within an inch of their life without legal justification, engage in criminal conduct off and on duty, and lie in your reports without any substantive or meaningful consequence, PAPD is the place for you. On your days off, you can drive drunk, run into parked cars (lie about it), and hang out with *honorably retired* PAPD Sergeant Wayne Benitez (while he enjoys his six-figure pension), and WAYNE will teach you how to *"not get shit on by these frickin' low-lifes"* (Latinos who live in the low-income Buena Vista Mobile Home Park).

17.    The subsequent dishonesty, code of silence, and victim-blaming the CITY OF PALO ALTO, CHIEF JONSEN, and PAPD routinely engage in when they prey upon minorities and low-income individuals and thereafter try to justify their violence is symptomatic of the CITY OF PALO ALTO's well nurtured and well-developed tolerance and encouragement of these unconstitutional and unlawful patterns and practices

7

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

(a municipal modus operandi that inevitably and sadly causes these preventable acts of repeated violence, trauma, injuries, and harm to JULIO and other similarly situated individuals).

18.     In Plaintiff Julio AREVALO's case, PAPD officers, including Defendant PAPD Agent DESTEFANO, didn't realize their actions, in circumstances eerily similar to past unlawful PAPD violence and unconstitutional actions, were captured by a nearby business's surveillance camera.

19.     The troubling video footage further exposes an already well and long-established pattern and practice of violence, dishonesty, and savagery that is not only tolerated, but encouraged, rewarded, and protected the Defendant CITY OF PALO ALTO, PAPD, CHIEF JONSEN, and LT. BECCHETTI.

20.     The trickle-down effects of this pattern and practice within this rogue police agency and municipality are beyond dangerous. People's lives are not only at risk, people are being severely and critically injured for no reason, all under the false guise of public safety. And not just people in general, very specific types of people. JULIO, a Latino male, was beaten and knocked unconscious, despite the fact that he didn't do anything illegal, he didn't attack any police officers, and he didn't have anything illegal in his possession. JULIO was peacefully multi-tasking just before nearly losing his life at the hands of PAPD Agent DESTEFANO. JULIO was walking his bicycle through a donut shop parking lot while eating a donut. These benign and lawful actions are not grounds for PAPD and its officers to serve as judge, jury, and executioner and not only sentence, but attempt to carry out the execution of JULIO. But they did attempt to execute JULIO by utilizing extremely violent, unreasonable, and excessive force that resulted in great bodily injury.

21.     What injuries did Agent DESTEFANO suffer? None.

22.     What injuries did the other officers suffer? None.

23.     Were any members of the public injured or threatened by JULIO? Nope.

24.     This violent and out of control trend and pattern of lawlessness among the CITY OF PALO ALTO and PAPD continues to have devastating consequences for victims like and including JULIO – human beings

8

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

who are then plagued with PAPD's gift-basket of trauma, emotional injury, physical deformities, and, in many cases, an unearned criminal history entry.

25.    And, PAPD and the CITY OF PALO ALTO's unlawful actions continue to leave minority and underprivileged Palo Alto residents and visitors with this lifelong painful and traumatic physical and emotional injuries.

26.    What will it take for these racist, violent, and unconstitutional patterns and practices to end?   What will it take for the CITY OF PALO ALTO and PAPD to take ownership of their past unlawful actions *and* stop this from happening yet again, once and for all? The escalating violence by Agent DESTEFANO and other PAPD officers is beyond frightening. This escalating police sponsored violence presents a clear, present, and fatal (yet preventable) risk of harm to JULIO and other similarly situated individuals (human beings).

27.    On July 10, 2019, JULIO purchased a donut from a donut shop in Palo Alto. JULIO intended to go back into the donut shop to buy a donut for his son (JULIO wanted to surprise his young son with a donut in the morning when his son would awake). The dangerous and threatening conduct of a brazen criminal, *right*?

28.    Prior to the Palo Alto Police beating JULIO and knocking him unconscious (and then telling him to not act stupid as he gurgled and moaned on the ground), JULIO rode his bicycle to the donut shop, parked his bicycle, purchased a donut, and then returned to his bicycle.

29.    As JULIO was walking his bicycle in the parking lot, Defendant PAPD AGENT DESTEFANO approached JULIO.

30.    Agent DESTEFANO immediately became aggressive and violent towards JULIO and proceeded to grab JULIO.

31.    *Rewind A Few Minutes*

9

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

a) Prior to Agent DESTEFANO violently attacking JULIO, PAPD Police Officer/Defendant PAPD AGENT DESTEFANO was parked in an adjacent parking lot, which is separated from the donut shop parking lot by a solid barrier (cinder block) that largely obstructs the view of the donut shop parking lot where JULIO was located.

b) Agent DESTEFANO proceeded to drive his patrol car to the area behind the donut shop.

c) Agent DESTEFANO parked, and quickly approached JULIO as JULIO was walking his bicycle through the lot, towards El Camino Real.

d) JULIO immediately recognized AGENT DESTEFANO as the distinctive looking officer approached JULIO.

e) That's that cop who always seems angry and people like (JULIO) and more often than not wind up in the hospital after that cop stops them.

f) JULIO knew AGENT DESTEFANO had a reputation for harassing and using violence towards Latino males and other low-income residents in the area.

g) JULIO was dedicated to making it home to give his son a donut in the morning. JULIO was committed to being peaceful, passively avoiding Agent DESTEFANO, and thereby not becoming a victim of AGENT DESTEFANO's well-known and well-established propensity for bullying, harassing, and using extreme violence towards (and seriously injuring) Latino males in Palo Alto, for basically nothing.

h) Despite JULIO's efforts to maintain the pre-existing status of peace, JULIO wound up committed to the Emergency Room, even if it was nearly two-hours after he was knocked unconscious and critically injured by Agent DESTEFANO and then assaulted and belittled by other PAPD officers.

32.   *Back to the donut shop.* Upon seeing Agent DESTEFANO, JULIO knew Agent DESTEFANO was one of the same officers who was involved in the violent multi-officer PAPD attack on JULIO's friend from

10

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

the Buena Vista Mobile Home Park, Gustavo ALVAREZ, the previous year. During *that* PAPD/DESTFANO encounter, JULIO's friend, Gustavo ALVAREZ, suffered a traumatic brain injury, severe damage to his mouth and one or more teeth, and other injuries and damages when PAPD officers, including Agent DESTEFANO, unlawfully kicked in ALVAREZ's front door, arrested, and violently assaulted ALVAREZ after *unlawfully* detaining ALVAREZ *on suspicion of driving on a suspended license*.

33.     As such, JULIO wanted to avoid becoming another victim of PAPD and AGENT DESTEFANO's racially motivated violence and hatred for Latinos like JULIO (and GUSTAVO).

34.     JULIO tried to politely de-escalate an apparently hyped-up AGENT DESTEFANO and JULIO politely and peacefully tried to passively avoid any interaction with Agent DESTEFANO. But, AGENT DESTEFANO apparently had other plans.

35.     Instead of JULIO bringing a donut home for his young son, JULIO's last memory of the interaction is from when JULIO tried to walk back into the donut shop and found himself violently attacked and shoved into the metal railing outside the shop (by Agent DESTEFANO).

36.     The next memory JULIO has is when woke up in the Stanford Emergency Room many hours later, in severe pain, with no recollection of the events, in a c-spine collar, his eyes swollen shut, his body bruised, injured, cut, and suffering from a broken orbital bone and traumatic brain injury. JULIO had trouble forming words. He couldn't see straight. He was in extreme pain. He wanted his mother. He wanted his son. He wanted his daughter.

37.     The donut shop surveillance footage and police dispatch radio recordings help fill in some of the gaps of this violent and unlawful detention, arrest, and assault by PAPD's Agent DESTEFANO.

38.     On July 10, 2019, without any legal justification, upon quickly approaching JULIO, Agent DESTEFANO immediately grabbed JULIO as JULIO was trying to peacefully avoid a confrontation with the quickly approaching Agent DESTEFANO.

11

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

39.     As JULIO (with his hands visible) walked away from Agent DESTEFANO, Agent DESTEFANO quickly advanced towards JULIO Agent DESTEFANO then repeatedly physically pushed JULIO into a sharp metal post/railing outside the donut shop entrance, which caused extreme pain and injury to JULIO due the readily apparent exposed vertical railing/spike portion of the railing that Agent DESTEFANO utilized in his violent tirade and attack of JULIO.

40.     As Agent DESTEFANO attacked, JULIO cried for help and asked for assistance from bystanders as he was being assaulted and seriously injured by Agent DESTEFANO.

41.     Instead of maintaining peace and order, Agent DESTEFANO quickly and violently escalated an otherwise peaceful encounter. But for AGENT DESTEFANO violently attacking JULIO (who wasn't breaking any laws or presenting any threat of harm or other danger to Agent DESTEFANO or anyone else), JULIO would have gotten back on his bike, traveled a couple hundred yards back to the Buena Vista Mobile Home Park, and spent time in the mobile home while he waited for his son to awake the next morning, at which time JULIO would watch his son enjoy the donut JULIO intended to buy for him.

42.     Instead, as Agent DESTEFANO became increasingly violent, using his bodyweight, Agent DESTEFANO continued to repeatedly drive JULIO's body into the exposed and sharp metal post/railing, which caused JULIO to suffer a large laceration on his chest, which began bleeding, and caused JULIO to experience additional extreme physical pain.

43.     JULIO cried out for help, but Agent DESTEFANO persisted. Then, in his continued angry and violent attack on JULIO, Agent DESTEFANO utilized a takedown maneuver. Specifically, Agent DESTEFANO slammed JULIO, head first, onto the hard cement walkway in front of the donut shop.

44.     During Agent DESTEFANO's violent takedown, he slammed JULIO's face and head into the hard cement/paved walkway just outside the donut shop at an extremely high-rate of speed and with an extreme level and amount of force. JULIO immediately lost consciousness and his body immediately went limp

12

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

(JULIO suffered a concussion/traumatic brain injury/TBI and a shattered orbital bone in his face, among other serious injuries).

45.     Despite Agent DESTEFANO's violence rendering JULIO unconscious (and rendering JULIO clearly in need of immediate medical attention), Agent DESTEFANO did not call for the fire department and medical personnel to respond. Agent DESTEFANO never called for fire and medics. Agent DESTEFANO never told anyone that JULIO lost consciousness he was slammed into the pavement.

46.     Instead, while JULIO was face down on the pavement and unconscious, Agent DESTEFANO positioned himself on top of JULIO's body and continued his violent assault on JULIO. Agent DESTEFANO proceeded to drive his left knee and full body-weight into JULIO's limp body and placed JULIO in handcuffs (hands secured in handcuffs behind his back while JULIO lay face down and limp on the pavement).

47.     Despite JULIO presenting absolutely no risk of harm to anyone, Agent DESTEFANO continued to physically assault and batter JULIO as JULIO was moaning and gurgling in pain. Agent DESTEFANO stood over top of JULIO as JULIO was still face down on the pavement and handcuffed. In a series of sadistic and pain-inducing acts of violence, Agent DESTEFANO drove his left boot into the back of JULIO's left thigh and then Agent DESTEFANO simultaneously pressed his full bodyweight into JULIO's right thigh and lower back area with Agent DESTEFANO's right knee and shin. Agent DESTEFANO grabbed onto the metal railing to leverage additional force and pain onto JULIO's body as Agent DESTEFANO drove his left boot/foot into JULIO's left leg and thigh.

48.     JULIO was gurgling, moaning, crying for help, and clearly in distress. At one point, he seemed to yell out for his mother, though he was hardly able to form much in the way of intelligible words. A number of other officers arrived on scene and perpetrated additional assaults upon the injured, handcuffed, and completely damaged and dazed JULIO (due to the facial fracture, large laceration, traumatic brain injury,

13

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

and other injuries). They swore at JULIO and chastised him. They spoke among themselves and laughed at JULIO. Despite being in handcuffs and posing no threat to officers, one officer twisted JULIO's already restrained and handcuffed wrist in a "pain compliance technique", designed to inflict further pain and suffering upon JULIO despite JULIO not presenting any threat or resistance, given JULIO's incapacitated and damaged state as he was slowly regaining an altered state of consciousness.

49.    Agent DESTEFANO and other officers continued to chastise and rebuke the handcuffed JULIO as JULIO unintelligibly and helplessly gurgled and moaned on the pavement. One PAPD's barked at JULIO, "Are you going to be cool? Because you're under arrest" … "Stop acting stupid."

40.    It wasn't until minutes *after* the unlawful arrest, detention, and violent assaults on JULIO that PAPD officers asked PAPD dispatch to run a name check on JULIO's and check on the terms/conditions of any probation grants.

41.    It wasn't until a number of minutes *after* the unlawful arrest, detention, and violent assaults on JULIO that PAPD officers actually learned that the Latino male was in fact JULIO.

42.    Instead of immediately taking JULIO to the hospital to seek necessary treatment for Agent DESTEFANO's traumatic injuries, Agent DESTEFANO instead *arrested* JULIO on bogus charges and took him to the *police station* in Agent DESTEFANO's endeavor to concoct a criminal case against JULIO.

43.    At the police station, JULIO continued to exhibit the sign symptoms associated with the traumatic brain injury he was dealt at the hands of Agent DESTEFANO. JULIO was in severe medical distress, and needed immediate emergency medical attention. Yet, he remained at the police station, in custody, and at the whim of Agent DESTEFANO.

44.    It wasn't until nearly two-hours later that AGENT DESTEFANO finally took JULIO to the hospital, where he was immediately admitted into the emergency department, placed in a C-Spine collar, and treated

14

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

for the critical injuries he sustained during the violent attack. In his report, AGENT DESTEFANO minimized and mischaracterized JULIO's past due need for immediate medical attention by writing, he "noticed Arevalo's right eye had begun to swell and was turning black" (when at the police station).

45.    Agent DESTEFANO made no mention of the fact that he slammed JULIO's head into the pavement hours earlier and that in doing so, JULIO was knocked unconscious.

46.    No unlawful items were located in JULIO's possession. Agent DESTEFANO and PAPD concocted a criminal case against JULIO and recommended the District Attorney's Office charge JULIO with a number of (bogus) criminal offenses. To date, the Santa Clara County District Attorney's Office has not pressed charges against JULIO.

47.    Unbeknownst to Agent DESTEFANO, his unlawful and violent police actions leading up to and during the violent attack on JULIO were captured on camera (surveillance cameras from the donut shop).

48.    Before knowing his actions before, during and after the attack on JULIO were captured on the surveillance camera, Agent DESTEFANO drafted a police report, which is riddled with false information.

49.    In the report, Agent DESTEFANO claims to have observed JULIO in what Agent DESTEFANO stated he believed to be a "hand to hand" (drug transaction).

a.    Agent DESTEFANO wrote in his police report that he *"observed Arevalo walk over to an unknown Hispanic male adult in the parking lot and quickly touch his hand."* Comparing this to the surveillance footage, it is abundantly clear that JULIO never touched hands with any Hispanic male (or anyone else). No such "hand to hand" transaction or anything that could be construed as such ever occurred. The surveillance footage establishes this information Agent DESTEFANO put in the police report was fabricated (i.e. Agent DESTEFANO lied in his police report). The surveillance footage shows that this was a complete fabrication by Agent DESTEFANO, in what can be logically interpreted as an apparent attempt to manufacture a legal justification for his illegal detention of JULIO and thereby falsely inculpate JULIO.

15

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

50.     Agent DESTEFANO and PAPD are no strangers to this Court and other courts (in their capacities as *defendants*). Both PAPD and Agent DESTEFANO have an individual and collective established history, pattern, and practice of breaking the law, rogue policing that includes violating individuals' constitutional rights, targeting individuals for their race, targeting individuals due to their sexual orientation, targeting individuals as a result of their socio-economic status, and violently injuring individuals who are unlawfully detained by PAPD for minor/petty/non-violent offenses (or no offenses at all).

51.     Agent DESTEFANO has a very clear and escalating history of involvement in what would otherwise be insignificant and peaceful police contacts, but, with Agent DESTEFANO involved, have, in the past, escalated them into violent attacks on residents who are thereafter plagued with critical injuries, deformities, physical trauma, and emotional damage that haunts these individuals for life.

52.     With respect to Agent DESTEFANO, this includes, but is not limited to Agent DESTEFANO's violent assault upon a young man named Tyler Harney while Mr. Harney was suffering from an epileptic seizure.

53.     Mr. Harney suffered fractures to his arm, requiring at least three surgeries, as well as for a sprained left wrist, pain in his ankles due to tight shackles, nerve damage to his left arm and hand, and bruises to his face, neck and back.

54.     Mr. Harney also suffered emotional distress, fear, anxiety, humiliation, loss of personal reputation, embarrassment, medical expenses, loss of income, and loss of physical liberty, according to the suit.

55.     This resulted in a $250,000.00 settlement by the City of Palo Alto to Mr. Harney.

56)     This also includes Agent DESTEFANO's involvement in a hit and run traffic collision where he lied to law enforcement and fabricated evidence in an attempt to throw-off the San Jose Police Department officers investigating the crime Agent DESTEFANO committed (while Agent DESTEFANO was under the

16

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

influence of alcohol/intoxicated). PAPD knew about all of this. He was employed by PAPD at the time. He wasn't fired. He was later promoted to a higher rank ("Agent").

57)     During the hit and run, Agent DESTEFANO was less than forthcoming with police, internal affairs investigators, and he was criminally prosecuted. Or, as Defendant PAPD Lieutenant Ben Becchetti (in another incident) seems to characterize and minimize Agent DESTEFANO's lies, there were "discrepancies" in the statements Agent DESTEFANO gave to San Jose Police officers investigating the hit and run (claiming he wasn't involved).

58)     Yet, Agent DESTEFANO not only kept his job as a police officer with PAPD, the CITY and PAPD subsequently promoted him to the mid-level supervisor rank of "Agent" (where he supervises patrol officers and trains new police officers).

59)     The DESTEFANO pattern doesn't end there. This pattern also includes Agent DESTEFANO's involvement in the violent and unlawful arrest, assault, and covering up by PAPD of an attack upon Gustavo ALVAREZ, a gay Latino resident of Palo Alto (and of the Buena Vista Mobile Home Park).

60)     Agent DESTEFANO, along with a number of other officers, unlawfully detained ALVAREZ on suspicion of driving on a suspended license and thereafter broke down ALVAREZ's front door, violently assaulted him, concocted a criminal case against ALVAREZ, and perpetrated a number of other atrocities (this includes the on-scene supervisor, PAPD Sergeant Wayne BENITEZ mocking ALVAREZ for being gay).

61)     The CITY OF PALO ALTO settled ALVAREZ's civil rights lawsuit for $572,500.00, every peace officer with PAPD had to complete a two-hour LGBTQ awareness course, and now *honorably* retired PAPD Sergeant Wayne BENITEZ had to write a letter of apology to ALVAREZ.

17

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

62) The list of PAPD endorsed and sponsored violence and constitutional violations goes on. The pattern of tolerating and encouraging these behaviors comes in the form of PAPD officers engaging in unlawful conduct and thereafter being promoted.

63) And, this pattern and practice that is tolerated and encouraged by PAPD, the CITY OF PALO ALTO, and their respective administrators has and continues to result in atrocities like those which Plaintiff JULIO has been subjected to at the hands of PAPD and the CITY OF PALO ALTO.

## JURISDICTION

64) This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12133, 28 U.S.C. §§ 1331, 1343, and 1367 and the statutory and common law of the State of California.

65) Jurisdiction is based upon 28 U.S.C. § 1343 and 29 U.S.C. 794 and 706(8)(B), and the Court's pendent jurisdiction over the state claims.

66) This action arises under Title 42 of the United States Code, Section 1983.

67) The unlawful acts and practices alleged herein occurred in and around the City of Palo Alto, California, which is within this judicial district.

68) Title 28 United State Code Section 1391 (b) confers venue upon this Court. This Court has jurisdiction over this action as this is a matter dealing with Federal Statutes and Constitutional Provisions, and each of the individuals and/or entities listed as defendants reside, work, and/or can be found within Santa Clara County, California.

69) The jurisdiction of this Court is predicated upon the fact that this Court has an interest in ensuring the rights of its citizens are protected and the events and rights involved in this action involve the application of federal law, including, but not limited to 42 U.S.C. 1983, et seq. and common law torts. Pursuant to 28 USC § 1331, this Court has jurisdiction over this matter because it alleges causes of action or claims arising

18

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1    out of the United States Constitution and the laws of the United States, including but not limited to: 42 USC

2    § 1983 and 1985. This Court has original jurisdiction pursuant to 28 U.S.C. § 1343(3). This Court also has

3    supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367.

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26

27

28

19

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## VENUE AND INTRADISTRICT ASSIGNMENT

70)     Venue is proper in the United States District Court for the Northern District of California, pursuant to 28 U.S.C. sections 84 and 1391.

71)     The events that gave rise to this complaint occurred in the City of Palo Alto, which is located in Santa Clara County in the State of California, and one or more of the defendants resides in Santa Clara County, California.

72)     Further, the acts or omissions alleged herein occurred in the Northern District of California and in and around the City of Palo Alto, County of Santa Clara, thereby providing for venue in the San Jose Division of this Court.

73)     Thus, assignment of this action to the San Jose Division of this Court is appropriate according to Local Rule 3-2(e).

//

//

//

//

//

//

//

//

//

//

//

//

20

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**PARTIES**

74)     Plaintiff **JULIO AREVALO** (hereinafter, "Plaintiff" or "ALVAREZ") was at all material times a resident of the County of Santa Clara in the State of California.

75)     Defendant **CITY OF PALO ALTO** ("CITY" or "CITY OF PALO ALTO") is a municipal corporation duly established and organized under the laws and constitution of the State of California. CITY is responsible for ensuring that Defendant CITY OF PALO ALTO POLICE DEPARTMENT's policies and practices do not violate individuals' substantive and procedural due process rights.

76)     Defendant **CITY OF PALO ALTO POLICE DEPARTMENT** ("PAPD") is a subdivision of CITY and CITY owns, operates, manages, directs and controls Defendant PAPD, which is a government agency/police agency and employs other defendants in this action. CITY and PAPD are responsible for ensuring that PAPD's policies and practices do not violate individuals' substantive and procedural due process rights and civil rights.

77)     Defendant **PALO ALTO POLICE CHIEF ROBERT JONSEN** ("JONSEN" or "CHIEF JONSEN") at all times material was Police Chief of the PAPD, and was acting within the course and scope of his employment. As Police Chief, CHIEF JONSEN was and is a policy-making official for Defendant City with the power to make official and final policy for PAPD.

78)     Defendant **PALO ALTO POLICE LIEUTENANT BEN BECCHETTI ("BECCHETTI" or "LT. BECCHETTI")** at all times material was a high ranking PAPD peace officer, and was acting within the course and scope of his employment. As a policy high-ranking PAPD administrator, LT. BECHETTI was and is a policy-making official for Defendant City with the power to make official and final policy for PAPD.

79)     Defendant **PALO ALTO POLICE AGENT THOMAS ALAN DESTEFANO JR.** ("DESTEFANO" or "AGENT DESTEFANO") is and was, at all times relevant to this action, an employee

21

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant DESTEFANO exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant DESTEFANO is sued individually and as a peace officer for CITY and PAPD.

80)     Defendant **PALO ALTO POLICE SERGEANT DUJUAN E. GREEN** ("GREEN" or "SGT. GREEN") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant GREEN exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant GREEN is sued individually and as a peace officer for CITY and PAPD. Further, at all times relevant to this action, SGT. GREEN was acting as a patrol supervisor, overseeing and supervising the other individual peace officer defendants in this matter.

81)     Defendant **PALO ALTO POLICE SERGEANT JOHN ALANIZ** ("ALANIZ" or "SGT. ALANIZ") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant ALANIZ exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant ALANIZ is sued individually and as a peace officer for CITY and PAPD. Further, at all times relevant to

22

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

this action, SGT. ALANIZ was acting as a patrol supervisor, overseeing and supervising the other individual peace officer defendants in this matter.

82)     Defendant **PALO ALTO POLICE OFFICER NICK ENBERG** ("ENBERG" or "OFFICER ENBERG") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant ENBERG exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant ENBERG is sued individually and as a peace officer for CITY and PAPD.

83)     Defendant **PALO ALTO POLICE OFFICER BRIAN CONNELLY** ("CONNELLY" or "OFFICER CONNELLY") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant CONNELLY exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant CONNELLY is sued individually and as a peace officer for CITY and PAPD.

84)     Defendant **PALO ALTO POLICE OFFICER PRIESS** ("PRIESS" or "OFFICER PRIESS") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant PRIESS exceeded the authority vested in him/her as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant PRIESS is sued individually and as a peace officer for CITY and PAPD.

23

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

85)     Defendant **PALO ALTO POLICE OFFICER IAN JOHNSON** ("JOHNSON" or "OFFICER JOHNSON") is and was, at all times relevant to this action, an employee of PAPD, working as a peace officer for CITY and PAPD, acting under color of authority of, and operating in the course and scope of his employment with the CITY and PAPD through Penal Code § 830.2. By engaging in the conduct described herein, Defendant JOHNSON exceeded the authority vested in him as a peace officer under the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant JOHNSON is sued individually and as a peace officer for CITY and PAPD.

86)     **Defendant PALO ALTO POLICE DEPARTMENT PUBLIC SAFETY PROGRAM MANAGER/RECORDS MANAGER LISA SCHEFF ("SCHEFF")** is and was, at all times relevant to this action, an employee of PAPD, working as a program manager/records manager for CITY and PAPD, acting under color of authority of, and operating in the course and scope of her employment with the CITY and PAPD. By engaging in the conduct described herein, Defendant SCHEFF intentional acted to conceal information thereby violating the United States Constitution, the laws of the State of California, and as an employee of CITY and PAPD. Defendant SCHEFF is sued individually and as an employee of the CITY and PAPD.

87)     The true names and capacities of Defendants DOES herein as DOES 1 thru 75 ("DOE Defendants" of "DOES") are unknown to Plaintiff at this time/Plaintiff does not know the true names and or capacities of Defendants not named in this complaint. Plaintiff will seek leave to amend this complaint to show and state their true names and capacities of these fictitiously named Defendants when, and if, they are ascertained. Plaintiff is informed and believes and thereon alleges that these fictitiously named individuals are legally responsible in some manner for the acts and omissions set forth below and are therefore liable to Plaintiff for the relief requested.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

88)     Plaintiff is informed and believes and thereon alleges that each of the defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happening as hereinafter described, and proximately caused injuries and damages to Plaintiff.

89)     Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff and further, one of more of the DOE Defendants were at all material times responsible for the hiring, training, supervision, and discipline of other Defendants, and/or directly responsible for violations of Plaintiff's rights.

90)     At all times relevant and mentioned herein, unless otherwise stated, each Defendant was the agent and/or employer of every other Defendant, and in doing the things, acts and omissions alleged below, was acting within the scope and authority of its agency and/or employment. All actions of each Defendant alleged herein were ratified and approved by the officers, supervisors, and managing agents of each of the other Defendants.

91)     Each individual defendant (meaning non-municipal defendants) is sued in his or her individual and official capacities.

92)     Plaintiff is informed and believes, and based upon such information and belief alleges, that each of the defendants was at all material times an agent, servant, employee, partner, joint venture, co-conspirator, and/or alter ego of the remaining defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes, and thereon alleges, that each of the defendants herein gave consent, aid and assistance to each of the remaining defendants, and ratified and/or authorized the acts or omissions of each defendant as alleged herein, except as may be hereinafter otherwise alleged.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

93)     At all material times, each defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiff's rights under the United States Constitution and the laws and Constitution of the State of California, and other harm.

94)     At all material times, each defendant acted under the color of the laws, statutes, ordinances and regulations of the State of California, and pursuant to the actual customs, policies, practices, and procedures of the governmental entity by which they were employed or retained.

95)     This complaint may be pled in the alternative pursuant to Federal Rules of Civil Procedure Rule 8(d)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

26

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## __CLAIMS PROCEDURE__

96)     Plaintiff has made the necessary claim, pursuant to California Government Code § 910, to preserve the state causes of action set forth herein.

97)     The City of Palo Alto thereafter denied Plaintiff's claim.

98)     This action, at all crucial times, was and is timely filed and made so as to preserve all causes of action, both federal and state.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

27

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## **STATEMENT OF FACTS**

99)     Unless otherwise stated, the allegations herein are based upon information and belief.

100)    Plaintiff hereby re-alleges and incorporates by reference each and every paragraph of this Complaint.

101)    Plaintiff JULIO AREVALO has been harassed, unlawfully detained, unlawfully searched, unlawfully threatened, and has been subjected to violent physical and emotional abuse by PAPD and its peace officers. PAPD and its officers have and continue to engage in efforts to conceal and cover up their illegal actions, dishonesty, and unlawful conduct. JULIO was at all relevant times, and is now, a young-adult Latino male. JULIO is also a father to two young children.

102)    At all relevant times and dates of the incidents described herein, JULIO was 23-years-old.

103)    JULIO has lived in and frequents the low-income housing area of the City of Palo Alto officially called the **Buena Vista Mobile Home Park** in the City of Palo Alto, which is located a short distance from Happy Donuts (in the City of Palo Alto).

104)    Buena Vista Mobile Home Park is located within the City of Palo Alto and is home to many similarly situated low-income Latinos and other minorities like JULIO.

105)    In stark contrast, the City of Palo Alto is home to some of the most successful and well-known tech companies in the world, including their high-level employees and founders.

106)    A strong majority of residents of the City of Palo Alto are wealthy and upper-middle-class with respect to their socio-economic status.

107)    There are very few Latino and black residents in the City of Palo Alto. According to the U.S. Census Bureau, of the roughly 65,000 residents in the City of Palo Alto, nearly 60% are white, 1.6% are black, and 5.7% are Latino. The median household income is nearly $160,000.00.

28

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

108)     The City of Palo Alto is, in essence, the heart of the Silicon Valley.

109)     Much of the wealth within the City of Palo Alto flows from Silicon Valley tech companies and their mid to high level employees and founders, many of whom reside within the City of Palo Alto.

110)     In contrast to these *majority* wealthy (white) Palo Alto residents, *minority* Plaintiff JULIO AREVALO and other Buena Vista Mobile Home associates and residents are not wealthy. They are poor. Many are not white. They do not work for tech companies, except for maybe a few who polish the floors and empty the trash bins at night at the sprawling tech company campuses. They do not have the benefit of tall fences, security staff, and manicured hedges to shield them from unwarranted police violence.

111)     The CITY OF PALO ALTO and PAPD view the Buena Vista Mobile Home Park and its residents and second-class *citizens*, underserving of the constitutional rights and protections afforded to Palo Alto's majority and wealthier residents. PAPD's patterns and practices in harassing residents of the mobile home park on a regular and routine basis reflects this.

112)     PAPD officers regularly drive through Buena Vista Mobile Home Park and harass residents. PAPD officers shine bright lights into their fragile mobile homes, bang on doors in the middle of the night, they remain parked with their engines idling (which rumbles through the thin and oftentimes delicate and deteriorating mobile home *walls*). And, they follow individuals who leave the mobile home park on foot (for no reason, other than they have been seen coming from the mobile home park).

113)     Despite encompassing a fraction of one block and a fraction of total number of Palo Alto residents, PAPD regularly targets Buena Vista Mobile Home Park ("Buena Vista") residents and those who associate with residents. In doing so, PAPD regularly and routinely engages in violence, constitutional violations, and other acts of misconduct under the color of authority towards Buena Vista residents and their associates.

29

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

114)     PAPD and its officers view Buena Vista residents and associates as subordinate citizens, undeserving of protection and undeserving of the constitutional rights that the *majority* of Palo Alto residents who live elsewhere freely enjoy.

115)     PAPD officers demean and persecute Buena Vista Mobile Home residents and see them as trash. Recently *honorably* retired PAPD Sergeant Wayne Benitez exemplified this PAPD attitude when (while on duty and in briefing a cadre of subordinate PAPD officers after beating a handcuffed, gay, Latino Buena Vista resident), then Sgt. Benitez described Buena Vista Mobile Home residents and associates as *"frickin' low-lifes"*.

116)     After a number of PAPD officers, including then PAPD Sergeant Wayne Benitez, Defendant Agent DESTEFANO, Defendant SGT. ALANIZ, DEFENDANT Officer JOHNSON, and other officers engaged in a coordinated cover-up of an unlawful detention, arrest, and physical attack upon Buena Vista resident Gustavo ALVAREZ in February 2018 (after kicking in the front door of ALVAREZ's mobile home while unlawfully detaining ALVAREZ on suspicion of driving on a suspended license), the on-scene PAPD supervisor, in a teaching moment, told the other PAPD officer, "See how much *they* behave when we put our foot down?", "See how quickly *they* behave once we put our foot down? And that's what we don't do enough of.", "Amazing how well behaved they become.", and "We put our foot down and they're all behaving themselves now."

117)     PAPD and its officers regularly and routinely harass and prey upon low-income and minority Buena Vista Mobile Home residents like JULIO. This pattern has persisted for years (and continues).

118)     PAPD encourages its officers to detain, harass, arrest, and prey upon Buena Vista Mobile Home residents.

119)     The general sentiment among Buena Vista Mobile Home Park residents and associates is that PAPD and its officers cannot be trusted – a well-earned and well-deserved reputation.

30

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

120)   PAPD and its officers stalk, harass, attack, injure, and unlawfully arrest Buena Vista Mobile Home Park residents and their guests. And, the City of Palo Alto and PAPD not only tolerate this, they endorse it, explicitly and implicitly.

## JULY 2019
### BRUTAL PALO ALTO POLICE ATTACK ON JULIO AREVALO
### CAUSING CRITICAL INJURIES, AND SUBSEQUENT COVER-UP

121)   In the present matter, the PAPD attack on Plaintiff JULIO AREVALO is yet another example of (PAPD) police sponsored violence toward a minority (Latino) low-income resident.

122)   On July 10, 2019 in the early-morning hours, JULIO rode his bicycle to a donut shop in the City of Palo Alto, California (Happy Donuts), which is located on the same block of El Camino Real as the Buena Vista Mobile Home Park.

123)   Happy Donuts is a "24/7" donut shop in the City of Palo Alto, located along El Camino Real.

124)   At all relevant time, Happy Donuts was open 24-hours per day/7-days-per week.

125)   Happy Donuts was and is frequented by many individuals who live in the area.

126)   At all relevant times, Happy Donuts hosted late night meet-ups for people who meet-up to play board games in groups, shift workers (police officers, nurses, and the like), and other Palo Alto and local residents.

127)   On July 10, 2019, JULIO parked his bicycle by the donut shop, purchased a donut, and went back out to the parking lot to his bicycle.

128)   JULIO was wearing a red (Stanford University) t-shirt.

129)   Stanford University is located roughly 1.6 miles away from the donut shop, also along El Camino Real in the City of Palo Alto.

31

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

130)     Stanford and/or Stanford employees oftentimes donate their lightly used clothing to local thrift shops where JULIO and other low-income Palo Alto and Buena Vista Mobile Home Park residents and their associated oftentimes buy their clothes.

131)     JULIO decided he wanted to purchase another donut to bring to home for his young son to enjoy that morning.

132)     While in the Happy Donuts lot and eating his donut, JULIO noticed a police vehicle (driven by Defendant PAPD Agent DESTEFANO).

133)     Prior to Defendant PAPD Agent DESTEFANO unlawfully detaining and violently attacking JULIO, PAPD police officer/Defendant CITY OF PALO ALTO POLICE DEPARTMENT POLICE OFFICER/AGENT DESTEFANO was parked in an adjacent parking lot along El Camino Real, which is separated from the donut shop parking lot by a solid barrier (cinder block or similar material) that, from the perspective of the lot where the patrol car and Agent DESTEFANO were parked, obstructs the view of the donut shop parking lot where JULIO was located.

134)     Agent DESTEFANO proceeded to drive his patrol car onto El Camino Real and then behind the donut shop.

135)     Agent DESTEFANO parked, and quickly approached JULIO as JULIO was walking his bicycle through the lot (towards El Camino Real) and enjoying his donut.

136)     JULIO immediately recognized Agent DESTEFANO as Agent DESTEFANO approached JULIO. How? JULIO had previously seen Agent DESTEFANO in the news for Agent DESTEFANO's well-known prior attacks on Palo Alto residents, some of whom JULIO knew.

137)     JULIO had recently seen PAPD Agent DESTEFANO in widespread press coverage and on July 10, JULIO therefore recognized PAPD Agent DESTEFANO when DESTEFANO was quickly and aggressively

32

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

approaching JULIO while JULIO was eating his donut and walking his bicycle through the Happy Donuts parking lot, towards El Camino Real.

138)    Specifically, JULIO was aware of DESTEFANO's highly publicized participation in a prior violent multi-PAPD-officer attack on and civil rights violations against Buena Vista Mobile Home Park resident Gustavo ALVAREZ (an attack captured on video, a fact unbeknownst to PAPD officers at the time of their unlawful actions and at the time they drafted their factually inaccurate police reports).

139)    JULIO recognized Agent DESTEFANO as the same white officer from the ALVAREZ video due to DESTEFANO's somewhat unique appearance – his very short stature, his noticeable tough-guy gait, his chubby physique, his noticeable and distinctive unique stubby features, and DESTEFANO'S distinctive and peculiarly shaped face and bald head.

140)    JULIO knew Agent DESTEFANO was one of the same officers who was involved in the violent multi-officer PAPD attack on JULIO's fellow Buena Vista Mobile Home Park resident and friend, Gustavo ALVAREZ the previous year (where ALVAREZ suffered a traumatic brain injury, broken teeth, and other injuries and damages when PAPD officers, including Agent DESTEFANO, unlawfully kicked in ALVAREZ's front door, arrested, and violently assaulted ALVAREZ after unlawfully detaining ALVAREZ on suspicion of driving on a suspended license).

141)    As such, JULIO wanted to avoid becoming another victim of PAPD and Agent DESTEFANO's infamously violent reputation for engaging in police sponsored racially motivated violence and attacks on residents, especially Latino residents.

142)    So, JULIO tried to politely deescalate an apparently hyped-up Agent DESTEFANO by (JULIO) politely and passively *trying* to avoid any interaction with Agent DESTEFANO.

143)    But, Agent DESTEFANO had other plans.

33

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

144)    Instead of JULIO bringing a donut home for his young son, JULIO woke up in the Stanford Emergency Room the next morning, with no recollection of the events up to a few short moments after the initial encounter with Agent DESTEFANO.

145)    When JULIO woke up in the emergency room, he was in extreme pain. He was in a c-spine collar, his eyes were swollen shut, his body was bruised, injured, and cut, he could barely speak, could barely see, had a fractured orbital bone, and was suffering from a traumatic brain injury.

146)    Back to the donut shop (July 10, 2019). Based upon Agent DESTEFANO's reputation among Buena Vista Mobile Home Park residents and other Latinos in Palo Alto, JULIO knew Agent DESTEFANO's history of harassing and using violence towards Latino males and other low-income residents in the area (and therefore JULIO feared and continues to fear both PAPD and Agent DESTEFANO).

147)    JULIO was dedicated to not becoming another victim of Agent DESTEFANO's well-known propensity and pattern for bullying, harassing, and using extreme force and violence towards Latino males in Palo Alto.

148)    On July 10, 2019, without any legal justification, upon quickly approaching JULIO, Agent DESTEFANO immediately grabbed JULIO as JULIO was walking his bicycle through the lot – while JULIO was eating a donut and approaching El Camino Real through the Happy Donuts parking lot. Agent DESTEFANO stepped in front of JULIO and prevented JULIO from continuing to walk his bicycle towards El Camino Real.

149)    Agent DESTEFANO aggressively lunged towards JULIO and despite Agent DESTEFANO's unwarranted aggression, JULIO politely told Agent DESTEFANO, *"Excuse me, back up please."*

150)    JULIO was unarmed. No weapons. JULIO didn't threatened Agent DESTEFANO or anyone else. He was pushing his bicycle while eating his donut. His hands were visible.

34

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

151)  JULIO, with his hands completely visible and not acting in an aggressive manner, leaned his bicycle against a railing and, in an attempt to avoid an apparently escalating situation, to no fault of his own, JULIO tried to deescalate the quickly escalating encounter by walking away and trying to enter the donut shop.

152)  Agent DESTEFANO then grabbed JULIO and said "you're on probation!" and pushed JULIO into the railing.

153)  JULIO peacefully and non-aggressively asked Agent DESTEFANO, "what am I doing?" and JULIO stated, "let go of me."

154)  Agent DESTEFANO then continued to push JULIO into the metal railing, where there was a sharp and exposed metal spike portion of the railing was clearly visible.

155)  Agent DESTEFANO began aggressively and intentionally pushing JULIO into the metal spike, which caused JULIO to immediately bleed and suffer extreme pain. JULIO's donut went flying out of his hands, through the air, and onto the ground.

156)  Because of the extreme pain he was experiencing, JULIO began yelling for help and screaming "Owwwwww" …"I'm not even resisting" (as Agent DESTEFANO continued to drive JULIO's body and back into the metal railing and exposed spike).

157)  Despite JULIO pleading with Agent DESTEFANO to stop (JULIO continually complained of extreme pain to his back and arm) and despite JULIO's attempts to deescalate the situation. Agent DESTEFANO instead increased his level of violence and continued *escalating* the situation, by way of physical violence.

158)  JULIO began crying as Agent DESTEFANO continued to assault JULIO and cried *"he's hurting me" … "I'm not resisting" … "I don't even know what's going on."*

159)  Agent DESTEFANO then flipped JULIO face first towards the railing and spike and violently and repeatedly physically pushed JULIO and JULIO's front chest and torso area into a sharp metal post/railing

35

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

outside the donut shop entrance. This caused JULIO to sustain a large laceration, which immediately began bleeding. This continued to add to the extreme and mounting pain JULIO was experiencing.

160)   Using his bodyweight, Agent DESTEFANO continued to repeatedly drive JULIO's body into the sharp metal post/railing, which caused JULIO to suffer a large laceration on his chest and experience additional extreme physical pain. JULIO cried out for help, but Agent DESTEFANO persisted.

161)   JULIO cried for help and asked for assistance from bystanders as he was being assaulted and seriously injured.

162)   Instead of maintaining peace and order, Agent DESTEFANO quickly and violently continued escalate what would have otherwise been a peaceful encounter, free of any force or resistance.

163)   As JULIO was crying out in pain, he asked Agent DESTEFANO, "For what? You said can you talk to me and I started walking away. You have no right to arrest me."

164)   Then, in his continued angry and violent attack on JULIO, Agent DESTEFANO pulled JULIO away from the metal railing and then slammed JULIO (chest first) into a cement pillar.

165)   JULIO said to Agent DESTEFANO, **"let go of me, please."**

166)   JULIO continued to beg Agent DESTEFANO to stop and asked Agent DESTEFANO, "why are you arresting me"

167)   JULIO continued to cry out for help and begged Agent DESTEFANO to stop. JULIO complained to Agent DESTEFANO about the extreme pain Agent DESTEFANO was inflicting upon JULIO (to JULIO's chest), but Agent DESTEFANO persisted.

168)   At one point, JULIO cried, "Oww, you're going to break my arm?" … "For what?"

169)   Then, Agent DESTEFANO engaged in an intentional, entirely unwarranted, and grossly excessive tirade of deadly force.

36

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

170)   Agent DESTEFANO utilized a violent and unwarranted takedown maneuver and specifically, Agent DESTEFANO body-slammed JULIO (head-first) into the cement walkway. This brutally violent act very well could have killed JULIO.

171)   During Agent DESTEFANO's violent body-slam, he slammed JULIO's face and head into the hard cement/paved walkway just outside the donut shop.

172)   JULIO immediately lost consciousness and his body immediately went limp (JULIO suffered a concussion/traumatic brain injury/TBI and a shattered orbital bone in his face, among other serious injuries). This is readily apparent in the donut shop surveillance footage.

173)   JULIO was unresponsive (because he was unconscious) when Agent DESTEFANO kept speaking to JULIO and telling JULIO to "stop".

174)   Agent DESTEFANO wrote in his report that once JULIO was on the ground, JULIO's *"right hand extended and locked out in front of his body in an attempt to prevent [DESTEFANO] from handcuffing him."* In reality, JULIO was unconscious.

175)   Despite Agent DESTEFANO's claims that JULIO was actively resisting, JULIO was unconscious at this point and incapable of resisting (having just suffered a shattered orbital bone and having just been knocked unconscious and thereby suffering a traumatic brain injury).

176)   Despite a shattered eye-socket, despite losing consciousness after Agent DESTEFANO slammed his head into the pavement (causing JULIO to lose consciousness), and despite JULIO clearly being in need of immediate and critical emergency medical attention, Agent DESTEFANO did not call for the fire department or medical personnel to respond.

177)   Instead, while JULIO was face down on the pavement and unconscious, Agent DESTEFANO positioned himself on top of JULIO's body and handcuffed JULIO.

37

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

178)   Even when JULIO was handcuffed, Agent DESTEFANO proceeded to drive his left knee and full body-weight into JULIO's body as JULIO lay face down on the cement walkway, severely injured, and still, for all intents and purposes, unconscious.

179)   As JULIO began regaining an extremely altered level of consciousness due to the extreme head trauma he just sustained, JULIO was unable to intelligibly speak. JULIO was clearly unaware of what had just occurred.

180)   Agent DESTEFANO nonetheless continued to physically taunt, assault and inflict pain upon JULIO as JULIO made gurgling noises and was moaning – when JULIO was in a critical and distressed state of consciousness.

181)   Instead of calling for medical assistance and instead of helping JULIO, Agent DESTEFANO repeatedly told JULIO to "stop" and then told JULIO to "stop resisting" (while JULIO's hands were already handcuffed behind his back, while JULIO was gurgling and moaning and clearly in distress, and while JULIO's eyes were closed as he lay face down on the ground, with Agent DESTEFANO on top of him).

182)   At this point (and at no point) did JULIO pose any threat to Agent DESTEFANO or anyone else (JULIO was walking his bicycle and eating a donut when Agent DESTEFANO initiated the encounter).

183)   Yet, while JULIO was *already* handcuffed, gurgling, moaning, and clearly in a critical medical state (with Agent DESTEFANO on top of JULIO, pressing his full body weight onto JULIO's critically injured body) Agent DESTEFANO's violent and sadistic attack continued. At this point, Agent DESTEFANO used both of his hands to grab JULIO's left hand and wrist (which was already secured in handcuffs behind JULIO's back) and Agent DESTEFANO began violently twisting JULIO's hand and wrist in an unnatural direction, inflicting severe pain upon JULIO.

38

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



184)    This *arrest control technique* or *pain compliance technique* is what police officers use when they are trying to put handcuffs someone who is actively resisting – not someone like JULIO who is barely conscious and is already secured in handcuffs.

185)    For example, this arrest control technique is used by a police officer to inflict pain upon the un-handcuffed individual, the pain causes them to comply, and this allows the officer to handcuff the person. But in this case, JULIO was already arrested secured in handcuffs, in a state of altered consciousness, and was not capable of resisting. The only reason Agent DESTEFANO did this was to further torture JULIO and Agent DESTEFANO's sadistic and violent actions continued to inflict extreme pain upon Agent DESTEFANO and cause injury to JULIO's wrist. The extreme pain inflicted upon JULIO by this unwarranted and excessive sadistic act caused JULIO to cry out in pain and squirm – very natural responses to extreme pain. Agent DESTEFANO then used this police manufactured exigency to justify the sadistic infliction of even more unwarranted pain upon JULIO.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

186)    Agent DESTEFANO stood over top of JULIO as JULIO was still face down on the pavement and handcuffed. Agent DESTEFANO then tells dispatch (via the police radio) that he has "one detained."

187)    Agent DESTEFANO drove his left boot into the back of JULIO's left thigh and then Agent DESTEFANO simultaneously pressed his full bodyweight into JULIO's right thigh and lower back area with Agent DESTEFANO's right knee and shin. Agent DESTEFANO grabbed onto the metal railing to leverage additional force and pain onto JULIO's body as Agent DESTEFANO drove his left boot/foot into JULIO's left leg and thigh.

188)    JULIO was gurgling, moaning, crying for help, and clearly in distress. At one point, he can be heard yelling for his mother, despite the fact that she was nowhere near.

189)    A number of other PAPD officers began arriving in the area with their lights and sirens activated.

190)    While JULIO continued to gurgle, cry, and moan, his breathing slowed and was increasingly labored and slow. JULIO was critically injured and struggling to breathe. JULIO was face down in the cement, with Agent DESTEFANO's full body weight on top of him. Despite JULIO posing no threat whatsoever, Agent DESTEFANO used his right arm and thrust it into JULIO's ribcage. In doing so, Agent DESTEFANO placed extreme pressure onto JULIO's ribcage and lungs, which forcefully compressed JULIO's chest and torso into the pavement. JULIO again lost consciousness and his body went limp.

191)    When other officers arrived on scene, despite JULIO continuing to pose no threat whatsoever (he was going in and out of consciousness, critically injured, and his hands were secured in handcuffs behind his back, Agent DESTEFANO was still on top of him, JULIO was face down in the cement walkway, and there were three officers on scene at this point - Agent DESTEFANO, Defendant OFFICER ENBERG, and Defendant SGT. GREEN), Defendant PAPD Officers continued to sadistically assault JULIO and verbally chastise the critically injured JULIO. Defendant OFFICER ENBERG, like Agent DESTEFANO had done just moments before, utilized a wrist-lock *arrest control technique* on JULIO's wrist to sadistically inflict

40

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1  pain and harm on the helpless JULIO. Defendant OFFICER ENBERG was the second officer to abuse this

2  technique that is reserved for people who are unrestrained and actively resisting (not individuals who are

3  critically injured and have their hands secured in locked handcuffs behind their back).



16  192)    Defendant PAPD officers included, but were not necessarily limited to Defendants Agent

17  DESTEFANO, SGT. ALANIZ, SGT. GREEN, OFFICER JOHNSON, OFFICER ENBERG, OFFICER

18  CONNELLY, and DOES 1-75, inclusive, perpetrated additional assaults upon the injured, handcuffed, and

19  completely dazed JULIO (who was in and out of consciousness due to the facial fracture, large lacerations,

20  traumatic brain injury, and other injuries).

21  193)    Despite JULIO's hands being secured in locked handcuffs and posing no threat to officers, one

22  officer twisted JULIO's wrist into a "pain compliance technique" to inflict further pain and suffering upon

23  JULIO. Agent DESTEFANO and other officers continued to chastise and rebuke the handcuffed JULIO as

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

JULIO unintelligibly and helplessly gurgled and moaned on the pavement and cried out in pain due to the unnecessary and painful acts of violently twisting JULIO's hands and wrists.

194)    At one point, Agent DESTEFANO sarcastically and sadistically yelled at the clearly critically injured and barely conscious JULIO, "Are you going to be cool? Because you're under arrest".

195)    JULIO was going in and out of consciousness and clearly unaware of what was going on. His eyes were closed and he would moan, and then lose consciousness again. Despite JULIO's critical state, Agent DESTEFANO taunted JULIO and told him to "Stop acting stupid." … "there's a bunch of cops coming"

196)    The three police officers on scene did nothing to stop Agent DESTEFANO and instead participated in the continued assaults of JULIO. The officers began mocking JULIO and peppered him with insults and profanity as they violently yanked him around and eventually yanked him to his feet.

197)    Agent DESTEFANO never reported to the officers on scene that JULIO had lost consciousness.

198)    None of the other officers who personally observed JULIO going in and out of consciousness made mention of the extent of JULIO's injuries (Agent DESTEFANO, SGT. GREEN, and OFFFICER ENBERG).

199)    Agent DESTEFANO, an experienced police officer, didn't ask for the fire department or paramedics to come to the scene to render assistance to JULIO after DESTEFANO traumatically injured JULIO, caused JULIO to lose consciousness, and despite the fact that JULIO was going in and out of consciousness, and despite JULIO gurgling and moaning in pain when he would regain momentary but altered consciousness. Instead, Agent DESTEFANO talked down to JULIO and demeaned JULIO. He continued to assault JULIO. He began his elaborate concoction of a false narrative to falsely inculpate JULIO and in doing so, elevate his (Agent DESTEFANO's) own status among PAPD.

200)    Agent DESTEFANO never told any of the officers or medics that JULIO's head been slammed into the pavement and that JULIO lost consciousness.

42

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

201)     None of the Defendant PAPD Officers who later arrived on scene and observed JULIO going in and out of consciousness appeared to adequately or properly tend to or allow fire and medics to properly tend to JULIO in a timely fashion, given JULIO's critical and fragile state.

202)     It wasn't until roughly 8-9 minutes later that *another* person on scene asked the dispatcher to have medics come to the scene. And, even when fire and medics responded, Agent DESTEFANO further prevented JULIO from receiving appropriate and proper medical care by failing to be honest and forthcoming with fire and medics about the nature and extent of JULIO's injuries and mechanism of his injuries.

203)     When Defendant PAPD Sgt. GREEN (or another officer on scene) was on scene, the dispatcher asked him (via police radio) to explain the extent of JULIO's injuries so that the dispatcher could let the fire department know.

204)     Instead providing this information to the dispatcher, Defendant PAPD SGT. GREEN (or one of the other officers and supervisors on scene)  further delayed the relaying of this information and apparently in an attempt to conceal the true extent of JULIO's injuries from the unencrypted police radio airwaves, advised the dispatcher that he would call dispatch and explain. He minimized the situation and told dispatch that JULIO was suffering from a bloody nose.

205)     Instead of immediately taking JULIO to the hospital to treat his traumatic injuries and instead of telling the fire and medic personnel who eventually arrived on scene that JULIO was just previously going in and out of consciousness after Agent DESTEFANO body slammed JULIO head first into the pavement (and caused JULIO to lose consciousness), Defendants continued their pursuit to conceal Agent DESTEFANO's violent and unwarranted attack and their endeavor to falsely inculpate JULIO.

206)     Instead of seeking proper medical care for the critically injured JULIO, Agent DESTEFANO *arrested* JULIO on spurious charges and took him to the police station in Agent DESTEFANO's patrol car,

43

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

despite JULIO's damaged and critical state and in Agent DESTEFANO's endeavor to concoct a criminal case against JULIO as a means of concealing Agent DESTEFANO's unlawful, brutal, and violent exhibition of deadly force against JULIO.

207)    While at the police station, JULIO continued to exhibit signs of extreme head trauma and distress. JULIO was in severe medical distress and in need of immediate emergency medical attention. And, given JULIO's head injury and other traumatic injuries, it was incumbent upon Agent DESTEFANO to timely and accurately relay the extent of JULIO's condition, injuries, and the method of injuries to medical personnel. But, Agent DESTEFANO failed to do so. Instead, Agent DESTEFANO continued to ignore, conceal, and prevent JULIO from receiving adequate medical treatment, which, in the critical hours after an individual suffers a traumatic brain injury, is vital in terms of an individual's long-term prognosis.

208)    It wasn't until nearly two-hours later that Agent DESTEFANO finally took JULIO to the hospital, where he was immediately admitted into the emergency room, placed in a C-Spine collar, and treated for the critical injuries he sustained during the violent attack. The critical hours after suffering a traumatic brain injury had lapsed for nearly two hours before JULIO was taken to the emergency room.

209)    Despite a furious, thorough, and desperate search of the Happy Donut parking lot, JULIO's backpack, JULIO's clothing, and other personal effects by Defendant PAPD officers, nothing illegal was located (as JULIO wasn't doing anything illegal). No contraband was located in JULIO's possession - constructive or actual – because JULIO didn't have anything in his possession.

210)    Agent DESTEFANO did not suffer any injuries whatsoever. No police officers were injured.

211)    Yet, JULIO suffered traumatic lacerations, a fracture, a traumatic brain injury, sprains, bruises, and a multitude of other physical injuries. All because he wanted to avoid an interaction with a police officer who JULIO knew had a well-established history of doing this to other people like JULIO.

44

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

212)    Agent DESTEFANO and PAPD nonetheless coordinated and conspired to and did in fact concoct a sham criminal case against JULIO. PAPD and Agent DESTEFANO recommended the District Attorney's Office charge JULIO with a number of criminal offenses, including resisting arrest, assaulting an officer, and under the influence. However, **the Santa Clara County District Attorney's Office declined to press any charges against JULIO.**

213)    Unbeknownst to Agent DESTEFANO, his unlawful and violent police actions leading up to and during the violent attack on JULIO were captured on camera (surveillance cameras from the donut shop).

214)    Before knowing his actions before, during and after the attack on JULIO were captured on the Happy Donuts surveillance camera, Agent DESTEFANO drafted a police report (PAPD Report No. 19-3674).

215)    In his police report, Agent DESTEFANO included a number of falsifications (a report that Agent DESTEFANO wrote before he knew that his actions were captured on camera at Happy Donuts and before he knew his actions would be scrutinized, in part, in the form of comparing the facts and chronology of events as described in his report to the dispatch audio). Agent DESTEFANO's fabrications (had they been true), *shockingly*, in every single instance, inculpate JULIO and exculpate DESTEFANO of any wrongdoing.

216)    In his police report, Agent DESTEFANO claims to have observed JULIO in what Agent DESTEFANO stated he believed to be a "hand to hand" (drug transaction) involving JULIO. Agent DESTEFANO wrote in his report that prior to contacting JULIO, he (Agent DESTEFANO), *"observed Arevalo walk over to an **unknown Hispanic male** adult in the parking lot and quickly touch his hand."*

217)    However, the Happy Donut surveillance footage establishes that this never occurred and this was therefore a complete fabrication by Agent DESTEFANO.

45

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

218)    No such "hand to hand" transaction or any touching of hands between JULIO and *any* other person ever occurred, yet Agent DESTEFANO, in no uncertain terms, said he saw JULIO touch hands with a "Hispanic male".

219)    Agent DESTEFANO not only put false information in his report (stating in his report that he saw JULIO touch hands with not just *any person*) Agent DESTEFANO wrote (false) information into his report stating that he saw JULIO touch hands with an unknown *Hispanic* male in this possible "hand to hand" drug transaction (that never occurred).

220)    The police radio/dispatch recordings provide further insight into the plethora of fabrications that Agent DESTEFANO included in his police report, apparently as a means of trying to justify his violent and unlawful actions on July 10, 2019.

221)    The dispatch recording makes clear that it wasn't until well **after** the unlawful arrest, detention, and until well *after* the most violent assaults on JULIO that a PAPD officer asked PAPD dispatch to run JULIO's name to check on the terms/conditions of any probation grants.

222)    Agent DESTEFANO wrote in his report that upon seeing JULIO, he (Agent DESTEFANO) "was aware Arevalo was on two active grants of Santa Clara County probation with search/seizure" (prior to initiating the detention and violently attacking JULIO).  However, Agent DESTEFANO never refers to JULIO by name until *after* the actual arrest and detention. Agent DESTEFANO never makes mention to any of the other officers on scene that JULIO is on "two active grants of probation", Agent DESTEFANO never tells any of the other officers on scene that JULIO is on  "two active grants of probation", and Agent DESTEFANO never makes any mention (to any other officers on scene) that JULIO is on probation with search terms. And, in reviewing the police dispatch audio recordings, it is clear that Agent DESTEFANO neither knew JULIO's name at the time he unlawfully detained and attacked JULIO nor did Agent DESTEFANO know that JULIO was on probation (let alone whether the probation grant or grants contained

46

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

search/seizure terms). Instead, Agent DESTEFANO apparently suspected JULIO was on probation when he decided to unlawfully detain JULIO, and thereafter looked up JULIO's name and ran his name a significant amount of time after he had already detained and brutally attacked JULIO. Similarly, on information and belief, Agent DESTEFANO didn't know whether JULIO was in fact on probation (let alone whether any probation grants included search and seizure terms) until well after he had already detained, arrested, brutally assaulted, and critically injured JULIO.

223)    Agent DESTEFANO instead apparently attempted to justify in his report his unlawful and violent detention, arrest, and violence towards JULIO by falsely claiming that he was aware of certain information before the detention/arrest/attack (when in fact Agent DESTEFANO looked it up afterwards).

224)    Specifically, it isn't until roughly 10-minutes *AFTER* Agent DESTEFANO advised dispatch that he had "one detained" (which occurred after Agent DESTEFANO violently attacked and gravely injured JULIO) that the officers on scene actually asked dispatch to run JULIO's name and date of birth.

225)    And, it wasn't until roughly 27-minutes *AFTER* Agent DESTEFANO advised dispatch that he had "one detained"/it wasn't until roughly 27-28 minutes after Agent DESTEFANO slammed JULIO onto the ground and rendered JULIO unconscious that Agent DESTEFANO asked dispatch to advise regarding the terms of JULIO's probation.

226)    Specifically, 27-minutes after Agent DESTEFANO had already detained, arrested, attacked, and injured JULIO, Agent DESTEFANO used his police radio to ask dispatch "Can you run Arevalo's terms of probation?" (and thereafter, the dispatcher informed Agent DESTEFANO of the terms).

227)    Defendant PAPD Lieutenant Ben BECCHETTI (in a PAPD Memorandum dated December 11, 2019) was apparently one of the PAPD administrators who conducted an *investigation* into Agent DESTEFANO's conduct. In said memorandum, Defendant LT. BECCHETTI concluded that Agent

47

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

DESTEFANO's use of force and violent attack on JULIO was justified and the level/amount of force used was reasonable.

228)     This is one of many examples of PAPD's flawed and conflicted system of investigating allegations of misconduct.

229)     On information and belief, Defendants PAPD LT. BECCHETTI and Agent DESTEFANO appear to be good friends outside of PAPD.

230)     They have traveled together to Las Vegas (along with a number of other PAPD peace officers) and, on information and belief, PAPD LT. BECCHETTI was a groomsman in Agent DESTEFANO's wedding (see photos below):



48

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.





Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

231)     Despite the apparently close relationship as between AGENT DESTEFANO and LT. BECCHETTI and despite the fact that it is a clear conflict of interest for Defendant LT. BECCHETTI to be the trier of fact and law in an investigation of AGENT DESTEFANO (a conflict that would clearly prevent LT. BECCHETTI from conducting a thorough, objective, honest, and fair adjudication of a misconduct investigation of Agent DESTEFANO), Defendants CHIEF JONSEN, PAPD and the CITY OF PALO ALTO empowered and endorsed this process.  This clear conflict of interest was neither mentioned nor did it stop Defendant LT. BECCHETTI from being a final decision maker with respect to the disposition of the investigation of his good friend, Agent DESTEFANO and Agent DESTEFANO's July 10, 2019 attack on JULIO.

232)     And, Defendants PAPD, CHIEF JONSEN, and LT. BECCHETTI's biased and insincere findings make clear that the conflict of interest tainted his ability to objectively and honestly investigate his friend and co-worker (Agent DESTEFANO), as evidenced by the fact that he determined Agent DESTEFANO did not use excessive force against JULIO (despite clear and objective evidence of unlawful and unwarranted excessive and deadly force used by Agent DESTEFANO against JULIO).

233)     Defendant PAPD LT. BECCHETTI not only failed to conduct an objective investigation with respect to the use of force components of the misconduct allegations, he also failed to properly investigative and adjudicate the dishonesty and police report fabrications perpetrated by Agent DESTEFANO.

234)     In his memorandum regarding his findings, Defendant PAPD LT. BECCHETTI minimized and failed to properly label Agent DESTEFANO's falsifications regarding Agent DESTEFANO's inclusion of the false "hand to hand" drug transaction information (involving a make-believe "unknown **Hispanic** male") in his police report by describing Agent DESTEFANO's written falsifications as mere *"discrepancies between the reports and videos reviewed"*.

50

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

235)   Following the arrest of JULIO AREVALO on July 10, 2019 Defendant PAPD SFT. GREEN interviewed JULIO in the back of the patrol car as part of a USE OF FORCE *investigation* regarding the force that was used on JULIO and in response to the critical and great bodily injuries suffered by JULIO at the hands of Agent DESTEFANO.

236)   It is unclear whether SGT. GREEN *Mirandized* JULIO prior to the conversation.

237)   On information and belied, the USE OF FORCE investigation/report was not apparently submitted to PAPD CAPTAIN ANDREW BINDER for review until December 11, 2019, 5 months following the incident.

238)   Defendant SCHEFF is the records supervisor at PAPD. Undersigned counsel, on behalf of JULIO repeatedly failed to follow the law when Defendant SCHEFF repeatedly failed to fulfill CA Public Records Act Requests submitted by undersigned counsel, on behalf of JULIO, for a number of records, including Body Worn Camera Footage and other records relating the July 10, 2019 incident.

239)   Furthermore, despite PAPD having completed the use of report on December 11, 2019, the report was *still* not made public for another 6 months until June of 2020 despite multiple requests pursuant to California Senate Bill 1421.

240)   Senate Bill 1421 Section 1(b) states: "The public has a right to know all about serious police misconduct, as well as about officer-involved shootings and other serious uses of force. Concealing crucial public safety matters such as officer violations of civilians' rights, or inquiries into deadly use of force incidents, undercuts the public's faith in the legitimacy of law enforcement, makes it harder for tens of thousands of hardworking peace officers to do their jobs, and endangers public safety."

241)   With respect to this incident, Defendants CITY, PAPD, and SCHEFF violated the California Public Records Act and California Senate Bill 1421 for almost an entire year.

51

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

242)     On July 15, 2019, five days after the PAPD assault of JULIO AREVALO, undersigned counsel submitted the following request to The Palo Alto City Attorney's Office, CITY OF PALO ALTO, and PAPD, which included the following language:

1. Any and all audio and video footage related to the referenced incident. This includes, but is not limited to any and all BWC (body worn camera footage) – both audio and video, any and all MAV (Mobile Audio/Video footage) – both audio and video, any and all audio and video recordings, and any and all other audio and video recordings;

2. Please note that pursuant to CA Govt. Code §6254, "...disclosure of a recording related to a critical incident may be delayed for no longer than 45 calendar days after the date the agency knew or reasonably should have known about the incident" and such delay may only be utilized "if, based on the facts and circumstances depicted in the recording, disclosure would substantially interfere with the investigation, such as by endangering the safety of a witness or a confidential source." Further, "If an agency delays disclosure pursuant to this paragraph, the agency shall provide in writing to the requester the specific basis for the agency's determination that disclosure would substantially interfere with the investigation and the estimated date for disclosure."

3. Any/all records related to any investigation into the use of force by one or more peace officers employed by PAPD against a person or persons that resulted great bodily injury. This includes records pertaining to on duty and off duty incidents;

4.  CAD (Computer Aided Dispatch) records relating the incident;

5. Any/all records pertaining to the use of force incident referenced above, being the incident resulted in great bodily injury but not death.

52

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

6.   The individual's physical description including date of birth, color of eyes and hair, sex, height and weight, the time and date of arrest, the time and date of booking, the location of the arrest, the factual circumstances surrounding the arrest, the amount of bail set, the time and manner of release or the location where the individual is currently being held, and all charges the individual is being held upon, including any outstanding warrants from other jurisdictions and parole or probation holds.

243)    Despite the fact that California law requires that, at a minimum, the Body Worn Camera footage be released within 45-days of a request for such, it wasn't until late June 2020 that Defendant SCHEFF, the City of Palo Alto, and PAPD actually released portions of the body worn camera footage and portions of their use of force reports.

244)    This is clear evidence of the pervasive "Culture of Cover Up" that exists not only within the Palo Alto Police Department but throughout the entirety of the PALO ALTO CITY OF PALO ALTO government.

**PAPD'S PATTERN OF POLICE SPONSORED VIOLENCE, DISHONESTY, DENIAL OF PROPER MEDICAL TO CRITICALLY INJURED VICTIMS, AND CORRUPTION HAS BEEN TOLERATED, PROTECTED, PROMOTED, REWARDED, AND ENCOURAGED FOR YEARS BY THE CITY OF PALO ALTO, PALO ALTO POLICE DEPARTMENT, PAPD CHIEF JONSEN, AND OTHER HIGH RANKING PAPD AND CITY OFFICIALS**

245)    Defendants PAPD and the CITY OF PALO ALTO have a time-tested pattern and practice of targeting minorities and committing unconstitutional violations against minorities and then covering it up. This epidemic has become the norm at the CITY OF PALO ALTO and PAPD for at least the past 20-30 years.

53

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

246)     Over 17 years ago (March 2003), a report found that **blacks and Latinos were "two to three times as likely as whites or Asians to be searched when they came into contact with Palo Alto police"**.[4]

247)     And, Defendants PAPD Agent DESTEFANO, PAPD, and the CITY OF PALO ALTO are no strangers to this Court and other courts (in their capacities as *defendants*), as a direct result of their incorporation of these unconstitutional patterns and practices.

248)     Both PAPD and Agent DESTEFANO have an individual and collective established history, pattern, and practice of violating individuals' constitutional rights, targeting individuals for their race, targeting individuals due to their sexual orientation, targeting individuals for their socio-economic status, falsifying evidence, destroying and concealing exculpatory evidence, using excessive and deadly force when the circumstances do not warrant such, and violently injuring individuals who are unlawfully detained by PAPD or detained for minor/non-violent offenses and do not pose a threat to officer safety of public safety.

249)     Agent DESTEFANO has a very clear history of escalating what would otherwise be insignificant and peaceful police contacts. Instead, when Agent DESTEFANO is involved, for sport, he violently escalates peaceful and mild interactions and citizen contacts into violent attacks on residents who are thereafter plagued with deformities, physical trauma, and emotional damage for life, and oftentimes find themselves facing criminal charges that are based upon Agent DESTEFANO's falsifications.

250)     The CITY OF PALO ALTO, PAPD, and CHIEF JONSEN are well aware of and endorse Agent DESTEFANO's unlawful and dishonest practices, as evidenced by the fact that, despite his clear pattern of violence and dishonesty, he remains employed as a police officer with PAPD (and was actually promoted after some of the troubling incidents).

---

[4] https://www.paloaltoonline.com/weekly/morgue/2003/2003_08_01.cops01jtja.html

54

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

251)     This includes an incident when DESTEFANO was arrested and/or prosecuted (off duty) for a "hit and run" (leaving the scene of a traffic collision without stopping to exchange information), his criminal and belligerent conduct, as well as his propensity for dishonesty, violence, and excessive force.

252)     By failing to properly discipline, terminate, and punish this conduct and by failing to properly train, supervise, discipline, and/or properly and honestly investigate complaints and/or charges against Agent DESTEFANO, Defendants CITY OF PALO ALTO and PAPD, Defendant CHIEF JONSEN and Defendant LT. BECCHETTI, and DOES 1 thru 75 foster and continue to foster a police agency that tolerates, encourages, and rewards dangerous police officers like Agent DESTEFANO, the foreseeable result is exactly within the scope of what happened to JULIO – citizens get maimed and wind-up with lifelong traumatic physical, emotional, and cognitive injuries.

253)     Despite Agent DESTEFANO's repeated violent and unconstitutional tirades, Defendants PAPD, CITY OF PALO ALTO, CHIEF JONSEN, LT. BECCHETTI, and DOES 1 through 75, inclusive, have helped Agent DESTEFANO conceal Agent DESTEFANO's unlawful and violent constitutional violations. And, they have in fact rewarded Agent DESTEFANO for his behavior by granting him specialty assignments and giving him promotions when, in any healthy police agency or municipality, he would have been terminated long ago (or perhaps he would have never been hired in the first place).


# 2013
# Then PAPD *Officer* DeStefano's Violent Attack on Tyler Harney

254)     With respect to Agent DESTEFANO, DESTEFANO has a propensity and established history of dishonesty and clear and known pattern of engaging in (oftentimes) racially motivated, unlawful and unconstitutional practices in his role as a PAPD police officer and mid-level supervisor ("Agent" rank).

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

255)    Defendants CITY and PAPD, Defendant CHIEF JONSEN, Defendant LT. BECCHETTI were and are aware of Agent DESTEFANO's documented history of violence and dishonesty. Their ratification of his past violent conduct under the color of authority and ratification of his past dishonesty allowed and continues to allow Agent DESTEFANO to work on full active duty status as a police officer with the City of Palo Alto and PAPD, and to victimize and terrorize individuals, including Latino and underprivileged residents like JULIO.

256)    This includes, but is not limited to Agent DESTEFANO's past violent assault of a young man named Tyler Harney (in 2013) while Mr. Harney was suffering from an epileptic seizure. Instead of seeking medical assistance for Victim HARNEY, Agent DESTEFANO violently physically assaulted Mr. Harney while Mr. Harney was having a seizure.

257)    Despite a number of Mr. Harney's friends telling Agent DESTEFANO that Mr. Harney was having a seizure and needed help, Agent DESTEFANO persisted with his violent attack on Victim HARNEY as Mr. Harney was seizing and posed no threat to officer or public safety.

258)    As a result of Agent DESTEFANO's unlawful and violent attack on Mr. Harney, Mr. Harney suffered fractures to his arm, requiring at least three surgeries, as well as a sprained left wrist, pain in his ankles due to tight shackles, nerve damage to his left arm and hand, and bruises to his face, neck and back.

259)    Tyler Harney also suffered emotional distress, fear, anxiety, humiliation, loss of personal reputation, embarrassment, medical expenses, loss of income, and loss of physical liberty.

260)    This occurred when two PAPD officers (Agent DESTEFANO and another officer) pushed Tyler Harney face forward against a squad car to arrest him and Tyler Harney immediately began to convulse uncontrollably as a result of a pre-existing seizure disorder.

56

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

261)     Rather than immediately provide medical assistance to Tyler Harney, Agent DESTEFANO and another officer forced Tyler Harney to the ground, face first, in a very similar fashion that Agent DESTEFANO did this to JULIO six-years later (in the present matter).

262)     Agent DESTEFANO or the other PAPD officer put his knee forcefully against plaintiff's back and neck while Agent DESTEFANO or the other PAPD officer then pulled and twisted back on Tyler Harney's right arm and continued to do so while saying 'stop, or I'm going to break your arm,' or other similar words. Again, these actions (nearly six years before the attack by Agent DESTEFANO on JULIO) are disturbingly similar to Agent DESTEFANO's attack and conduct on Plaintiff JULIO in 2019.

263)     Although Tyler Harney was not a resident of the Buena Vista Mobile Home Park, he frequented the mobile home park as a visitor as a number of his friends lived there.

264)     The collective actions of Agent DESTEFANO and the other officer did in fact severely break Tyler Harney's arm.

265)     Tyler Harney was *ultimately* taken to Stanford Hospital to be treated for fractures to his left humerus bone.

266)     In the associated civil rights lawsuit against PAPD (United States District Court, Northern District of California C-14-3415), the City of Palo Alto, Agent DESTEFANO, and other PAPD personnel, it was alleged that Tyler Harney was deprived of his state and federal constitutional rights "to be free from unreasonable searches and seizures, to be free from wrongful government interference with his freedom of expression and freedom of assembly and association, and to be free from bodily restraint and harm from personal insult and injury to personal relations."

267)     Tyler Harney did not commit the crimes he was arrested for: battery on a police officer and resisting or obstructing a police officer (again, standalone obstruction charges accompanied by use of force – the exact circumstances the U.S. DOJ determined require a heightened level of scrutiny) and at all material

57

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

times, Tyler Harney acted peacefully and lawfully, never threatened any person, and never interfered with any police officer.

268)   Similarly, in the present case and circumstances, JULIO did not commit the crimes he was arrested for: battery on a police officer, resisting or obstructing a police officer, and under the influence, and at all material times, JULIO acted peacefully and lawfully, never threatened any person, and never interfered with any police officer.

269)   Due to PAPD and Agent DESTEFANO's violent actions in the Tyler Harney incident, this resulted in a $250,000.00 settlement by the City of Palo Alto to Mr. Harney, yet DESTEFANO kept his job. At that time, he held the rank of "officer" with PAPD.

270)   Instead of terminating/firing Agent DESTEFANO, PAPD subsequently rewarded and promoted Agent DESTEFANO to a specialty assignment/task force and thereafter promoted DESTEFANO to the mid-level supervisor rank of "Agent".

## 2017
## PAPD Officer DeStefano's Off-Duty Hit & Run, DeStefano's Obstruction of the Related Police Investigation, Criminal Prosecution of DeStefano, and Related Dishonesty

271)   Next, PAPD's tolerance, acceptance, and ratification of Agent DESTEFANO's criminal conduct persisted well after the Tyler Harney incident.

272)   This includes Agent DESTEFANO's 2017 involvement in a hit and run traffic collision where he repeatedly lied and about his involvement to the San Jose police officers investigating the incident and in fact fabricated a story to try to obstruct the San Jose Police investigation (all while Agent DESTEFANO was under the influence of alcohol/intoxicated).

58

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

273)    On January 9, 2017, San Jose Police Department officers (SJPD Report 2017-170090526) responded a "hit & run" traffic collision call in San Jose where the victim reported that a male (later identified as Defendant PAPD Agent DESTEFANO) was driving recklessly, ran into a parked car (causing damage), and then fled the scene.

274)    The suspect/driver was later identified as Agent DESTEFANO.

275)    When the victim (the individual who owned the parked car that Agent DESTEFANO ran into and damaged before Agent DESTEFANO fled the scene) contacted Agent DESTEFANO, Agent DESTEFANO lied to the victim and denied his involvement in the collision. And, Agent DESTEFANO in fact made-up/fabricated a story to protect himself and told the victim that his (Agent DESTEFANO's) car was also struck by the same unknown assailant.

276)    The victim was informed by a witness that Agent DESTEFANO was lying and that the third-party witness had in fact seen Agent DESTEFANO crash into the victim's parked vehicle, exit his vehicle, inspect the damage, and thereafter leave the scene.

277)    The victim then called the San Jose Police Department to report the hit and run/collision and San Jose Police officers responded to investigate.

278)    When San Jose Police contacted Agent DESTEFANO the first time, Agent DESTEFANO lied to them and denied involvement in the traffic collision/hit and run. Agent DESTEFANO crafted a (false) story about his truck also being struck by the assailant (that, true to DESTEFANO's pattern, if believed, would have falsely inculpated another person, while improperly exculpating DESTEFANO of any wrongdoing).

279)    San Jose Police officers noted that Agent DESTEFANO had **"slow, slurred, and raspy speech. He [DESTEFANO] had odor of alcohol coming from his breath and was swaying from side to side."**

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

280)    Agent DESTEFANO's *first* fabricated story to San Jose Police officers was that his parked vehicle had been side-swiped and provided an elaborate story about hearing a "bang" and then coming out to his car and noticing that his car and his neighbor's car were "screwed up" (all of this was determined to be false).

281)    A (sober) witness told police that he heard a vehicle "screeching its tires" and saw Agent DESTEFANO's truck leaving the area. The witness again heard Agent DESTEFANO's vehicle's tires screeching and turned around and heard a loud noise. He saw Agent DESTEFANO almost strike another vehicle as Agent DESTEFANO parked.

282)    San Jose Police then re-contacted Agent DESTEFANO and confronted him with the witness statement (i.e. they told Agent DESTEFANO they knew he was lying when he said he wasn't involved and when he said another person actually ran into his car as well).

283)    San Jose Police Officers attempted to take Agent DESTEFANO's statement, but Agent DESTEFANO was "uncooperative".

284)    San Jose Police Officers told Agent DESTEFANO he was "not cooperating with the investigation".

285)    Later on, Agent DESTEFANO called San Jose Police again and told them he wanted to provide a statement. When they again responded to his residence, he again lied and told the police that "he did not hit anyone" and that "he did not even remember driving the truck and he does not remember hitting the car."

286)    Despite the San Jose Police officers "remind(ing) him (DESTEFANO)" that "his story had changed a few times" and telling him "he needed to be honest", he continued to perpetuate his false statements to the investigating police officers, again, in a manner that falsely blamed a third-party for the collision while falsely relieving DESTEFANO of wrongdoing, if his lies would have been believed *in this instance*.

287)    San Jose Police determined Agent DESTEFANO was lying and sent the case to the Santa Clara County District Attorney's Office for review.

60

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

288)   Agent DESTEFANO was charged with misdemeanor hit and run (Superior Court of California, County of Santa Clara Case No. C1758065).

289)   The CITY OF PALO ALTO and PAPD conducted an internal affairs investigation.

290)   Despite the fact that Agent DESTEFANO was very likely driving while intoxicated, despite his repeated acts of dishonesty, despite DESTEFANO's falsification of evidence during a law enforcement investigation, despite his various criminal violations, despite his probable driving under the influence, and despite his past misconduct (i.e. *at least* the Harney incident), Agent DESTEFANO not only kept his job as a police officer with PAPD, **he was subsequently promoted** to the rank of "Agent" (where he now supervises and trains new police officers).

## 2018
## Palo Alto Police Department's (and Agent DeStefano's) Violent Assault of Gustavo Alvarez and Covering Up of Gustavo Alvarez Incident

291)   Agent DESTEFANO's less than stellar conduct didn't end in 2018.

292)   In fact, Agent DESTEFANO was directly involved in and present for the violent and unlawful arrest, assault, and covering up by PAPD of an attack upon Gustavo Alvarez, a gay Latino resident of Palo Alto (and, like JULIO, ALVAREZ was a Latino associated with the low-income Buena Vista Mobile Home Park).

293)   In the ALVAREZ incident, PAPD officers, including Agent DESTEFANO, lied, failed to intervene, failed to report the other officers' unlawful uses of force, and concealed their unlawful actions, without realizing their actions were captured (audio and video) on ALVAREZ's home surveillance camera.

294)   Agent DESTEFANO, along with a number of other officers (including a number of the PAPD personnel/officers named in this action - including, but not limited to SGT. ALANIZ and OFFICER

61

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

JOHNSON), unlawfully detained ALVAREZ on suspicion of driving on a suspended license and thereafter kicked in ALVAREZ's front door (while ALVAREZ was trying to come out and comply with PAPD's unlawful demands), violently assaulted him, concocted a criminal case against ALVAREZ, and perpetrated a number of other atrocities (this includes the on scene supervisor, now *honorably retired* PAPD Sergeant Wayne BENITEZ mocking ALVAREZ for being gay).

295)   The CITY OF PALO ALTO settled ALVAREZ's civil rights lawsuit for $572,500.00 and as a term of the settlement every peace officer with PAPD had to complete a two-hour LGBTQ awareness course. And, PAPD Sergeant Wayne BENITEZ had to write a letter of apology to ALVAREZ, in which BENITEZ admitted that he "lost (his) composure".

296)   In the ALVAREZ incident, or around February 17, 2018, OFFICER CONDE of PAPD was on duty and on patrol in the City of Palo Alto.

297)   The patrol supervisor/sergeant who was supervising OFFICER CONDE was then PALO ALTO POLICE SGT. WAYNE BENITEZ.

298)   On information and belief, the on duty acting lieutenant was PALO ALTO POLICE SGT. ADRIENNE MOORE, the on-duty supervisor of SGT. BENITEZ and the other PAPD officers.

299)   Agent DESTEFANO was an active participant on scene in the unlawful detention, arrest, assault(s), abuse, harassment, threatening, and other unlawful actions perpetrated against ALVAREZ on February 17, 2018.

300)   Agent DESTEFANO participated in and failed to intervene, document, report, or otherwise stop the violent attack on ALVAREZ, and was a co-conspirator in the attempted concealment and covering-up of the violent PAPD assault on ALVAREZ.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

301)     Defendant PAPD SGT. ALANIZ was an active participant on scene in the unlawful detention, arrest, assault(s), abuse, harassment, threatening, and other unlawful actions perpetrated against ALVAREZ on February 17, 2018.

302)     Despite the fact that the video(s) and information about the Alvarez case were highly publicized (videos showing SGT. BENITEZ, Agent DESTEFANO and the other officers' blatantly illegal and shockingly violent conduct), the Palo Alto Police Officers Association did not publicly condemn SGT. BENITEZ's actions and was in fact celebrated by the CITY OF PALO ALTO, PAPD, and CHIEF JONSEN and rewarded with an honorable retirement (BENITEZ collects a six figure pension).

303)     Despite the fact that the video(s) and information about the ALVAREZ case have been highly publicized (videos showing PAPD officers blatantly illegal and shockingly violent civil rights violations and criminal conduct), the CITY OF PALO ALTO and the CITY OF PALO ALTO POLICE DEPARTMENT have failed to take appropriate action and have in fact made it a clear pattern and practice of tolerating, encouraging, and rewarding unlawful behavior by its officers.

304)     Agent DESTEFANO was not only an active participant in the physical attack upon ALVAREZ, Agent DESTEFANO was an active participant in concealing, covering up, lying, mischaracterizing, and withholding information and evidence in relation to the events that occurred on or around February 17, 2018.

305)     BENITEZ was and is a highly regarded and celebrated PAPD officer, even in light of his unconstitutional, racist, homophobic, and violent conduct towards ALVAREZ, under the color of authority. Then PAPD SGT. BENITEZ was previously the president of the Palo Alto Police Officers Association for five years, he had been a board member of the Palo Alto Police Officers Association for 12+ years, he had served as a Field Training Officer, a School Resource Officer, a Team Leader for the PAPD SWAT Team, was in charge of the PAPD Reserve Officer program, was a board member in the North Santa Clara County

63

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Gang Task Force, was a Terrorism Liaison Officer, was assigned to the PAPD special operations bureau, and *held* "secret clearance" through the FBI/Federal Bureau of Investigation (but, on information and belief, is now under investigation by the FBI in relation to his conduct during the ALVAREZ incident).

306)   On information and belief, the vast majority of PAPD not-so-quietly endorses and celebrates BENITEZ's criminal conduct under color of authority and essentially feels that ALVAREZ deserved the beating and cover-up he was subjected to by PAPD.

307)   On or around February 17, 2018 PAPD OFFICER CONDE was wearing a full police uniform and was driving a marked police vehicle. At approximately 10:23 PM, OFFICER CONDE observed a vehicle driving west on the 600 block of Los Robles Avenue in the City of Palo Alto.

308)   OFFICER CONDE could not see or identify the driver of the vehicle. OFFICER CONDE recognized the vehicle as being associated with Plaintiff GUSTAVO ALVAREZ (he claimed that, based on *prior* contacts with ALVAREZ, he knew the vehicle was associated with ALVAREZ). However, again, he never saw ALVAREZ behind the wheel of the vehicle when he allegedly saw the vehicle on the public roadway on February 17, 2018.

309)   At some point, OFFICER CONDE ran a records check as to the *vehicle's registration* on the Mobile Data Terminal/laptop/computer in CONDE's patrol vehicle.

310)   CONDE learned that there was a release of liability on file to ALVAREZ.

311)   This records check was only for the purpose of verifying the registered owner information (as to the *vehicle*) and California Department of Motor Vehicle ("DMV") status of the *vehicle*. The records check was *not* for the purpose of checking the status of ALVAREZ's driver's license and CONDE never attempted to or actually checked ALVAREZ's license status before initiating the detention of ALVAREZ.

312)   OFFICER CONDE did not know if ALVAREZ was the driver of the vehicle.

64

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

313)    OFFICER CONDE never observed ALVAREZ actually driving the vehicle on a public roadway or anywhere else on or around February 17, 2018.

314)    OFFICER CONDE decided to detain ALVAREZ when he saw ALVAREZ on foot in the private driveway near ALVAREZ's parked vehicle, which was parked in the private driveway of ALVAREZ's private residence.

315)    OFFICER CONDE did not know the status of ALVAREZ's *driver's license* at the time OFFICER CONDE unlawfully detained ALVAREZ, but in trying to justify the unlawful detention, OFFICER CONDE offered that he knew ALVAREZ had a driver's license *in the past.*

316)    On or around February 17, 2018, after seeing the vehicle on the roadway, the vehicle went out of view from CONDE for a brief period of time as CONDE attempted to follow the vehicle.

317)    OFFICER CONDE then observed the vehicle parked in the driveway associated with ALVAREZ's family's mobile home, which is located within a mobile home park in the City of Palo Alto.

318)    OFFICER CONDE saw ALVAREZ near the parked vehicle and ALVAREZ was then on foot in ALVAREZ's private driveway.

319)    It wasn't until OFFICER CONDE unlawfully detained ALVAREZ when he (CONDE) *later* learned that there was *at least* one other individual within the vehicle.

320)    Without ever attempting to or actually running a check on ALVAREZ's driver's license, without knowing whether ALVAREZ's license was in fact then suspended, and without ever having actually seen ALVAREZ driving the vehicle on the roadway, OFFICER CONDE proceeded to detain ALVAREZ.

321)    CONDE did not have an arrest warrant, search warrant, or any other lawful means or justifications to detain and arrest ALVAREZ.

322)    CONDE did not use the lights or sirens on his patrol vehicle to detain ALVAREZ (though SGT. MOORE later told ALVAREZ's father it was a full-on traffic stop with lights).

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

323)     Instead, CONDE told ALVAREZ he was detained while ALVAREZ was standing on his (ALVAREZ's) family's private driveway.

324)     OFFICER CONDE later admitted (while testifying under oath during a motion to suppress hearing) that he did not know whether ALVAREZ's license was suspended at that time/when he proceeded to detain ALVAREZ on February 17, 2018.

325)     OFFICER CONDE further testified that he didn't make note of any traffic violations that would have justified the detention and that had he observed any such moving violations, he "probably would have wrote it down."

326)     Prior to initiating the unlawful and warrantless detention of ALVAREZ, OFFICER CONDE never utilized his radio or any other means to try to verify whether ALVAREZ's driver's license was in fact suspended.

327)     Despite the fact that OFFICER CONDE did not know whether ALVAREZ's license was suspended when CONDE decided to unlawfully detain ALVAREZ, CONDE tried to later justify his unlawful detention and subsequent arrest of ALVAREZ by concocting a baseless story to the effect that he had reasonable suspicion to believe that ALVAREZ had a suspended license on February 17, 2018 based upon the fact that CONDE knew that ALVAREZ's license was suspended *in the past*, and that he therefore had reasonable suspicion to detain ALVAREZ. However, during his testimony at the hearing, CONDE admitted that he looked up at least some of the prior contacts with ALVAREZ (the contacts he referenced in the report) after the February 17, 2018 incident.

328)     Specifically, in the police report that OFFICER CONDE drafted, he wrote that he had reasonable suspicion to detain ALVAREZ because he had reasonable suspicion to believe that ALVAREZ's driver's license was suspended.

66

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

329)     The proffered *justification* for the unlawful detention of ALVAREZ amounts to the warrantless detention of a pedestrian on private property due to OFFICER CONDE's mere hunch that ALVAREZ's license was currently suspended due to the fact that CONDE supposedly knew ALVAREZ's was suspended *in the past.*

330)     ALVAREZ was not on probation or parole, there were no active "wants" or warrants, and there was no other legal justification to detain ALVAREZ. Nonetheless, while unlawfully detaining ALVAREZ in ALVAREZ's private driveway, OFFICER CONDE commanded ALVAREZ to submit to the (unlawful) detention and speak with him (CONDE).

331)     CONDE initially told ALVAREZ that he saw him driving the vehicle, despite the fact that he never saw ALVAREZ driving the vehicle.

332)     Just after detaining ALVAREZ in ALVAREZ's driveway, ALVAREZ repeatedly questioned OFFICER CONDE, asking CONDE if he saw ALVAREZ driving the vehicle.

333)     OFFICER CONDE stuttered, stammered, and would not initially answer the question(s) on this point.

334)     At one point, ALVAREZ asked CONDE, "why are you going to detain me? For what?"

335)     OFFICER CONDE replied, "because I know you're driving with a suspended license" (again, this was false, as CONDE later admitted under oath).

336)     Again, OFFICER CONDE never actually observed ALVAREZ driving the vehicle and OFFICER CONDE did not know whether ALVAREZ had a suspended license when CONDE decided to unlawfully detain ALVAREZ.

337)     ALVAREZ also asked OFFICER CONDE if he had a warrant and OFFICER responded to ALVAREZ "you're legally detained" (again, OFFICER CONDE did not have a warrant).

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

338)   OFFICER CONDE eventually admitted to ALVAREZ that he (OFFICER CONDE) never actually saw ALVAREZ driving the vehicle. This admission was recorded (audio and video) on ALVAREZ's home surveillance camera.

339)   Specifically, ALVAREZ asked OFFICER CONDE "Who'd (sic) you know who was driving?" and CONDE replied, "I didn't."

340)   ALVAREZ then proceeded to tell CONDE that he (ALVAREZ) is "not coming down" (to CONDE's patrol car) and ALVAREZ told CONDE, "you cannot come into my house".

341)   ALVAREZ proceeded to close the front door of his home and CONDE returned to his patrol car, which was parked near the edge of ALVAREZ's driveway.

342)   OFFICER CONDE used his police radio and asked for additional police units to respond and at least four additional officers responded to the scene, including CONDE's supervisor, Defendant SGT. BENITEZ.

343)   OFFICER CONDE informed other responding PAPD officers that ALVAREZ was now wanted for driving on a suspended license and resisting/delaying/obstructing a peace officer (California Vehicle Code § 14601 and California Penal Code § 148).

344)   A cadre of PAPD officers, including, but not necessarily limited to OFFICER CONDE's immediate patrol supervisor (Defendant PALO ALTO POLICE SGT. WAYNE BENITEZ), Defendant PALO ALTO POLICE AGENT THOMAS ALAN DESTEFANO JR., Defendant PALO ALTO POLICE OFFICER MATTHEW HUBBARD, and Defendant PALO ALTO POLICE OFFICER JOHNSON (Agent DESTEFANO7745) responded to the scene to assist OFFICER CONDE with the unlawful detention of ALVAREZ.

345)   The Defendant officers were not wearing body worn cameras.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

346)     The Defendant officers were each wearing *microphones* affixed to each of their uniforms that recorded the *audio* of the incident.

347)     Each of their patrol cars were equipped with numerous fixed cameras that point in a multitude of directions. The video footage captured by these fixed cameras syncs with the audio that is captured via the wireless microphones affixed to each of their uniforms. However, when a given officer is on foot and outside of his or her patrol vehicle, the fixed camera(s) on the patrol vehicle will not capture the relevant footage unless the officer places his or her vehicle in a position such that the eye(s) of the cameras point in the direction/directions of the relevant activities and incidents.

348)     On information and belief, as a matter of practice, custom, and procedure, the officers strategically park (and in this case intentionally parked) their patrol vehicles out of view of ALVAREZ's front door, in such a manner and in an intentional effort to evade the camera's eye and officers thereafter engage in certain *verbal* dialogue that, without accompanying video footage, allows them to justify their unlawful actions, mischaracterize the true happenings in a given incident, fabricate stories that paint their conduct in the best light, and conceal unlawful activity in which they engage, as they did here.

349)     However, despite ALVAREZ warning the Defendant officers that they were being recorded (on ALVAREZ's home surveillance camera), the Defendant officers not only continued down an unlawful, destructive and coordinated path of illegal, unprofessional, violent, oppressive, and illegal conduct, the Defendant officers, in drafting the associated police reports, conspired and coordinated to fabricate information, conceal relevant information, violate laws, policies, and procedures, and maliciously and without justification destroy property, take property, detain, arrest, attack, incarcerate, harass, and prosecute ALVAREZ and his personal property.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

350)   With respect to the events that followed, OFFICER CONDE wrote in his police report that "[A]s Ofc Hubbard, Agent DeStefano, Sgt Benitez, and I approached (ALVAREZ)" … he (ALVAREZ) "slammed the front door".

351)   This is one (among many) inconsistencies, falsities, and fabrications that followed [in comparing the police report(s) to the events captured on ALVAREZ's *home surveillance camera*]. Specifically, ALVAREZ's home surveillance audio and video footage tells an entirely different story.

352)   First, ALVAREZ never slammed the door. The door was apparently closed when officers approached the front door, ALVAREZ was inside the residence when the officers approached the front door, and the door remained closed (it was never apparently slammed as the officers were approaching).

353)   Next, the home surveillance video footage shows four officers, Defendant(s) SGT. BENITEZ, AGENT DESTEFANO, OFFICER CONDE, and a fourth unidentified officer (either OFFICER JOHNSON, OFFICER HUBBARD, or OFFICER ALANIZ) storming towards ALVAREZ's front door. A fifth unidentified officer is standing in the roadway (either OFFICER JOHNSON, OFFICER HUBBARD or OFFICER ALANIZ).

354)   The Defendant officers were standing in ALVAREZ's private driveway just outside the closed front door and proceeded to repeatedly yell at ALVAREZ (through the closed front door). The Defendant officers quickly and unnecessarily escalated the unlawful detention into a full-fledged attack on ALVAREZ and his family's residence. The home surveillance cameras and associated video footage shows the following events:

    a)   The officers began yelling for ALVAREZ to "come on out" ... and AGENT DESTEFANO screamed and threatened, "or we're gonna break down the door!"

    b)   ALVAREZ replied through the closed front door by saying, "it's recording."

    c)   Defendant AGENT DESTEFANO again replied, "Come on out or we're gonna kick the door in!"

70

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

d)  ALVAREZ then replied and asked, "How? Do you have a warrant?"

e)  AGENT DESTEFANO replied, "We don't need one!"

f)  Defendant SGT. BENITEZ tells his subordinate officers he's going to "boot the door" in and AGENT DESTEFANO replies, "Yeah."

g)  SGT. BENITEZ then violently kicks the front door with his right foot/boot, but is unsuccessful in breaching the door with this kick.

h)  ALVAREZ can then be heard yelling "I'm coming out!" (in fear for his safety and as a direct result of the officers' threats and under such duress and coercion ALVAREZ was trying to comply with the unlawful orders by law enforcement).

i)  ALVAREZ then tried to comply with the unlawful law enforcement commands and in the home surveillance video footage, ALVAREZ can be heard again saying he's coming out. And, in the audio, the sound of the doorknob jangling can be heard (ALVAREZ attempting to comply with the unlawful commands by trying to turn the knob, trying to open the door, and trying to exit the residence in accordance with the unlawful commands from law enforcement). Next, in continuing their unlawful siege (as seen in the home surveillance video footage) Defendant AGENT DESTEFANO is seen un-holstering his service pistol, AGENT DESTEFANO points it at the front door and aggressively yells "Come on out!"

j)  Simultaneously, Defendant CONDE can be seen and heard charging towards the front door and yelling "Come on out!" and Defendant SGT. BENITEZ proceeds to violently kick in the door again with his boot/foot, this time successfully breaking, breaching and damaging the door and threshold.

k)  At this same time, ALVAREZ was attempting to comply with the officers' unlawful commands and unlawful breaking and entering into ALVAREZ residence in the form of ALVAREZ trying to open his front door and come out in compliance with the officers' unlawful commands.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

l) Despite ALVAREZ's attempted compliance with the officers' unlawful physical attack and unlawful destruction of the door and threshold, the officers continued to escalate their use of force and escalate the situation by destroying property, using profanity, physically attacking, and violently and unnecessarily abusing ALVAREZ.

m) Specifically, AGENT DESTEFANO can be seen continuing to point his service pistol at ALVAREZ while AGENT DESTEFANO and OFFICER CONDE continue yelling at ALVAREZ to come out and "Give up!" ALVAREZ continues to try to comply with the unlawful attack and repeatedly says, "I coming out!" … "I coming out!"

n) Defendant SGT. BENITEZ then violently grabbed ALVAREZ as ALVAREZ was trying to peacefully comply. SGT. BENITEZ violently grabbed, yanked, and pulled ALVAREZ out of the residence down the staircase.

o) AGENT DESTEFANO can then be seen holstering his weapon and simultaneously and violently grabbing ALVAREZ.

355)    AGENT DESTEFANO proceeds to yell at ALVAREZ to "Get the fuck out!" despite ALVAREZ's compliance and despite the fact that ALVAREZ was being violently and unlawfully pulled out of his residence by the PAPD officers.

356)    SGT. BENITEZ, AGENT DESTEFANO, and OFFICER CONDE then physically assault ALVAREZ by slamming ALVAREZ, face down, onto the hood of ALVAREZ's parked car while ALVAREZ was handcuffed (in the private driveway of ALVAREZ's family's mobile home in the mobile home park).

357)    The next sequences of disturbing events, as depicted in the home surveillance video footage drastically differ from what was written in the police report(s) drafted by OFFICER CONDE, SGT.

72

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

BENITEZ, and OFFICER JOHNSON (on information and belief, AGENT DESTEFANO, OFFICER HUBBARD, and OFFICER ALANIZ did not draft reports in relation to these events).

358)    Specifically, SGT. BENITEZ wrote the following in his police report, *"I then used my right hand and grabbed Alvarez on the front of his shirt and physically pulled him outside. His vehicle was parked directly in front of the short set of stairs that led to his front door so Agent DeStefano and I put Alvarez on the hood of his car where he was handcuffed. No other force was used on Alvarez."* (emphasis added)

359)    The home surveillance footage (audio and video) tells a drastically different and more violent story with respect to the unlawful siege perpetrated by and the physical force used by the Defendant officers:

    a)  From behind ALVAREZ, while ALVAREZ is compliant, prone on the hood of his parked car, and with ALVAREZ's head being pushed into and held against the metal hood of the vehicle by SGT. BENITEZ's left hand, SGT. BENITEZ says to ALVAREZ "You think you're a tough guy now?" At the same time SGT BENITEZ was making these remarks and threats, he was pressing ALVAREZ's face and head into the hood with SGT. BENITEZ's left hand. Simultaneously, SGT. BENITEZ cocked back with his right fist and violently struck/punched ALVAREZ in the lower back/kidney area (with a closed/clinched fist).

    b)  At the same time, AGENT DESTEFANO and OFFICER CONDE were also physically assaulting and pressing ALVAREZ into the hood of the car while ALVAREZ remained compliant and face down on the hood of the parked car in his private driveway.

    c)  At the same time, one additional officer (OFFICER HUBBARD, Defendant OFFICER JOHNSON or OFFICER ALANIZ) had his left hand on SGT. BENITEZ's back and was within a few feet of ALVAREZ.

73

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

d)  At the same time, one additional officer (Defendant OFFICER HUBBARD, Defendant OFFICER JOHNSON, or Defendant OFFICER ALANIZ) was standing in the roadway near the edge of the driveway, looking directly at the area where ALVAREZ was being assaulted.

e)  SGT. BENITEZ, AGENT DESTEFANO and OFFICER CONDE then proceeded to place handcuffs around ALVAREZ's two wrists/hands as ALVAREZ's hands were behind his back and as ALVAREZ remained compliant, incapacitated, and restrained face down and pressed against the hood of the car by the officers.

f)  Next, ALVAREZ (in Spanish) told his father (who was inside of the residence and out of view), to "record this, Papa".

g)  Apparently enraged by ALVAREZ's verbal request for his father to record the assault, without any justification. and for no apparent reason other than a result of haste and anger, SGT. BENITEZ again cocks his right hand back and violently slams and slaps ALVAREZ in the head with his (SGT. BENITEZ's) open palm/hand. At the same time, SGT. BENITEZ did this, he also yelled at ALVAREZ to "Shut up!"

h)  ALVAREZ then says, "He just hit me!"

360)   While ALVAREZ is being restrained on the hood of his car, ALVAREZ was compliant and not assaultive in any regard.

361)   None of the PAPD officers on scene intervened to prevent the repeated physical assaults against ALVAREZ.

362)   Again, in SGT. BENITEZ's report about the incident, he states that ALVAREZ was "put on the hood of his car where he was handcuffed" and that "**no other force was used on Alvarez.**" SGT. BENITEZ made no mention of the violent and unwarranted punch he dealt to ALVAREZ's lower back/kidney area.

74

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

SGT. BENITEZ made no mention of the violent and unwarranted and open palm slap/slam he dealt to ALVAREZ's head/face. None of the other officers who were on scene reported these violent and unwarranted uses of force and the officers who did draft written reports omitted this information from their reports. All of these amount to "uses of force" that would have required SGT. BENITEZ to complete a Supervisor's Use of Force Report. However, Sgt. Benitez not only failed to complete a Supervisor's Use of Force Report, he specifically covered up and concealed the incident by falsifying a police report (i.e. he omitted key information about his assaultive actions/uses of force against ALVAREZ and put forth a false narrative in his summary of the incident).

363)    With respect to the next events, the home surveillance video footage shows the following: After ALVAREZ was slapped/slammed in the head, told to shut up by SGT. BENITEZ and after ALVAREZ is assaulted and handcuffed by SGT. BENITEZ, AGENT DESTEFANO, and OFFICER CONDE, ALVAREZ again complained that SGT. BENITEZ hit him.

364)    Next, AGENT DESTEFANO and OFFICER CONDE stood up straight and ceased physical contact with ALVAREZ's person.

365)    SGT. BENITEZ was over top of ALVAREZ (who was compliant, incapacitated, and face down on the hood with his hands handcuffed behind his back). This was near the front right fender/hood area, just in front of the front passenger side mirror of the vehicle.

366)    At that point, AGENT DESTEFANO was standing directly to the right of SGT. BENITEZ and was facing and looking at SGT. BENITEZ and ALVAREZ (ALVAREZ was face down on the hood with his hands handcuffed behind his back). AGENT DESTEFANO was standing just in front of the front passenger side headlight of the vehicle. AGENT DESTEFANO was roughly 1 to 3 feet from SGT. BENITEZ and ALVAREZ and facing them.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

367)    At the same time, OFFICER CONDE was standing in the area of the front driver's side headlight, facing and looking at ALVAREZ and SGT. BENITEZ (roughly 3-5 feet away).

368)    At this point, ALVAREZ is still compliant, handcuffed with his hands behind his back, and being forcefully held face first on the hood of the parked car.

369)    SGT. BENITEZ, with both of his hands, violently grabbed and yanked the handcuffed ALVAREZ from behind and off of the hood (by grabbing onto the hoodie area of ALVAREZ's jacket). SGT. BENITEZ violently yanked ALVAREZ off of the hood in this manner and in doing so, SGT. BENITEZ caused ALVAREZ's torso and head to snap backwards in a whiplash fashion. For no justifiable reason and without any sort of provocation by ALVAREZ, SGT. BENITEZ then immediately pushed ALVAREZ back towards the vehicle and slammed ALVAREZ back onto the hood, which in turn caused ALVAREZ's torso and head to violently slam into the hood and windshield of the vehicle. ALVAREZ had no way to defend himself from this violent and unprovoked attack and no way to cushion the impact being that his hands were completely restrained in handcuffs behind his back. While violently slamming the handcuffed ALVAREZ onto the hood, SGT. BENITEZ simultaneously leaned into ALVAREZ yelled into ALVAREZ's left ear, "You think you're a tough guy, huh?!"

370)    AGENT DESTEFANO clearly observed this entire series of brutal assaults and threats and did nothing to intervene or prevent this attack or additional attacks on ALVAREZ as AGENT DESTEFANO was standing within 1-3 feet of this when they occurred and facing/looking at the disturbing events.

371)    OFFICER CONDE clearly observed this entire series of brutal assaults and threats and did nothing to intervene or prevent this attack or additional attacks on ALVAREZ as OFFICER CONDE was standing within 3-5 feet of this when they occurred and facing/looking at the disturbing events

372)    It is unclear exactly where the fourth officer was standing (Defendant OFFICER HUBBARD, Defendant OFFICER JOHNSON or Defendant OFFICER ALANIZ), but it appeared he was likely standing

76

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

on the front stairs near the front door of the residence (roughly 4-6 feet from the incident), just out of view of the home surveillance camera.

373)    It appears the fifth officer (Defendant OFFICER HUBBARD, Defendant OFFICER JOHNSON, or Defendant OFFICER ALANIZ) was somewhere in the roadway near the end of the driveway.

374)    None of the PAPD officers on scene intervened to prevent the repeated physical assaults and threats against ALVAREZ.

375)    None of the PAPD officers on scene called for medical help, rendered medical care for ALVAREZ, or engaged in any other efforts to see that ALVAREZ was afforded necessary medical care to treat his injuries (i.e. he was bleeding, his tooth was knocked loose, and he suffered a concussion/traumatic brain injury/"TBI")

376)    None of the PAPD officers subsequently reported these violent, unlawful, and unjustified acts.

377)    None of the PAPD officers completed a Use of Force or Supervisor's Use of Force report.

378)    Just after this assault, AGENT DESTEFANO utilized his handheld police radio and informed dispatch the ALVAREZ had been arrested (using the police code "10-15").

379)    Again, in the police report that SGT. BENITEZ drafted, he wrote *"His [ALVAREZ's] vehicle was parked directly in front of the short set of stairs that led to his front door so AGENT DESTEFANO and I put ALVAREZ on the hood of his car where he was handcuffed. **No other force was used on Alvarez.**"*

380)    As a result of this unprovoked attack(s), ALVAREZ was bleeding from the mouth and his tooth was knocked loose. Later on in jail, ALVAREZ was too scared to ask the jail staff for medical assistance based upon the threats by PAPD officers, so he pulled his own tooth out to try to mitigate the pain he was experiencing.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

381)    As a result of his head being slammed into the windshield by PAPD officers (while his hands were secured behind his back in handcuffs), ALVAREZ suffered a traumatic brain injury (concussion/MTBI/Mild Traumatic Brain Injury).

382)    Just after SGT. BENITEZ slammed ALVAREZ on the hood and windshield and made the "tough guy" comment, ALVAREZ complained that he was bleeding. At that point, instead of rendering assistance and summonsing medical personnel, SGT. BENITEZ continued to threaten ALVAREZ. Specifically, SGT. BENITEZ stated, "You think you're a tough guy? Huh?" Thereafter, ALVAREZ stated, "Oh my God. I'm bleeding!" In response, SGT. BENITEZ stated, **"You're gonna be bleeding a whole lot more!"**

383)    Approximately 20 seconds later, SGT. BENITEZ told ALAVREZ, *"What's wrong, you're not so tough now. What's the problem? Huh? You're so tough. How come you're not so tough now?"*

384)    Thereafter, SGT. BENITEZ proceeded to verbally abuse and taunt ALVAREZ by making various statements to ALVAREZ and denigrating ALVAREZ.

385)    Immediately after, ALVAREZ's father complained to the officers about the broken front door/complained to the officers about how they had kicked in and damaged the door. In response, an unidentified officer yelled at ALVAREZ's father to go inside, the officer told him that he needs to "act like an adult", and they repeatedly threatened to take ALVAREZ's father to jail. At one point, when ALVAREZ's father is speaking to the officers in Spanish (his native language), SGT. BENITEZ aggressively yelled to the father (in English), **"If you want to speak to us, you speak English."** The officers did this knowing that ALVAREZ's father doesn't speak English.

386)    ALVAREZ's father tried to show the officers the broken door. In response, the officer yells at him, "you broke your own door." The officer also made fun of the father who was clearly distressed by the damage to his door and the officer sarcastically said to the father, "it's so sad." SGT. BENITEZ went on to tell ALVAREZ's father that although he could take the father to jail too, in lieu of taking the father to jail, his

78

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

(ALVAREZ's father's) punishment will be that he has to fix his own door. This was intended as a way of tricking (and thereby) dissuading ALVAREZ's family from reporting the incident and discouraging them from seeking compensation for the property damage SGT. BENITEZ and the other PAPD officers unlawfully caused to the ALVAREZ home (i.e. you deal with/you fix your broken door that we broke, don't report it and in exchange, we won't arrest you and take you to jail).

387)   Next, in de-briefing his subordinate officers on scene just after the assaults and raid against ALVAREZ and his home, SGT. BENITEZ utilized the opportunity to provide a teaching moment to the subordinate officers and made remarks that included, but were not necessarily limited to the following:

388)   "See how much *they* behave when we put our foot down?"

   a)   "No leniency here."

   b)   "See how quickly they behave once we put our foot down? And that's what we don't do enough of."

   c)   "Amazing how well behaved they become."

   d)   "And look how well behaved they are now."

   e)   "We put our foot down and they're all behaving themselves now."

   f)   During the debrief, SGT. BENITEZ addressed ALVAREZ's father, "If you want to speak to us, you speak English."

   g)   SGT. BENITEZ also said to ALVAREZ's father through an unidentified Spanish-speaking party on scene that they (PAPD) kicked the door and they (PAPD) have every right to do that. SGT. BENITEZ goes on to explain that, "[that] is the problem with him (ALVAREZ's father) for defying the police" ... "so we could charge him with a crime too" ... "but we're not gonna do that"... "he can just go fix his door and that can be his punishment" ... "but he cannot defy the police."

   h)   SGT. BENITEZ also stated to ALVAREZ's father that he's lucky that he's not going to jail, that he should be going to jail, that the door was broken because ALVAREZ was "playing those games."

79

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

SGT. BENITEZ tells the father he "needs to get a little smarter here", and "he's very lucky he's not going to jail."

i)  Later on, AGENT DESTEFANO and another officer were standing in the driveway during the towing of ALVAREZ's vehicle (apparently unaware that the home surveillance cameras was capturing their conversation). The unidentified officer tells DESTEFANO that ALVAREZ chose to mess with the wrong sergeant and that he (ALVAREZ) is "lucky he didn't get put to sleep" (i.e. killed by SGT. BENITEZ). AGENT DESTEFANO goes onto laugh about this. The officers make fun of the laundry shed on the property and say that people might start popping out of there.

j)  SGT. BENITEZ at one point begins mocking ALVAREZ for being gay, "They went to pull him over, then he ran inside. Then he stood at the door. He's, he's gay."  SERGEANT BENITEZ then changed his tone of voice (to imitate ALVAREZ in a flamboyant and high-pitched tone) and stated, "come and get me" (then another individual started laughing). Shortly after those comments, SERGEANT BENITEZ went on to say, "he (ALVAREZ) came out again" (SERGEANT BENITEZ then again imitates ALVAREZ in a high pitched and flamboyant tone) and SERGEANT BENITEZ then says "boom!" (referring to SERGEANT BENITEZ kicking in ALVAREZ's front door). Another individual can be heard laughing.

k)  SGT. BENITEZ also stated during the de-brief, "We're not gonna get shit on our here by these frickin low-lifes." This was clearly motivated by his disgust for individuals who are gay, who are Latino, and who are low-income.

389)  In the police report authored by OFFICER CONDE, CONDE made no reference to any of the use of force/physical assaults perpetrated individually and collectively by the Defendant officers.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

390) The manner in which OFFICER CONDE characterized certain portions of the contact and the manner in which OFFICER CONDE intentionally withheld any mention of use of force from his police reports (and during his testimony during the motion to suppress hearing) establishes the purposeful and intentional concealing of this information and the purposeful and intentional withholding of this information from the reports.

391) Specifically, OFFICER CONDE wrote in his report that *"As Ofc Hubbard, Agt. DeStefano, Sgt Benitez, and I approached ALVAREZ, he slammed the front door."* This is false.

392) In OFFICER JOHNSON's report, he makes no mention of any use of force by any officers during the events at issue. By omitting key information from his report, OFFICER JOHNSON put knowingly and willfully submitted a police report that he knew contained false information.

393) Again, ALVAREZ never slammed the door. The door was apparently closed when the officers were approaching it, ALVAREZ was inside the residence when the officers approached the front door, and the door remained closed (it was never slammed as the officers were approaching).

394) Further, when OFFICER CONDE testified under oath during the Motion to Suppress hearing during the pendency of the related criminal proceeding against ALVAREZ in state court, OFFICER CONDE made no mention of the repeated uses of force/assaults and threats. By omitting key information from his testimony, refusing to answer certain questions, and mischaracterizing key aspects of the interaction, OFFICER CONDE knowingly and willfully testified untruthfully under oath.

395) It wasn't until after ALVAREZ was detained, beaten, arrested, and repeatedly threatened that the officers decided to run ALVAREZ's license to check on its status.

396) Thus, ALVAREZ was not only unlawfully detained without reasonable suspicion, he was also arrested without probable cause. When the Defendant officers detained and arrested ALVAREZ they did not have the knowledge and information needed to effect a lawful detention and arrest.

81

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

397) After ALVAREZ was arrested, Defendant officers towed ALVAREZ's vehicle from the driveway and impounded and/or stored ALVAREZ's vehicle, improperly and without legal justification, citing authority pursuant to California Vehicle Code § 14602.6. ALVAREZ was unable to pay to retrieve his vehicle from storage/impound and to this day does not have possession of the vehicle. Thus, Defendants' collective actions caused ALVAREZ's to be permanently deprived of his permanent property (i.e. his vehicle) without legal justification.

398) PAPD officers searched ALVAREZ.

399) PAPD officers searched ALVAREZ's vehicle.

400) PAPD officers transported and eventually booked ALVAREZ into jail and ALVAREZ remained in custody for a number of days.

401) Although OFFICER CONDE allegedly conducted a Drug Abuse Recognition exam of ALVAREZ, OFFICER CONDE never completed the necessary Field Sobriety Tests ("FST's") and never observed ALVAREZ driving on the public roadway. Nonetheless, among the charges upon which ALVAREZ was booked into jail was DUI/Driving Under the Influence (though the District Attorney refused to file DUI charges against ALVAREZ because there were not FST's conducted and "no bad driving" observed).

402) On information and belief, sometime after the assault, while ALVAREZ was in custody, SGT. MOORE arrived on scene as the acting lieutenant to supervise and advise all officers at the scene.

403) The following day, February 18, 2018, Defendant SGT. MOORE went to the ALVAREZ home to further the attempts by PAPD to dissuade the ALVAREZ family from reporting the actions of CONDE, BENITEZ, DESTEFANO, HUBBARD, JOHNSON AND ALANIZ.

404) SGT. MOORE did this by dissuading the family and thereby ALVAREZ himself from taking legal action against said Officers by telling the family that the conduct by the PAPD Officers was lawful. SGT. MOORE told ALVAREZ's father something to the effect of "it was a full on car stop .. with lights" … and

82

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

that ALVAREZ ran from the police and into his home. SGT. MOORE told ALVAREZ's father that when people run from the police, the police can chase them. And, SGT. MOORE said that she heard the ALVAREZ family question how the police could kick in the door without a warrant and SGT. MOORE proceeded to justify the unlawful actions by the PAPD officers from the prior evening by telling the family the police didn't need a warrant because the officers acted in the "heat of the moment."

405)    The Santa Clara County District Attorney's Office declined to prosecute ALVAREZ on the DUI charge due to "lack of evidence", citing a lack of "bad driving", "no admission of recent use", and a "refusal to take a blood test." This is evidenced by the DMV DS 702 form that was completed and filed/executed by the Santa Clara County District Attorney's Office on February 20, 2018.

406)    As a result of the information, misinformation, and failure to provide truthful, accurate, and complete information within the police reports authored by CONDE, BENITEZ, and JOHNSON, and because of Agent DESTEFANO's failure to intervene and failure to draft any reports or report the unlawful actions by PAPD officers, ALVAREZ was charged with various offenses in the Superior Court of California, County of Santa Clara (Docket B1896518).

407)    ALVAREZ was arraigned on various charges on February 22, 2018.

408)    Thereafter, in the related criminal proceeding ALVAREZ filed a motion to suppress evidence, citing a lack of legal justification for the law enforcement detention of ALVAREZ.

409)    Prior to the hearing on the motion, Santa Clara County Deputy District Attorney Montana Musso informed ALVAREZ's defense counsel that the District Attorney's Office intended to dismiss one of the charges (CA Penal Code Section § 485) due to insufficiency of the evidence. DDA Musso informed defense counsel that she felt the search of ALVAREZ's vehicle (which allegedly yielded the evidence associated with the CA Penal Code Section § 485 charge) was improper and their office would therefore be dismissing the charge regardless of the outcome of the motion to suppress hearing.

83

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

410)    On November 16, 2018 at 9:00AM, the Motion to Suppress hearing was held in Department 84 of the Superior Court of California, County of Santa Clara. The motion was argued by Deputy District Attorney Montana Musso and Tessa Stephenson (who, at the time was, Certified Law Student with the District Attorney's Office and is now a Deputy District Attorney with the same office). On information and belief, neither DDA Musso nor (now) DDA Stephenson were made aware (by the officers or anyone else at PAPD) of the illegal conduct by the PAPD officers and, on information and belief, neither were not aware of the assaultive and illegal conduct perpetrated by PAPD. On information and belief, despite the fact that all or most of the officers were present to testify during the hearing, none of them divulged to the DDA Musso or DDA Stephenson that they violently assaulted ALVAREZ and that the reports contained false information.

411)    Judge Jerome Nadler of the Superior Court of California, County of Santa Clara presided over the matter, ultimately granted ALVAREZ's motion (finding that the officers' detention of ALVAREZ was not supported by reasonable suspicion and was therefore unlawful), and thereby suppressed evidence.

412)    Defendants CONDE, BENITEZ, DESTEFANO, HUBBARD, and JOHNSON were all subpoenaed to testify at the hearing. However, only CONDE ended up testifying at the hearing.

413)    During CONDE's sworn testimony, CONDE acknowledged that a police report is a complete summary of all the important facts in the case and acknowledged that he made the report as accurate as possible.

414)    During CONDE's sworn testimony, in response to a question by ALVAREZ's defense counsel asking, "Are there any additions or subtractions on the report that you came across when you reviewed it that you want to make so it more accurately reflects what occurred on February 17 of 2018..." CONDE replied, "Not at this time."

415)    During his sworn testimony, when CONDE was given a chance to correct any inaccuracies or omissions in his police report, CONDE declined and failed to make any such corrections.

84

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

416) During CONDE's sworn testimony, CONDE repeatedly avoided answering certain questions with respect to whether he saw ALVAREZ driving and made no mention of the assaults, threats, or attacks perpetrated against ALVAREZ.

417) CONDE acknowledged that he signed the "Affidavit Re: Probable Cause and Bail Setting" under penalty of perjury (the affidavit where CONDE wrote that he saw ALVAREZ "driving on the roadway").

418) However, during CONDE's sworn testimony, he would not answer ALVAREZ's defense counsel's repeated questions and the Court's questions on the point of whether he ever saw ALVAREZ behind the wheel of the vehicle/driving the vehicle on the roadway on February 17, 2018.

419) During CONDE's sworn testimony, CONDE acknowledged that just before he decided to detain ALVAREZ (on February 17, 2018), he never attempted to or actually ran a check on ALVAREZ's driver's license to see if it was suspended and CONDE acknowledged that he didn't know whether or not ALVAREZ's license was suspended on February 17, 2018 at the point in time when he decided to detain ALVAREZ.

420) During CONDE's sworn testimony, he continued to conceal information and evidence in such a manner that painted ALVAREZ and ALVAREZ's conduct in a false and negative light and falsely painted the conduct of the PAPD officers in a favorable light so as to conceal the true events that occurred during the interaction, so as to perpetuate the unwarranted prosecution of ALVAREZ and to perpetuate the concealment of the unlawful acts of PAPD and its officers.

421) At the summation of CONDE's testimony, the Court heard arguments from the District Attorney's Office and ALVAREZ's defense counsel.

422) The Court/Judge Jerome Nadler of the Superior Court ultimately granted ALVAREZ's motion to suppress.

85

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

423)   In granting ALVAREZ's motion to suppress, Judge Nadler specifically held that CONDE lacked reasonable suspicion to detain ALVAREZ. This resulted in an immediate dismissal of the resisting/obstructing/delaying a peace officer charge (CA Penal Code § 148) and the paraphernalia charge (CA Health & Safety Code § 11364), and the District Attorney's Office moved to dismiss and the Court thereafter dismissed the CA Penal Code § 485 charge.

424)   On November 20, 2018 in Department 84 of the Superior Court of California, County of Santa Clara, by motion of the Santa Clara County District Attorney's Office, the final remaining criminal charge against ALVAREZ was dismissed based upon the insufficiency of the evidence [CA Vehicle Code § 14601.2(a)].

425)   As such, all of the criminal charges against ALVAREZ in relation to the February 17, 2018 incident were dismissed based upon the insufficiency of the evidence (Superior Court of California, County of Santa Clara Docket B1896518).

426)   In the ALVAREZ matter, PAPD officers and PAPD exhibited deliberate indifference to the medical needs of ALVAREZ, and/or provided care that was not objectively reasonable, in failing to provide proper medical treatment to address ALVAREZ's injuries. This includes, but was not limited to PAPD officers' failures to summons fire and medics to examine ALVAREZ and failure to provide any or adequate medical care and treatment after ALVAREZ was repeatedly subjected to excessive and unreasonable force in the form of being slammed face first onto the front hood of the vehicle by PAPD officers, punched in the kidney/lower back area with a closed fist just after being slammed face first onto the hood of the vehicle by PAPD officers, just after being violently slammed/slapped on the side of the face/head by PAPD Police Officers, and just after being violently slammed onto the windshield and hood of the vehicle by PAPD officers (while ALVAREZ's hands were already restrained and secured in handcuffs behind his back).

427)   ALVAREZ asserted that Officer Conde initiated the traffic stop as a pretext, solely in order to detain and harass ALVAREZ, and without any legal basis to do so.

86

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

428) ALVAREZ also asserted that he was wrongfully and without justification cited and arrested for driving on a suspended license, driving under the influence, resisting arrest/resisting or delaying a peace officer, possession of controlled substance paraphernalia, and misappropriation of lost property.

**2009**
**Off-Duty DUI "Roll-Over" Collision Involving PAPD Officer Whose Blood Alcohol Concentration was Twice the Legal Limit**
**(A PAPD Officer Who Was Criminally Charged, Convicted, and Placed on Criminal Probation, but Instead of Getting Fired, Was Promoted to Sergeant)**

429) In 2009, then PAPD officer Eric BULATAO was involved in a very serious traffic collision on Highway 101 in Santa Clara County (near the San Antonio Road offramp) while driving under the influence.

430) Specifically, then PAPD Officer BULATAO was off-duty and driving a personal vehicle under the influence of alcohol when he crashed. His BAC (Blood Alcohol Concentration) later registered twice the legal limit (0.16).

431) When the California Highway Patrol arrived on scene, the CHP officer noted that PAPD officer BULATAO had a strong odor of alcohol coming from him, slow and slurred speech, and he was swaying two to three inches in a circular motion.

432) Then PAPD Officer BULATAO refused to cooperate with CHP, refused to answer the CHP officer's questions, and refused to do CHP's requested field sobriety tests.

433) Despite being near the San Antonio Road exit in Palo Alto, then PAPD Officer BULATAO told the investigating CHP officer that he was not sure what exit he was on, but was in San Jose and was almost home.

434) Then PAPD Sergeant ZACH PERRON (who is currently a captain with PAPD) was contacted by a CHP sergeant. Then PAPD Sergeant Zach PERRON (who has a less than stellar history of his own) went and picked up PAPD officer BULATAO and was released by CHP to PAPD Sergeant Zach PERRON.

435) PAPD Officer BULATAO was charged with DUI, convicted, and placed on probation.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

436) Defendants CITY OF PALO ALTO and PAPD did not terminate then PAPD Officer BULATAO. In fact, BULATAO was subsequently *promoted* to SERGEANT and is currently employed as a police officer (SERGEANT/Supervisor) with PAPD.

**The City of Palo Alto and Palo Alto Police Department's Documented History of Tolerating Officers' Civil Rights Violations and Other Criminal Behavior by its Officers, Targeting of Minorities and Other Protected Classes of Individuals, and Promotion of Officers Who Engage in These Unlawful and Constitutional Behaviors**

437) PAPD has an established history of perpetrating civil rights violations against individuals, including racial profiling, unlawful detentions and arrests, unwarranted violence, excessive force, and a culture that promotes, tolerates, and encourages its personnel to violate laws under the color of authority.

438) The CITY OF PALO ALTO and PAPD have, for years, not only tolerated these violations and injustices, they promote and reward PAPD officers who, in any healthy law enforcement agency, would have been terminated from their positions of employment and stripped of their peace officer powers long ago.

439) Lynne JOHNSON was a prior Police Chief for PAPD/CITY OF PALO ALTO.

440) In her capacity as PAPD Chief, CHIEF JOHNSON directed PAPD officers to broadly question black men while searching for suspects in a string of past street robberies.

441) According to a prior news report/article entitled "Police told to check out persons based on race - Police Chief Lynne Johnson tells residents that blacks and Hispanics may be questioned based on descriptions of burglars and robbers", prior PAPD Chief JOHNSON (while PAPD chief) stated, " *'When*

88

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

*our officers are out there and they see an African-American, in a congenial way, we want them to find out who they are,' and Chief Johnson stated this practice is not unconstitutional."[5]*

442)    At the time the PAPD Chief made these statements, then PAPD Chief Johnson tried to justify these unconstitutional and racially motivated directives to PAPD and its officers by stating that street robberies have increased and police need to use common sense when trying to find the suspects, even if that means stopping people based on vague descriptions.

443)    During the directive to PAPD officers to stop people based on their race and appearance, then PAPD Chief JOHNSON stated "If my officers see an African-American who has a doo-rag on his head, absolutely the officers will be stopping and asking who that person is"

444)    U.S. House of Representatives, Representative Anna G. Eshoo condemned PAPD's directives issued statements about then PAPD Chief Lynne Johnson's racist and unwarranted directives: "Using race as the only basis for criminal suspicion in the absence of any probable cause is not only unacceptable, it is unconstitutional and has no place in our community and our country. Chief Johnson's comments send a destructive message which is harmful to our entire community and the directive she issued to the Department undermines civil liberties." Representative Eshoo also stated, "Regardless of how Chief Johnson's comments might be defended or explained, she has demonstrated a profound lack of judgment and leadership that should be demanded of a top law enforcement official."[6]

//

//

//

//

---

[5] https://www.paloaltoonline.com/news/2008/10/31/video-police-told-to-check-out-persons-based-on-race
[6] https://eshoo.house.gov/media/press-releases/rep-eshoo-statement-palo-alto-police-chief-lynne-johnson

89

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**2003**
**Violent and Racially Motivated Attack of Black Palo Alto Resident by Palo Alto Police**
**Officers, Criminal Prosecution of PAPD Officers,**
**and Subsequent Promotion of Involved PAPD Officer**

445)    In 2003, the Santa Clara County District Attorney's Office charged two PAPD officers (then PAPD

Officer Craig LEE and then PAPD Officer Michael KAN) for violent assaults they were accused of

committing while on duty against a black Palo Alto resident (Albert Hopkins, pictured below[7]):



446)    Even after the beating of Victim HAWKINS, one publication acknowledged *"[Q]uestions about the*

*PAPD's tactics with people of color still linger"*[8]

---

[7] http://www.paloaltohistory.org/resources/albert-hopkins.jpg
[8] http://www.paloaltohistory.org/albert-hopkins-beating.php

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

447)     Currently, in 2020, both of these police officers are still employed as police officers with the CITY OF PALO ALTO and PAPD. And, after being charged with a felony for an on-duty violent assault of a black Palo Alto resident, PAPD and the CITY OF PALO ALTO not only failed to terminate/fire the officers, they actually *promoted* one of the officers to "sergeant" and that individual now serves as an acting patrol "lieutenant" (*now* PAPD SGT. CRAIG LEE).

448)     The following details, in whole or in part, regarding the PAPD/HOPKINS beating were retrieved from PaloAltoHistory.org[9]:

a)   Victim HOPKINS was a long-time Palo Alto resident.

b)   Victim HOPKINS was black.

c)   Victim HOPKINS was later employed as a coordinator of the "Academic Center" at Gunn High School in Palo Alto.

d)   At the time of the PAPD beating of Victim HOPKINS, HOPKINS was living in his car.

e)   Victim HOPKINS was relaxing inside of his car (his mobile home) with his foot on the dashboard and HOPKINS was eating ice cream.

f)   Then 40-year-old PAPD rookie police officer Craig Lee saw HOPKINS' gray Honda after two residents had called police.

g)   On July 13, 2003, at 10:34 p.m., while on duty and in full uniform, PAPD Officer LEE drove his marked PAPD police vehicle up to 59-year-old Victim HOPKINS

h)   PAPD Officer LEE asked Victim Hopkins for ID.

i)   Victim HOPKINS did not initially give his name.

---

[9] http://www.paloaltohistory.org/albert-hopkins-beating.php

91

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

j) "Lee learned his name by a radio check on Hopkins' car license plate.  Hopkins then confirmed his identity and his Palo Alto address.  He could not find his driver's license in the car."

k) "After pulling up behind the vehicle, Lee got out to question Hopkins. As Lee approached the Honda, Hopkins jolted his door open, nearly hitting Lee and stood up outside his car. He started yelling at Lee, accused him of racial profiling and demanded that he go away. "A black man can't do nothing in Palo Alto without the police being involved," he said. Lee then ordered Hopkins to get back in his car and close the door. Hopkins got back in, but left the door partially open. Lee then asked for identification, but reached for his gun when Hopkins began to rummage around the clothes-filled car."

l) "Soon fellow officer, 25 year-old Michael Kan arrived and conferred with Lee. They then returned to the car and ordered Hopkins to get out. From this point, accounts differ somewhat. The officers claimed that when Hopkins refused, they pepper-sprayed him in the face and tried to pull him out of the car --- as he tried to pull them in. When they eventually got Hopkins out of the vehicle, the officers said he refused to get down on the ground and that is when they started to use force, beating him with their steel batons and pepper-spraying him again."

m) "Hopkins told the story differently. He said he got out from the car on his own and that when he did, they immediately began beating him "like sharks going after blood in the water." He was eventually arrested, treated by medics,  released and never charged with a crime. Later, Hopkins had surgery for a chipped bone in his knee."

n) "When Hopkins eventually threatened to file charges against the PAPD, The City of Palo Alto agreed to pay Hopkins $250,000 in return for his agreement not to file a civil claim. Still, a criminal trial was yet to come. Kan and Lee were arrested and charged with felony assault and misdemeanor battery."

o) "After this encounter, on-duty and uniformed Palo Alto Police officer Michael Kan stopped his marked police car nearby.  Officer Lee spoke to Kan; Kan then ordered Hopkins out of the car.  Officer

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Kan tried to pull Hopkins out of the car; he initially resisted but then stood up.  Kan then hit Hopkins repeatedly with his police baton while Hopkins tried to ward off blows.  Officer Lee also hit Hopkins repeatedly with his police baton."10

p)   "When officers Kan and Lee failed to subdue Hopkins with baton blows, both officers doused him extensively with pepper spray.  Hopkins was overcome, temporarily blinded and handcuffed.  Paramedics provided first aid at the scene.  Hawkins was transported to the hospital where he was treated for his injuries, including abrasions on his body and a raised welt near his eye."

q)   "But many in Palo Alto wondered if Hopkins had been interrogated in the first place due to racial profiling."

r)   "Since 2000, the PAPD (in an effort to counter the oft-heard claim that they used racial profiling in police stops) had kept track of the race of every person with whom they had come into contact. The results showed that minorities accounted for a disproportionate number of people pulled over by Palo Alto police. Opinions differed greatly over why this was."

s)   "Lee and Kan claimed they had the right to detain Hopkins because Hopkins was belligerent, did not produce his identification, and acted threateningly. The officers said they acted with discretion, starting with the 'lowest level' of force but eventually resorting to their batons when Hopkins refused to hand over identification or listen to orders. 'If Albert Hopkins had obeyed reasonable commands, they wouldn't have used force," said Kan's attorney. Lee's lawyer added that the allegation of racial discrimination was the 'smokiest of smoke screens' and the 'reddest of red herrings.'"

t)   "It was also revealed that Kan may have been particularly tough on Hopkins in an effort to prove himself to superiors. In May 2003, Kan reportedly watched a fellow officer fight to arrest a suspect,

---

10 http://www.paloaltohistory.org/albert-hopkins-beating.php

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

but failed to help. He was ordered to take additional 'redman' training -- where he would hold exercises with officers wearing padded red protective suits -- to make him 'more aggressive and effective in controlling suspects.' When asked how he was doing after beating Hopkins, Kan reportedly told a lieutenant: 'I guess I won't need that redman training anymore.'"

u) "The trial was headline news in Palo Alto and up and down the Peninsula. While cross-examinations were often tense and combative, it was the closing arguments that really stirred the pot."

v) Deputy District Attorney Peter Waite prosecuted the and argued that "in some ways the Hopkins beating was worse than Rodney King."

w) "While King had committed a crime --- drunk driving --- Hopkins was innocently sitting in his car, Waite argued. Later, he compared Hopkins to Rosa Parks in his refusal to give his identification to officers --- something Waite claimed was not required. 'He knew the law better than these bozos,' he told the court. He also weighed in on the debate over Palo Alto's racial climate. Discussing the two callers who originally called in to police that night, he said, 'Palo Alto, it's the kind of place where citizens --- as is their legal right to do --- call in black people that are walking down the street or sitting in their car.'"

449) According to Palo Alto Online[11], then PAPD Chief JOHNSON acknowledged that, in the public's eyes, PAPD had credibility and trust issues *from the minority community*:

a) Then PAPD Chief Johnson stated, *"I've had officers be asked, after making a traffic stop, `Are you going to beat me, too?'"*

---

[11] https://www.paloaltoonline.com/weekly/morgue/2003/2003_08_01.cops01jtja.html

94

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

b)  Then PAPD Chief Johnson also stated, *"It was clear to me, before this incident, that the credibility, trust and confidence in the department (from the minority community) had been eroded in recent years for a variety of reasons"*

c)  A report in March 2003 showed that African-Americans and Latinos were two to three times as likely as whites or Asians to be searched when they came into contact with Palo Alto police between July and December of 2002.[12]

d)  From 2000 and until the PAPD Lee/Kan attack on HOPKINS, PAPD kept track of the race of every person with whom they had come into contact. The results showed that minorities accounted for a disproportionate number of people pulled over by PAPD. [13]

450)    A report in March 2003 "showed that African-Americans and Latinos were two to three times as likely as whites or Asians to be searched when they came into contact with Palo Alto police …" between July and December of 2002.[14]

451)    In any healthy police agency, these two PAPD officers would have been terminated/fired for their beating of Victim HOPKINS. However, to this day, both officers remain employed as police officers with the CITY OF PALO ALTO and PAPD.

452)    PAPD officer Craig LEE was subsequently promoted by Defendants CITY OF PALO ALTO and PAPD to the rank of "Sergeant" (a supervisory role within PAPD). And, at the direction of PAPD and the CITY OF PALO ALTO, he has served as an acting lieutenant (an even higher-level supervisor within PAPD, overseeing the entire nighttime "A-Side" patrol shift sector of PAPD).

---

[12] https://www.paloaltoonline.com/weekly/morgue/2003/2003_08_01.cops01jtja.html
[13] http://www.paloaltohistory.org/albert-hopkins-beating.php
[14] https://www.paloaltoonline.com/weekly/morgue/2003/2003_08_01.cops01jtja.html

95

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

453)    And, PAPD Officer Michael Kan continues to be employed as a police officer with PAPD (see photograph below, retrieved from the official PAPD Facebook page[15]):



//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

[15] https://www.facebook.com/PaloAltoPolice/photos/a.726090110760122/2273629696006148

96

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**Current PAPD Chief Jonsen's History of Fostering A Law Enforcement
Culture Where Constitutional Violations, Excessive Force, and Race Based Discrimination
are Tolerated, Encouraged, and Promoted**

454)    The current PAPD chief (Defendant PAPD CHIEF JONSEN) has an established history of overseeing law enforcement agencies that promote and foster an environment where police brutality, violence, constitutional violations, and other injustices are perpetrated by law enforcement officers and those officers are not properly disciplined and fostering an environment where such activities are encouraged, tolerated, promoted, and rewarded.

455)    Prior to working as the Chief of Police for the City of Palo Alto, Defendant CHIEF JONSEN worked as a high-ranking law enforcement official at the Los Angeles County Sheriff's Department ("LASD").

456)    This included PAPD CHIEF JONSEN's administrative peace officer ranks as lieutenant and captain is LASD.

457)    During his tenure at the Los Angeles County Sheriff's Department, the specific divisions of the LASD that PAPD CHIEF JONSEN's oversaw included two LASD stations located in the Antelope Valley cities of Lancaster and Palmdale, California.

458)    Because of apparent problems with a toxic culture among Defendant JONSEN's LASD stations, PAPD CHIEF JONSEN's divisions of the LASD were investigated by the United States Department of Justice, Civil Rights Division ("US DOJ") and a formal report was produced by the U.S. Department of Justice in 2013[16].

**459)**    The US DOJ concluded that PAPD CHIEF JONSEN's substations within the Antelope Valley area of Los Angeles County **"engaged in a pattern or practice of discriminatory and otherwise unlawful**

---

[16] https://www.justice.gov/file/414701/download

97

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**searches and seizures, including the use of unreasonable force, in violation of the Fourth Amendment, the Fourteenth Amendment, and Title VI."** … and the US DOJ **"found also that deputies assigned to these stations have engaged in a pattern or practice of discrimination against African Americans in violation of the Fair Housing Act."**

460)    The US DOJ concluded that PAPD CHIEF JONSEN's substations within LASD, **"some types of policy violations are routinely tolerated. This tolerance for misconduct occurs in part because the accountability measures LASD has in place are not effectively implemented"**

461)    The US DOJ concluded, "Policing practices in the Antelope Valley reflect, and unfortunately contribute to, a harmful divide between some of the more long-standing, primarily white residents of the community, and newer, more often non-white arrivals to the Antelope Valley. Our investigation demonstrated reasonable cause to believe that LASD Antelope Valley deputies engage in a pattern or practice of misconduct in violation of the Constitution and federal law in a number of ways, including: • Pedestrian and vehicle stops that violate the Fourth Amendment; • Stops that appear motivated by racial bias, in violation of the Fourteenth Amendment and federal statutory law; • The use of unreasonable force in violation of the Fourth Amendment; and • Discrimination against Antelope Valley residents on the basis of race by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act (FHA)."

462)    The US DOJ found that Defendant PAPD CHIEF JONSEN's divisions engaged in a **"pattern or practice of unconstitutional law enforcement activity"**. This included targeting low income minorities who resided in low income housing. The US DOJ described their findings as follow (quoted from US DOJ's 2013 report):

   a)   *We have reasonable cause to believe that LASD's Antelope Valley deputies engage in a pattern or practice of unconstitutional law enforcement activity that reflects unlawful bias and that violates*

98

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

*individuals' rights not to be subjected to unreasonable searches and seizures, including the use of unreasonable force. These practices violate the Fourth Amendment, the Fourteenth Amendment, the Fair Housing Act, and Title VI. Our investigation uncovered an apparently unjustified disparate impact of stops and searches of African Americans and Latinos, as well as a practice of racially biased enforcement of the voucher program, unlawful backseat detentions, and a pattern of stops and searches without adequate legal justification.*

b) *LASD deputies stop and search African Americans and Latinos in the Antelope Valley in a manner indicating that stops and searches are motivated, at least in part, by bias. With the assistance of a statistical expert, we conducted a regression analysis of all 4,084 pedestrian and 44,672 vehicle stops and searches recorded in Lancaster and Palmdale during 2011.[7] This analysis allowed us to control for factors other than race that could potentially influence the reason why African Americans and Latinos are stopped and/or searched at a disproportionately higher rate. All of the regression analyses conducted of this data accounted for a multitude of factors, including (1) the demographic composition of each LASD reporting district, (2) the ages of residents, (3) the gender of residents, and (4) the crime rates by race reported by each reporting district. Each statistic described in the following paragraphs was conducted using a regression analysis, which accounted for these four different variables, to determine whether there is a disproportionate effect on African Americans and Latinos. Additionally, the regressions are weighted by district populations, because the estimates of population and crime characteristics are more reliable in districts with larger populations. While it is impossible to account for every single factor that could affect law enforcement activity, the regression analyses account for the major factors that influence law enforcement activity, including crime rates.*

99

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

c) **Pedestrian Stops and Searches.** Our statistical analysis of 2011 pedestrian stop data showed that the stop rate of minority pedestrians is disproportionately high in the Antelope Valley. In Palmdale, African-American and Latino pedestrians are stopped at a rate 33% higher than if there were no racial differences, and, in Lancaster, African-American pedestrians are stopped at a rate 38.5% higher than if there were no racial differences. In Lancaster, the aggressive pedestrian stop rate of African Americans cannot be justified by demonstrating that the higher rate of stops results in discovery of more contraband. In fact, a regression analysis controlling for the factors described above indicates that there is about a 50% lower rate of contrabandseizureforAfrican-Americanpedestrianscomparedtowhites. In Palmdale, there was nostatisticallysignificantdifferenceincontrabanddiscoveryratesbyrace. The low contraband seizure rate for African Americans indicates that, overall, LASD deputies in the Antelope Valley appear to have a less accurate threshold of suspicion for searching African Americans, and that the greater frequency of searches of African Americans cannot be explained by a greater likelihood that they are carrying contraband (such as illicit drugs or weapons).

d) **Vehicle Stops and Searches.** Though the analysis of Antelope Valley's 2011 vehicle stops alone did not reveal any racial disparities, the analysis of the searches resulting from vehicle stops revealed a stark effect on African Americans and, to a lesser extent, Latinos. Controlling for potential intervening factors, the regression analysis revealed a finding that, following vehicle stops, the search rate of the persons of African Americans in the Antelope Valley is 10-15 percentage points higher than that of whites, and the disparity in the search rate of Latinos in the Antelope Valley is also statistically significant. Additionally, across the Antelope Valley, the vehicles of African Americans are searched at an 8-14 percentage point higher rate than whites. The analysis also revealed that, in vehicle stops, Latinos and their vehicles are searched at a statistically significant disparate rate.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

e)   The following use of force incidents illustrate the consistent pattern in which deputies use forceunreasonablyinretaliationforaperceivedthreatthathasalreadypassed. In one instance, a deputy OC-sprayed multiple times a handcuffed and hobbled man after the man spat at the deputy. The deputy successfully applied a hobble restraint to the legs ofa handcuffed man in the backseat of a patrol car after he began kicking the car window. When the man later began to spit at the deputy from the backseat of the car, the deputy stopped the vehicle, opened the back door, and warned the man that he would be pepper sprayed if he continued to spit. The man then spat at the deputy again, and the deputy sprayed him with multiple bursts of OC spray, each lasting for approximately two seconds. The deputy's actions constituted excessive force because the individual- whose arms and legs were completely restrained in the rear of the vehicle - did not pose an immediate threat to the safety of the officer or the public warranting use of OC spray. In a separate incident, a handcuffed man spat at a deputy while the deputy was standing the man against a wall in the Lancaster jail lobby. In response, the deputy immediately hit the man on the side of the face with an open hand. The deputy offered no facts that would objectively warrant this level of force and it appears the force was prompted by the spitting.

f)   LASD's guidance on this topic is problematic and may help explain the retaliatory force incidents were viewed. The guidance justifies the use of deputies' force to prevent spitting because it is a "battery" and viewed as an "attack," and provides that a heel palm strike is an appropriate use of force to re-direct or stop such an attack. The guidance does not make clear that force may not be used after the threat has dissipated. Furthermore, in its summary, the guidance takes an aggressive tone that may encourage retaliatory force: "Remember that the word 'force' is part of the very title of our profession: Law Enforcement." The aggressive tone of the guidance is consistent with a recurring theme that we observed in reviewing use of force reports and interviewing community members - that deputies

101

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

unnecessarily escalate situations to unreasonable uses of force that are not necessary to obtain compliance from the subject, and that LASD practices, and in some instances policies, condone this. See Deorle, 272 F.3d at 1282. It appears that LASD guidance on appropriate deputy response to spitting is being conflated by deputies with the situations described above, where the deputies' force occurred after any perceived threat occurred, and where the force was simply retaliatory and could not be justified as preventing further risk.

g) **Use of Force Related to Obstruction Charges Raises Concerns.** When an officer uses force and arrests someone only for obstruction of justice, it raises the question of what legitimate law enforcement objective was being obstructed. Because of the potential nexus between obstruction and similar arrests and improper uses of force, these uses of force warrant special attention. LASD has been on notice of the need to focus on this issue since at least 2010, when LASD's Special Counsel issued a report on obstruction arrests and related use of force in the Antelope Valley. The Special Counsel noted that Lancaster and Palmdale had a high rate of obstruction arrests when compared to the rest of LASD, with the number of obstruction arrests at Lancaster and Palmdale stations accounting for 25% of all obstruction arrests by LASD and exceeding the number of obstruction arrests for every other station. Lancaster and Palmdale also reported disproportionately high proportions of African Americans arrested for obstruction. The report noted also that, based on 2007 data, 30% of Palmdale's arrests where obstruction was the highest charge involved a reported use of force, and 24% of Lancaster's obstruction arrests involved a reported use of force.

h) To LASD's considerable credit, its policies reflect an understanding that for policing to be most effective, the community must see the police as legitimate partners in a cooperative effort to prevent crime. LASD calls this approach "Trust-Based Policing," and describes this as "the use of police resources in a manner that includes the public participation in the mission of public safety." LASD

102

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

understands that "[t]he purpose of public trust policing is to provide a higher level of public safety" and that "[i]t is incumbent upon law enforcement to recognize that without the full faith and cooperation of the public, the mission of public safety is severely impaired."

### City of Palo Alto and PAPD's Tolerating and Promoting Individuals Who Have Documented Histories of Engaging in Racist Behavior (PAPD Captain Zach Perron)

463)   Former PAPD Officer Marcus BARBOUR is a black male adult.

464)   On information and belief, BARBOUR is a decorated war veteran, an exemplary peace officer, and is currently employed as a peace officer with another law enforcement agency.

465)   BARBOUR previously worked as a PAPD officer, before being subjected to a harsh, racist, and objectively traumatizing statement by one of his superiors within PAPD.

466)   Specifically, while at PAPD, Officer BARBOUR, a black officer, was subjected to harsh and unspeakable racism by a white PAPD administrator, PAPD sworn officer, CAPTAIN Zachary PERRON.

467)   While in BARBOUR's presence, **PAPD Captain PERRON stated, *"n\*ggas don't swim."***

468)   While on duty in his capacity as a PAPD patrol officer, Officer BARBOUR was pursuing a black male suspect. While Officer BARBOUR was chasing the suspect, the black male suspect jumped into the San Francisquito Creek. Officer BARBOUR heroically rescued the black male suspect. Officer Barbour returned to PAPD station after rescuing the suspect.

469)   While at the PAPD station, PAPD Captain Zach PERRON (a white male) said to Officer BARBOUR (and in the presence of other PAPD personnel), *"n\*ggas don't swim."*

470)   Captain PERRON made the comment in a hallway in front of other officers.

471)   Captain PERRON's current and/or past duties as a high ranking official within PAPD include acting as the coordinator of the PAPD Investigative Services Division, a position in which he oversees the

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Investigative Services Division of PAPD. PAPD Captain PERRON also previously oversaw and personally handled public affairs matters for PAPD.

472) Instead of terminating Captain PERRON, as any healthy law enforcement agency would do upon learning of this racist and shameful conduct by Captain PERRON, PAPD instead promoted PERRON to the rank of Captain. Captain PERRON currently works as a peace office (at the "CAPTAIN" rank) with PAPD.

**DECEMBER 2019**
**City of Palo Alto and PAPD's Proactive Measures to Decrease Transparency/**
**Engage in Concealmentof Police Officer Misconduct By Severely Limiting Misconduct Matters**
**Referred to Independent Police Auditor For Investigations & Analysis (and Severely Limiting**
**and Eliminating Access to Most Records)**

473) On December 16, 2019, the CITY OF PALO ALTO (Palo Alto City Council) voted unanimously to drastically limit the scope of information previously provided to the public in the CITY OF PALO ALTO and PAPD's Bi-Annual Independent Police Auditor's Public Report.

474) This made it significantly easier for (and was, on information and belief, designed by) Defendants PAPD and CITY OF PALO ALTO to hide misconduct.

475) And, this made it harder for the public to identify corrupt, dishonest, and/or violent officers within the Department.

476) Defendant PAPD CHIEF JONSEN, along with City Manager Ed Shikada, recommended approval of a new three-year contract with The OIR group, an Orange County based independent auditing firm that had previously provided and would continue to provide bi-annual audits of the Palo Alto Police Department.

477) The City of Palo Alto communicated to the public that this was a continuation of the existing scope of services already in place in Palo Alto. However, this was not the case.

478) One significant clause that was a part of the previous Police Auditor's contract was deliberately absented from the renewed scope of services.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

479)    Specifically, "complaints and investigations of internal personnel or human resources matters are <u>not</u> part of the independent police auditor services."

480)    This clause means that misconduct classified by the PAPD as a "human resource" issue will not be investigated by an independent auditing body, does not need to appear, and will not appear in the Independent Police Auditor's report that is provided to the public.

481)    The new contract also does not limit the PAPD's ability to decide what matters, specifically, are "human resource" or "internal" in nature.

482)    A particularly relevant example is the racial slur incident where PAPD Captain PERRON used a racial slur in front of a subordinate black PAPD officer.

483)    Incidents of this nature would now not be made known to the public, limiting the public's awareness of the biases and other relevant issues related to corruption, dishonesty, violence, etc. that could directly affect an officer's ability to adequately and fairly protect the public.

484)    PAPD would be permitted to handle the issue internally however it deemed appropriate and would face no input, criticism, or commentary from the members of the public whom PAPD is tasked to serve and protect. This significant change to policy occurred in direct response to and only one month following the settlement of the Gustavo Alvarez case in which violent and discriminatory misconduct by several officers, including a number of the offending PAPD officers in the AREVALO incident, was brought to the attention of the Public, the CITY OF PALO ALTO and PAPD.

//
//
//
//
//
//
//
//
//

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**2019**
**Defendants City of Palo Alto and PAPD Endorsement of, Participation in**
**and Celebration of Disgraced Ex-PAPD Sergeant Wayne Benitez**
**and Retention of Problem PAPD Officers, Including Defendant PAPD Agent DeStefano**

485)    As discussed, former PAPD Sgt. WAYNE BENITEZ, along with Agent DESTEFANO, PAPD Sgt. JOHN ALANIZ, and a number of other on duty PAPD officers violently assaulted Gustavo ALVAREZ in February 2018.

486)    BENITEZ mocked ALVAREZ for being gay after violently assaulting and injuring ALVAREZ.

487)    Despite Agent DESTEFANO's involvement in the ALVAREZ attack and cover-up, Agent DESTEFANO remains employed as a police officer with PAPD/CITY.

488)    The failure to properly discipline and terminate Agent DESTEFANO after the ALVAREZ incident directly caused the AREVALO attack to occur given that Agent DESTEFANO was not only allowed to keep his job, he was not deterred from perpetrating violent and illegal constitutional violations.

489)    Aside from BENITEZ, all of the other officers who were involved in the coordinated attack upon ALVAREZ and coordinated concealment of the ALVAREZ incident remain employed as peace officers by PAPD and the CITY OF PALO ALTO.

490)    Despite BENITEZ's clear criminal violations, constitutional violations, bigotry, and other official misconduct and violations, he was not fired or terminated by PAPD.

491)    Defendants CITY OF PALO ALTO and PAPD and their employees and administrators allowed BENITEZ to honorably retire from PAPD and BENITEZ therefore collects a pension that exceeds $100,000.00 per year.

492)    On information and belief, the FBI/Federal Bureau of Investigation's civil rights division has and continues to conduct a criminal investigation into the PAPD conduct in the ALVAREZ incident.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

493)     There is also a local criminal investigation and potential future criminal prosecution on the horizon for one or more of the PAPD officers involved in the ALVAREZ attack (currently overseen by the Santa Clara County District Attorney's Office).

494)     Despite all of this, the culture within PAPD is one that celebrates and supports BENITEZ and views BENITEZ as the victim of the ALVAREZ incident (in February 2018).

495)     On October 18, 2019, a plethora of current and active duty PAPD personnel and officials (some of whom were on duty and in uniform as PAPD officers while attending the event) hosted a retirement celebration and party for the disgraced BENITEZ at a restaurant and bar located within the City of Palo Alto.

496)     While the celebration ensued, half of the patio area of the restaurant was designated for the BENITEZ/PAPD party and the other half of the patio was accessible to public patrons of the restaurant.

497)     Dozens of police officers, many of whom are current PAPD officers and high-ranking PAPD supervisory officials attended the party to celebrate BENITEZ.

498)     This included a number of on-duty PAPD officers and supervisors who attended the party in uniform, and, on information and belief, many of those uniformed officers removed their body worn cameras prior to entering the party.

499)     The BENITEZ celebration (October 2019) was well *after* the video of BENITEZ beating a handcuffed gay Latino Palo Alto resident (Gustavo ALVAREZ) and well *after* the civil rights/federal lawsuit was filed, when PAPD, the CITY OF PALO ALTO, and the general public had already been privy to the disturbing conduct of BENITEZ, Agent DESTEFANO, SGT. ALANIZ, Officer JOHNSON, and the other PAPD officers involved in the ALVAREZ attack and cover-up.

500)     Defendant Agent DESTEFANO attended the BENITEZ retirement party while DESTEFANO was on duty and in uniform. It appears that Agent DESTEFANO likely removed his body-worn-camera prior to

107

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

entering the party. Agent DESTEFANO openly celebrated with and spent time with BENITEZ at BENITEZ's party to celebrate his *honorable* retirement from PAPD.



108

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13



14 //
15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24 //
25

110

26
Complaint for Violations of Civil Rights
27 Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.
28

501)     Defendant PAPD Sgt. JOHN ALANIZ was involved in both the ALVAREZ attack and the present AREVALO attack by PAPD

502)     Defendant SGT. ALANIZ attended the BENITEZ retirement party and celebrated BENITEZ's *honorable* retirement.

503)     Defendant PAPD Sgt. JOHN ALANIZ attended the BENITEZ retirement party and celebrated with BENITEZ.

504)     Defendant ALANIZ was on duty and in uniform (see photographs of SGT. ALANIZ below, from the BENITEZ retirement celebration):



111

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.





112

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

505)     Defendant PAPD Officer IAN JOHNSON was involved in both the ALVAREZ and AREVALO attacks by PAPD.

506)     Defendant PAPD Officer IAN JOHNSON attended the BENITEZ retirement party and celebrated BENITEZ. Defendant PAPD Officer IAN JOHNSON arrived to the party with another uniformed PAPD officer. Defendant PAPD Officer JOHNSON was on duty and in uniform when he attended the party. And, it appears he likely removed his body worn camera before entering the party.



113

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16   //
17   //
18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //
26

114

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

27
28

507)   All but one of the individuals in the below photograph (from the BENITEZ retirement party), aside from Ex-PAPD Sergeant BENITEZ (white shirt) are current PAPD police officers, some of whom are supervisors. This includes, but is not limited to Defendants Agent DESTEFANO and PAPD Sgt. ALANIZ (both of whom were on duty and in uniform while they attended the party). This also includes PAPD officer Michael KAN (the officer who was previously charged with felony assault for beating a black Palo Alto resident):



508)   Other unidentified individuals believed to be off-duty police officers, including PAPD police officers, other PAPD personnel, and/or civilian PAPD and/or CITY personnel attended the party and celebrated BENITEZ:



115

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



509)    PAPD Sergeant David LEE was on duty (in plain clothes), carrying a handheld police radio, and present for much of the BENITEZ/PAPD celebration for BENITEZ (see photo below):



Friday, October 18, 2019
18:25:16

116

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

510)     The below photographs were retrieved from the official PAPD Facebook page. The first of the two photographs show an unidentified PAPD sergeant. The same PAPD sergeant and another PAPD officer/Agent (female with bleached blonde hair) appear together in another PAPD Facebook



//

//

//

//

//

//

//

//

//

117

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

511)    Both the unidentified PAPD sergeant and PAPD agent pictured above attended the BENITEZ

retirement party and celebrated BENITEZ (photographs from BENITEZ retirement party below):





//

//

//

//

//

//

118

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

512)    The following photographs of PAPD officer ZALAC were retrieved from the official PAPD Facebook page:





119

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

513)     PAPD officer ZALAC attended the BENITEZ retirement party (apparently off duty), drank alcohol,

and celebrated BENITEZ along with other PAPD officers and BENITEZ.





120

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

514)    PAPD Agent Heather SOUZA is pictured below (photographs retrieved from the official PAPD Facebook page):



515)    PAPD Agent SOUZA attended the BENITEZ retirement party and celebrated BENITEZ (photograph from the BENITEZ retirement party):



121

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

516)    PAPD Officer PONS is pictured below (photographs retrieved from the official PAPD Facebook page):




//

//

//

//

//

//

//

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

517)    PAPD Officer PONS attended the BENITEZ retirement party and celebrated BENITEZ:



518)    Other PAPD and CITY personnel, PAPD officers (including high-ranking PAPD officials), and other police officers (some of whom were not identified) attended the BENITEZ retirement party, in doing so openly (implicitly) endorsed BENITEZ and his unconstitutional and unlawful conduct, and celebrated BENITEZ, despite their awareness of BENITEZ's dishonest, violent, and bias unconstitutional actions committed while BENITEZ was on duty as a PAPD sergeant (against Gustavo ALVAREZ) earlier in the year. All of the following photographs are from the October 2019 BENITEZ retirement party.

123

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20



21
22
23
24
25
26
27
28

124

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



125

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



126

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



127

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.





129

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.





Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

131

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



Friday, October 18, 2019
17:54:34



Friday, October 18, 2019
18:17:44

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.





133

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



 

134

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

135

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



136

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8



9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25

138

26
27
28

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.







139

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






140

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1

2

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25



26

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

27

28

142

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

143

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.



144

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26

145

27

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

28

1

2

 

3

4

5

6

7

8

9

10

11

12

13

14

15

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26

146

27    Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

28

**2015**
**Violent PAPD Attack on Black Shoplifting Suspect**
**(A Man Who Did Not Shoplift/Who Paid for Items)**
**Causing Great Bodily Injury**

519)     In 2015, five on duty PAPD officers severely injured a black shoplifting suspect (the black male

suffered a fractured eye socket, similar to one of JULIO's injuries sustained during the July 2019 attack by

Defendant Agent DESTEFANO).

520)     When the five officers attack the black suspect, the man said "I can't breathe".

521)     One PAPD officer repeatedly punched the man in the hip area and witnesses stated that PAPD

officers were scraping the man's face on the pavement while the man was *allegedly* resisting.

522)     It turned out that the black man had actually paid for the items he was accused of shoplifting and the

District Attorney declined to file any charges against the black man.

**2019**
**Denial of Timely and Proper Medical Care by PAPD**
**to 54-Year-Old Palo Alto Resident Woman Suffering from a Seizure**

523)     In June 2019, a 54-year-old Palo Alto woman was experiencing a severe medical episode (a seizure)

and feared she would suffer a stroke if she didn't get to the hospital.

524)     Unable to call 911 herself, the resident asked a child to call 911, at the woman's request.

525)     It took close to 9-minutes for PAPD to arrive. PAPD waited another five minutes before allowing

fire and medics to tend to the woman.

526)     As the woman was hunched over on the ground outside her home, she repeatedly plead with PAPD

officers to get her medical help.

527)     The woman told PAPD officers who were standing over her, *"I've got to go," … "I've got to go. I've*

*got to go right now. I don't think I have a lot of time left. There's something really wrong."*

147

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

528)   Despite fire and medics promptly arriving *in the area*, PAPD ordered medical personnel to stay away and to remain a block away (and thereby prevented the woman from getting timely and necessary medical care).

529)   Fire and medics complied with PAPD orders to stay away and waited for further instructions from PAPD.

530)   On information and belief, PAPD and its officers violated a number of policies and their violations resulted in a more than 40-minute delay for in the female victim getting to hospital to get care.

531)   In reviewing the incident, it was determined that PAPD's conduct in depriving the woman of medical care was unwarranted.

532)   There was an unexplained five-minute stop by the main responding PAPD officer (who was only three blocks from the victim's house when the PAPD officer was dispatched to the emergency call).

533)   There was no body-worn camera footage from one PAPD police sergeant.

534)   There was missing GPS data for that same PAPD sergeant's patrol car.

535)   There was a PAPD search of the woman's house and subsequent sharing of confidential information about the incident by a PAPD police officer with her spouse, who then conveyed it to others.

//
//
//
//
//
//
//
//
//
//
//
//
//

148

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## **DAMAGES**

536)    With respect to the unlawful action(s) perpetrated by all Defendants in the present matter, as a direct and proximate result of Defendants' unlawful conduct, Plaintiff JULIO AREVALO suffered assault, battery, wrongful detention, false imprisonment, loss of wages and excessive force.

537)    As a further proximate result of Defendant's conduct, Plaintiff suffered extreme physical injury, emotional distress, fear, terror, anxiety, humiliation, and loss of sense of security, dignity, and pride as a resident of Palo Alto, the State of California, United States of America.

538)    The conduct of the Defendant was malicious, wanton, and oppressive. Plaintiff is therefore entitled to and award of punitive damages against said Defendant.

539)    As a proximate result of Defendants' conduct, AREVALO suffered severe pain and physical injuries, including but not limited to extreme pain, bleeding, bruising, one or more bone fractures, a traumatic brain injury, and other physical injuries.

540)    As a proximate result of Defendants' conduct, AREVALO suffered unwarranted and unlawful incarceration and other acts

541)    As a further proximate result of Defendants' conduct, AREVALO suffered severe emotional and mental distress. This includes, but is not limited to fear, terror, anxiety, depression, humiliation, embarrassment, and loss of her sense of security, dignity, and pride.  He suffered and continues to suffer serious emotional harm, fear for his safety while in a public and elsewhere, while he awaiting trial and also after the criminal charges were dismissed (to present).

542)    AREVALO suffered constant worry that he might be condemned to spend time in custody for crimes he did not commit and/or charges that stemmed from unlawful law enforcement conduct and detentions and arrests that were not supported by reasonable suspicion, probable cause, or any other legal justification.

149

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

543) AREVALO lives with a constant concern is concerned that any future charges filed against him by any Defendant or other PAPD personnel will result in the same concealment of exculpatory evidence and violent actions against AREVALO and his family.

544) As a further proximate result of defendants' conduct, on information and belief, AREVALO has and will incur medical expenses and/or damages and injuries and other costs and expenses, and will continue to incur medical expenses and/or damages and injuries and other costs and expenses in the future in an amount according to proof. AREVALO will also lose future income in an amount according to proof.

545) As a further proximate result of defendants' conduct, AREVALO has incurred damages in a sum not yet completely ascertained, but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

546) The conduct of the individual Defendants was malicious, sadistic, wanton, and oppressive. AREVALO is therefore entitled to award of punitive damages against the Defendants.

//

//

//

//

//

//

//

//

//

//

//

150

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

# CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Civil Rights**
**Unlawful Detention, Arrest, Search and Seizure and**
**Unreasonable and Excessive and Deadly Force**
**(42 U.S.C § 1983)**
*(Against Defendants - PAPD Police Officers: AGENT DESTEFANO, SGT. GREEN, OFFICER ENBERG, OFFICER JOHNSON, SGT. ALANIZ, OFFICER CONNELLY, CHIEF JONSEN, and DOES 1 thru 75, inclusive)*

547)    Plaintiff JULIO AREVALO realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

548)    As a direct and proximate result of the various individual Defendants' actions and omissions, Plaintiff was deprived of his rights and privileges under the First Amendment, Fourth Amendment, Eighth Amendment, and the Fourteenth Amendment to the United States Constitution and the laws of the State of California, including but not limited to California Civil Code §43, in that Plaintiff was wrongfully and without proper cause detained, searched, seized, arrested, tortured, severely injured, incarcerated, maliciously prosecuted, and subjected to unreasonable and excessive force by the Defendants. Plaintiff's real and personal property was searched, seized, and/or destroyed, and Plaintiff was deprived of objectively reasonable medical care or was provided with deliberately indifference medical care while in the care, custody, and control of Defendants.

549)    Defendants, in violation of the Fourth Amendment, conducted a stop/detention of AREVALO and when they did so, the stop was not justified by "reasonable suspicion", probable cause, or another lawful means/justification.

550)    Defendants unlawfully detained, arrested, physically assaulted, severely injured, and denied AREVALO medical care, the Defendants used unreasonable and deadly force depriving AREVALO of his

151

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

right to be secure in his person against unreasonable searches and seizures as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution.

551)    Moreover, Plaintiff was merely walking his bicycle through a parking lot and eating a donut, he was unarmed, and he did not pose any threat or use any force against Defendant Agent DESTEFANO or any other officers that would have warranted the brutal and violent use(s) of force against JULIO.

552)    Defendant Agent DESTEFANO's use of deadly force in slamming JULIO's head into the cement walkway at a high rate of speed and other uses of force, as described, were unreasonable given these circumstances.

553)    Defendant did not have a lawful basis to use any force against AREVALO, let alone this extreme amount of deadly force against Plaintiff, which violated Plaintiff's constitutional rights under the Fourth Amendment.

554)    Defendants, in violation of the Fourth Amendment, intentionally engaged in an unlawful detention and arrest of AREVALO, said acts subjected AREVALO to one or more "seizures" under the Fourth Amendment, and said "seizures" were unreasonable.

555)    Defendants, in violation of the Fourth Amendment, conducted a stop/detention of AREVALO, thereafter arrested AREVALO, the arrest was not justified or supported by "probable cause" or any other lawful justification.

556)    Defendants intentionally committed certain acts that amounted to excessive force and deadly force, those acts violated AREVALO's Fourth Amendment right not to be subjected to excessive force.

557)    Defendants' misconduct alleged above violated Plaintiff AREVALO's right to be free from unreasonable and excessive use of force as guaranteed by the 4th Amendment and the 14th Amendment of the United States Constitution.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

558)     Defendants intentionally committed acts that constituted deadly force against AREVALO, Defendants did not have probable cause to believe that AREVALO posed a significant threat of serious physical injury to Defendants or others, and/or it would have been feasible for Defendants to give AREVALO adequate warnings warning before using deadly force, but Defendants volitionally chose to forego doing so.

559)     Defendants' misconduct directly and proximately caused Plaintiff AREVALO to suffer life-threatening injuries, including bodily injury, one or more bone fractures, traumatic brain injuries, pain and suffering, shock, extreme emotional distress, and humiliation.

560)     As described in the preceding paragraphs, the conduct of Defendants toward Plaintiff AREVALO constituted excessive and unlawful deadly force in violation of the United States Constitution.

561)     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights and personal safety and well-being.

562)     In doing the acts complained of herein, Defendants (police officers) acted under the color of the law to violate AREVALO's basic human dignity and his right to be free from excessive use of force under the Fourth Amendment to the United States Constitution.

563)     Defendants subjected AREVALO to Defendants' wrongful conduct, depriving Plaintiff of rights described herein, knowingly, maliciously, and/or with conscious and reckless disregard for whether the rights and safety of Plaintiff would be violated by their acts and/or omissions.

564)     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Defendant CITY OF PALO ALTO and Defendant CITY OF PALO ALTO POLICE DEPARTMENT in that:

   a)   As a matter of both policy and practice, the City of Palo Alto and City of Palo Alto Police Department directly encourage, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

153

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

b) As a matter of both policy and practice, the City of Palo Alto and City of Palo Alto Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Defendant police officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff; specifically, City of Palo Alto and City of Palo Alto Police Department police officers accused of excessive force can be confident that the City of Palo Alto and City of Palo Alto Police Department will not investigate those accusations in earnest and will refuse to recommend discipline even where a given officer has engages in the use of excessive force.

c) Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the City of Palo Alto and City of Palo Alto Police Department abuse citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the City of Palo Alto and City of Palo Alto Police Department make findings of wrongdoing in a disproportionately small number of cases.

d) Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the City of Palo Alto and City of Palo Alto Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case.

e) Defendants City of Palo Alto and City of Palo Alto Police Department have failed to act to remedy the patterns of abuse described herein, despite actual knowledge of the same, thereby causing the types of injuries alleged herein;

f) As a matter of express policy, Defendants City of Palo Alto and City of Palo Alto Police Department do not sufficiently create and/or retain any records properly documenting allegations of excessive force against police officers, thereby preventing the City of Palo Alto and City of Palo Alto Police Department from ascertaining any patterns of abuse which might develop over the course of a police officer's career;

154

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

g) As a matter of express policy, Defendants City of Palo Alto and City of Palo Alto Police Department refuse to take into consideration patterns of allegations of civil rights violations when evaluating the merits of any particular complaint

565) As a result of the unjustified and excessive use of force (and deadly force) and other violations by Defendant officers, as well as Defendants City of Palo Alto and City of Palo Alto Police Department policies and practices, Plaintiff has suffered severe personal injury, pain and injury, damages, as well as emotional distress and harm.

566) Defendants, in violation of AREVALO's Fourth Amendment rights, initiated the prosecution of ALVAREZ for various alleged criminal offenses, without a factual basis, without sufficient evidence, and with devious and unlawful motives, aimed to demean and discredit AREVALO in order to conceal the unlawful and dangerous police actions perpetrated by Defendants.

567) When Defendants initiated the prosecution of AREVALO, the following applied: (1) Defendants initiated the criminal proceeding against AREVALO, (2) Defendants lacked probable cause to initiate the proceedings, (3) the criminal proceeding ended in AREVALO's favor, (4) Defendants acted maliciously or for a purpose other than bringing AREVALO to justice, and (5) as a consequence of the proceeding, AREVALO suffered a significant deprivation of liberty.

568) Plaintiff, as an arrestee, had the rights and privileges of the Fourth Amendment to necessary and proper medical care following the Defendants' use of force against him.

569) Defendants were required to promptly seek medical care and ensure that Plaintiff's injuries were not exacerbated during the time he remained in police custody, yet they failed to do so.

570) Defendants were deliberately indifferent to the severity of AREVALO's need for medical attention, took actions which were and are contrary to acceptable practices and affirmative duties by Defendants in

155

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

seeking immediate medical care, and failed to ensure that Plaintiff's medical needs were addressed without further injury.

571)    Defendants not only failed to immediately and effectively call for necessary emergency medical care for AREVALO, but certain Defendants delayed the medical care from being administered to Plaintiff by never contacting medical personnel to assess Plaintiff after Defendants injured and harmed Plaintiff.

572)    Defendant officers had a reasonable opportunity to prevent the other Defendant officer or officers from using excessive force against Plaintiff had they been so inclined, but they failed to do so.

573)    Even when medical personnel were granted access to the critically injured AREVALO, one or more of the Defendants acted to conceal the violence and crimes committed against AREVALO (by failing to be completely forthcoming with medical personnel about the mechanism and method of injury Defendants utilized in harming AREVALO).

574)    Defendant SCHEFF was an active participant in concealing, covering up, lying, mischaracterizing, and withholding information and evidence in relation to the events and activities pertaining to unlawful acts by the Palo Alto Police Department, including, but not necessarily limited to acts of dishonesty, criminal conduct, and acts of excessive force.

575)    As a result of the Defendant Officers' failure to intervene, Plaintiff suffered pain and injury, as well as emotional distress. The misconduct was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of others.

576)    Defendants and their employees, officers and agents violated Plaintiff's Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and destroying Plaintiffs' property without a warrant.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

577)     Defendants and their employees, officers, and agents violated AREVALO's rights to be free from false arrest. These unlawful actions were done with the specific intent to deprive AREVALO of his constitutional rights to be secure in his property.

578)     AREVALO is informed and believes that the acts of Defendants and their employees and agents were intentional in failing to protect and preserve AREVALO's property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

579)     As a direct and proximate consequence of these unlawful acts, ALVAREZ has suffered and continues to suffer loss of his personal property and is entitled to appropriate damages for the loss of and injury to his property.

580)     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in all paragraphs of this complaint, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

581)     The misconduct described was undertaken by Defendant police officers within the course and scope of their employment and under color of law such that their employer, City of Palo Alto and City of Palo Alto Police Department are liable for their actions.

582)     The conduct of Defendants and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

583)     Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

//

//

157

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## SECOND CAUSE OF ACTION
### Violation of Civil Rights
### Denial of Proper Medical Care and Other Civil Rights Violations
### (42 U.S.C § 1983)
*(Against Defendants - PAPD Police Officers: AGENT DESTEFANO, SGT. GREEN, OFFICER ENBERG, OFFICER JOHNSON, SGT. ALANIZ, OFFICER CONNELLY, CHIEF JONSEN, and DOES 1 thru 75, inclusive)*

584)     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

585)     As a direct and proximate result of the various individual Defendants' actions and omissions, Plaintiff was deprived of his rights and privileges under the First Amendment, Fourth Amendment, Eighth Amendment, and the Fourteenth Amendment to the United States Constitution and the laws of the State of California, including but not limited to California Civil Code §43, in that Plaintiff was wrongfully and without proper cause detained, searched, seized, arrested, falsely arrested, incarcerated, maliciously prosecuted, and subjected to unreasonable and excessive force by the Defendants, Plaintiff's real and personal property was searched, seized, and/or destroyed, and Plaintiff was deprived of objectively reasonable medical care or was provided with deliberately indifference medical care while in the care, custody, and control of Defendants.

586)     Defendants, in violation of the Fourth Amendment, conducted a stop/detention of JULIO and when they did so, the stop was not justified by reasonable suspicion, probable cause, or any other legal justification.

587)     Defendants, in violation of the Fourth Amendment, intentionally engaged in an unlawful detention and arrest of JULIO, said acts subjected JULIO to one or more "seizures" under the Fourth Amendment, and said "seizures" were unreasonable.

588)     Defendants, in violation of the Fourth Amendment, conducted a stop/detention of JULIO, thereafter arrested JULIO, the arrest was not justified or supported by "probable cause".

158

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

589)    Defendants intentionally committed certain acts that amounted to excessive force, those acts violated JULIO's Fourth Amendment and other constitutional rights to not be subjected to excessive force.

590)    Defendants' acts of misconduct alleged above violated Plaintiff JULIO's right to be free from unreasonable and excessive use of force as guaranteed by the 4th Amendment and the 14th Amendment of the United States Constitution.

591)    Defendants intentionally committed acts that constituted deadly force against JULIO, Defendants did not have probable cause to believe that JULIO posed a significant threat of serious physical injury to Defendants or others, and/or it would have been feasible for Defendants to give JULIO a warning before using deadly force, but Defendants did not do so.

592)    Defendants' misconduct directly and proximately caused Plaintiff JULIO to suffer very serious personal injury including bodily injury, pain and suffering, shock, disfigurement, extreme emotional distress, and humiliation.

593)    As described in the preceding paragraphs, the conduct of Defendants toward Plaintiff constituted excessive force in violation of the United States Constitution.

594)    The misconduct by Defendants objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

595)    In doing the acts complained of herein, Defendants acted under the color of the law to violate JULIO's basic human dignity and his right to be free from excessive use of force under the Fourth Amendment to the United States Constitution.

596)    Defendants subjected JULIO to Defendants' wrongful conduct, depriving JULIO of rights described herein, knowingly, maliciously, and/or with conscious and reckless disregard for whether the rights and safety of Plaintiff would be violated by their acts and/or omissions.

159

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

597)     The misconduct described in this allegation and all allegations was undertaken pursuant to the policy and practice of the City of Palo Alto and City of Palo Alto Police Department in that:

a)   As a matter of both policy and practice, the City of Palo Alto and City of Palo Alto Police Department directly encourage, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

b)   As a matter of both policy and practice, the City of Palo Alto and City of Palo Alto Police Department facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Defendant police officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff; specifically, City of Palo Alto and City of Palo Alto Police Department police officers accused of excessive force can be confident that the City of Palo Alto and City of Palo Alto Police Department will not investigate those accusations in earnest and will refuse to recommend any real discipline even where a given officer has engaged in the use of excessive force and related dishonesty.

c)   As a matter of widespread practice so prevalent as to comprise municipal policy, officers of the City of Palo Alto and City of Palo Alto Police Department abuse citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the City of Palo Alto and City of Palo Alto Police Department make findings of wrongdoing in a disproportionately small number of cases. And, even when they do make findings of misconduct, the City of Palo Alto and City of Palo Alto Police Department engage in minimization, victim-blaming, covering-up, and other methods of fraudulent mitigation that send a clear message to PAPD Officers that misconduct will be tolerated and any punishment will be minimal. This toxic and dangerous pattern and practice fosters an environment

160

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

where criminal police officers like Defendant Agent DESTEFANO and Ex-PAPD (and honorably retired) Sgt. BENITEZ are celebrated and idolized by more junior officers and rewarded by more senior and higher-ranking officials.

d)  Municipal policy-makers are aware of, and condone and facilitate by their inaction, a "code of silence" in the City of Palo Alto and City of Palo Alto Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case.

e)  Defendants City of Palo Alto and City of Palo Alto Police Department have failed to act to remedy the patterns of abuse described herein, despite actual knowledge of the same, thereby causing the types of injuries alleged herein;

f)  As a matter of express policy, Defendants City of Palo Alto and City of Palo Alto Police Department do not sufficiently create and/or retain any records properly documenting allegations of excessive force against police officers, thereby preventing the City of Palo Alto and City of Palo Alto Police Department from ascertaining any patterns of abuse which might develop over the course of a police officer's career;

g)  As a matter of express policy, Defendants City of Palo Alto and City of Palo Alto Police Department refuse to take into consideration patterns of allegations of civil rights violations when evaluating the merits of any particular complaint.

598)  As a result of the unjustified and excessive use of force and other violations by Defendant officers, as well as Defendants City of Palo Alto and City of Palo Alto Police Department policy and practice, Plaintiff has suffered pain and injury, as well as emotional distress.

161

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

599)    Defendants, in violation of JULIO's Fourth Amendment and other constitutional rights, attempted to falsely initiate a criminal prosecution of JULIO for various alleged criminal offenses, as they regularly and routinely do in attempting to discredit and dissuade their victims from having a chance at justice.

600)    When Defendants initiated the prosecution of JULIO, the following applied: (1) Defendants initiated the criminal proceeding against JULIO, (2) Defendants lacked probable cause to initiate the proceedings, (3) the criminal proceeding ended in JULIO's favor (no criminal charges have ever been filed), (4) Defendants acted maliciously or for a purpose other than bringing JULIO to justice, and (5) as a consequence of the proceeding, JULIO suffered a significant deprivation of liberty.

601)    Plaintiff, as an arrestee, had the rights and privileges of the Fourth Amendment to necessary and proper medical care following the Defendants' use(s) of any force against him, including the deadly force that was unlawfully used against JULIO.

602)    Defendants were required to promptly seek medical care and ensure that JULIO's nearly fatal injuries were not exacerbated during the time he remained in police custody. Yet, they failed to do so, and waited for hours before getting JULIO medical attention that he needed hours before.

603)    Defendants were deliberately indifferent to the severity of JULIO's need for medical attention, took actions which were and are contrary to seeking immediate medical care, and failed to ensure that Plaintiff's medical needs were addressed without further injury.

604)    Defendants not only failed to immediately (or ever) and effectively allow for proper and timely medical care, but certain Defendants delayed the medical care from being administered to Plaintiff by concealing the true method of JULIO's injuries after Defendants violently injured and harmed Plaintiff.

605)    The Defendants, including Defendant Agent DESTEFANO, had a reasonable opportunity to prevent another officer or officers from using excessive force against Plaintiff had they been so inclined, but they failed to do so.

162

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

606)     Defendants, including PAPD's high-ranking official(s) acted to conceal the violence and crimes committed against ALVAREZ.

607)     Defendant PAPD Records Supervisor SCHEFF was an active participant in concealing, covering up, lying, mischaracterizing, and withholding information and evidence in relation to the events and activities pertaining to unlawful acts by the Palo Alto Police Department, including, but not necessarily limited to acts of dishonesty, criminal conduct, and acts of excessive force.

608)     As a result of the Defendant Officers' failure to intervene, Plaintiff suffered pain and injury, as well as emotional distress. The misconduct was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of others.

609)     Defendants and their employees, officers and agents violated Plaintiff's Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating Plaintiffs' property without a warrant.

610)     Defendants and their employees, officers, and agents violated JULIO's rights to be free from false arrest. These unlawful actions were done with the specific intent to deprive ALVAREZ of his constitutional rights to be secure in his property.

611)     JULIO is informed and believes that the acts of Defendants and their employees and agents were intentional in failing to protect and preserve JULIO's property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and/or destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

612)     As a direct and proximate consequence of these unlawful acts, JULIO has suffered and continues to suffer loss of his personal property and is entitled to appropriate damages for the loss of and injury to his property.

613)     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in all Paragraph herein, and in a sum not yet completely ascertained

163

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

614)    The misconduct described was undertaken by Defendant police officers within the course and scope of their employment and under color of law such that their employer, City of Palo Alto and City of Palo Alto Police Department are liable for their actions.

615)    The conduct of Defendants and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

616)    Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.


### THIRD CAUSE OF ACTION
**(Violation of Civil Rights - 42 U.S.C. §1983 - *Monell* Liability)**
*(Against Defendants CITY OF PALO ALTO, CITY OF PALO ALTO POLICE DEPARTMENT, PAPD JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive)*

617)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

618)    At the time of the incidents complained of herein, JULIO was a civilian and within the City of Palo Alto and County of Santa Clara, California, and the Defendant City of Palo Alto, Defendant City of Palo Alto Police Department, and Defendant CHIEF JONSEN, and DOES 1 thru 75, inclusive, by and through its supervisory officials and employees, has been given notice on repeated occasions prior to the unlawful and unconstitutional actions perpetrated by PAPD officers, including nearly all of the known defendant officers involved in the present matter, of a pattern of ongoing constitutional violations and practices by the individually-named Defendants herein and other employees and officers employed by the City of Palo Alto and City of Palo Alto Police Department in their patrol and other divisions, including, but not limited to,

164

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

having received notice regarding the use of unlawful detention, unlawful arrest, unlawful use of unreasonable and excessive force, unlawful seizure of property and persons, dishonesty, the failure to provide proper medical care, and other violations of civil rights and rights under the U.S. Constitution, the California Constitution, and applicable provisions of state and federal law.

619)    This includes, but is not limited to notice regarding violations of the First, Fourth Amendment, Eighth Amendment, and the Fourteenth Amendment to the United States Constitution and the laws of the State of California, including but not limited to California Civil Code § 43, in that individuals have been wrongfully and without proper cause detained, arrested, and subjected to unreasonable and excessive force, and denied proper medical care by the City of Palo Alto and the City of Palo Alto Police Department of its officers, agents, employees, and the like, additionally has been placed on notice of deprivations by these individuals of citizens and residents of objectively reasonable medical care and/or instances where care was provided with a deliberate indifference medical care while in the care, custody, and control of Defendants.

620)    Defendants City of Palo Alto, the City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, incorporated general instruction, statutes, ordinances and/or regulations, there were choices by policy making officials, customs existed, there was inadequate training and/or supervision, and there was inadequate screening that caused JULIO to suffer the numerous violations of his rights at the hands of the employees, officers, and agents of CITY and PAPD.

621)    These policies and practices have been and continue to be implemented by Defendants, such as the harassment, deliberate indifference and excessive use of force inflicted by Defendant Agent DESTEFANO and the other involved Defendant PAPD Officers, and DOES 1 thru 75, inclusive, are the proximate cause of the deprivation of Plaintiff's rights secured under the Fourth Amendment.

165

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

622)     The violent force used by Defendant Agent DESTEFANO and Defendant PAPD Officers and DOES 1-50, inclusive was not a good faith effort to maintain or restore order, but was applied maliciously and sadistically for the very purpose of causing harm.

623)     Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, by their policy and practice of tolerating, encouraging, and rewarding the unlawful detaining, searching, arresting, and seizing of people, and other unlawful conduct such as denying proper medical care, fabricating and/or withholding information and evidence so as to inculpate innocent parties, is subjecting individuals, particularly minorities, including Plaintiff, to serious physical, psychological, emotional, and physiological harm.

624)     In theory, civilian residents and individuals shouldn't have to worry about police engaging in unlawful and violent acts towards any resident, but PAPD and the CITY OF PALO ALTO have done just that.

625)     Despite said notice, Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 50, inclusive, have demonstrated deliberate indifference to this pattern and practice of constitutional violations, having shown deliberate indifference, by failing to take necessary, appropriate, and/or adequate measures to prevent the continued perpetuation of said pattern of conduct by their employees and agents.

626)     In fact, they celebrate, encourage and promote this behavior by engaging in victim-blaming, shaming their victims, dissuading their victims, allowing criminal police officers to remain on the force and allowing certain criminal officers to be celebrated for their unlawful actions (while creating a culture where attendance of the celebration and retirement parties of criminal police officers is encouraged and actively participated in as an acceptable practice for all PAPD officers). Defendants have, for decades, been in the business of promoting and encouraging these behaviors among officers and fostering a thuggish police force that lacks any accountability or transparency.

166

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

627)     This lack of an adequate supervisorial response by Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75 inclusive, demonstrates the existence of an informal but longstanding custom, policy, and/or practice, which tolerates and promotes the continued violations of civil rights of individuals by City of Palo Alto and City of Palo Alto Police Department employees and agents.

628)     JULIO is informed and believes that in addition to these long-standing practices and customs, Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 70, inclusive, have failed to provide adequate training, or no training at all, on the obligations of the Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 50, inclusive, to its employees, agents, officers, and the like to not engage in excessive force, and to conduct themselves as professionals charged with not only ensuring the safety of the City of Palo Alto and City of Palo Alto Police Department staff but the safety of all residents, citizens, and like with whom their officers, employees, and agents come into contact.

629)     The acts of the individually-identified Defendants alleged herein are the direct and proximate result of the deliberate indifference of Defendants City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, and its/their supervisory officials and employees to violations of the constitutional rights of individuals, including Plaintiff, by the individually-named Defendants and other employees, agents, officers, and the like.

630)     The City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, have failed to adequately seek out or stop such sadistic behavior as alleged herein by failing to investigate claims of excessive force, unlawful detention and/or arrest, failure to provide medical care, and further failing to adequately discipline, punish, or expel employees, agents, officers, and the like who have engaged in the aforementioned and/or similar conduct when handling alleged suspects.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

631)   The City of Palo Alto, the City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, have either provided no training at all regarding appropriate handling, treatment, and protection of out of custody and in custody individuals, or has allowed and caused PAPD officers to receive wholly inadequate training with no measurable standards, or no measuring, of the training recipient's understanding, retention, and application – or non-application – of training materials and subject matter.

632)   JULIO's injuries were a foreseeable and proximate result of the deliberate indifference of the City of Palo Alto and City of Palo Alto Police Department, Chief Jonsen, and DOES 1 thru 75, inclusive, to the constitutional violations taking place in the City of Palo Alto and City of Palo Alto Police Department, existing as a result of the patterns, practices, customs and/or policies, and/or lack of training or non-existent training, described above.

633)   As a proximate result of defendants' malicious and sadistic conduct, JULIO suffered and continues to suffer injuries and damages as set forth in the paragraphs and subparagraphs herein.  The punitive damage allegations of paragraphs and subparagraphs herein apply in this Claim for Relief to all individually-named Defendants.

634)   As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in the herein Paragraphs, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

635)   The conduct of Defendants, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

636)   Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

168

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

### FOURTH CAUSE OF ACTION
### (State Created Danger – 42 U.S.C § 1983)
*(Against Defendants - PAPD Police Officers: AGENT DESTEFANO, SGT. GREEN, OFFICER ENBERG, OFFICER JOHNSON, SGT. ALANIZ, OFFICER CONNELLY, CHIEF JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive)*

637) Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

638) Defendants rendered AREVALO more vulnerable to harm by engaging in the conduct described herein.

639) The harm to AREVALO was a foreseeable and direct result of Defendants' conduct.

640) Defendants acted with conscious disregard of a great risk of serious harm and/or a deliberate indifference.

641) There was a special relationship as between Defendants' and AREVALO as AREVALO was a detainee and arrestee within the care, custody, and control of Defendants' and the relationship was therefore different from the Defendants' conduct with the public at large.

642) Defendants' conduct made AREVALO more vulnerable to the harm AREVALO suffered.

643) As a proximate result of defendants' malicious and sadistic conduct, AREVALO suffered and continues to suffer injuries and damages as set forth in the paragraphs and subparagraphs herein. The punitive damage allegations of paragraphs and subparagraphs herein apply in this Claim for Relief to AREVALO.

644) As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in all prior paragraphs, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

169

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

645)   The conduct of Defendants, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

646)   Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

**FIFTH CAUSE OF ACTION**
**(First Amendment – Free Speech, 42 U.S.C § 1983)**
*(Plaintiff Against All Defendants and DOES 1 thru 75, inclusive)*

647)   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

648)   Defendants acted under the color of the law to violate AREVALO's rights to free speech, AREVALO's actions were all protected activities under the First Amendment of the United States Constitution.

649)   As a proximate result of defendants' malicious and sadistic conduct, AREVALO suffered and continues to suffer injuries and damages as set forth in the paragraphs and subparagraphs herein.  The punitive damage allegations of paragraphs and subparagraphs herein apply in this cause of action to all individually named defendants.

650)   As a direct and proximate consequence of these unlawful acts, AREVALO has suffered and continues to suffer loss of his personal and real and personal property and is entitled to appropriate damages for the loss of, and injury to, his person and property.

651)   As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in the paragraphs in this complaint, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

652) The misconduct described was undertaken by Defendant police officers within the course and scope of their employment and under color of law such that their employer, City of Palo Alto and City of Palo Alto Police Department are liable for their actions.

653) Defendants, inclusive, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

654) Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

## SIXTH CAUSE OF ACTION
### (First Amendment and Fourteenth Amendment, 42 U.S.C. §1983 - *Monell* Liability)
*(Against Defendants City of Palo Alto, City of Palo Alto Police Department, Chief Jonsen, Lt. Becchetti and DOES 1 thru 75, inclusive)*

655) Plaintiff JULIO AREVALO incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

656) At the time of the incidents complained of herein, AREVALO was a resident of the City of Palo Alto County of Santa Clara, California.

657) The City of Palo Alto and City of Palo Alto Police Department, by and through their supervisory officials and employees, have been given notice of repeated occasions prior to the violation of residents and individuals' First Amendment rights, of a pattern of ongoing constitutional violations and practices by the individually-named Defendants herein and other officers, employees, agents, and the like employed by the City of Palo Alto and City of Palo Alto Police Department in their patrol and other divisions, including having received notice regarding unlawfully arresting people engaged in protected and lawful activity in violation of the First and Fourteenth Amendments to the United States Constitution.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

658)   Defendants City of Palo Alto, the City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, incorporated general instruction, statutes, ordinances and/or regulations, there were choices by policy making officials, customs existed, there was inadequate training and/or supervision,  and there was inadequate screening that caused AREVALO to suffer the numerous violations of his rights at the hands of the employees, officers, and agents of CITY and PAPD.

659)   These policies and practices have been and continue to be implemented by Defendants, such as the harassment by Defendants (PAPD officers), and are the proximate cause of the Defendants' deprivation of Plaintiff's rights secured under the First Amendment.

660)   The City of Palo Alto and City of Palo Alto Police Department, by their policy and practice of suppressing free speech as referenced above, is subjecting individuals, including Plaintiff, to serious physical, psychological and physiological harm as outlined above.

661)   Despite said notice, Defendants City of Palo Alto and City of Palo Alto Police Department, CHIEF JONSEN and DOES 1 thru 75, inclusive, have demonstrated deliberate indifference to this pattern and practice of constitutional violations, having shown deliberate indifference, by failing to take necessary, appropriate, and/or adequate measures to prevent the continued perpetuation of said pattern of conduct by their employees and agents. This lack of an adequate supervisorial response by Defendant City of Palo Alto, Defendant City of Palo Alto Police Department, Defendant CHIEF JONSEN, and DOES 1 thru 75, inclusive, demonstrates the existence of an informal custom, policy, or practice, which tolerates and promotes the continued violation of civil rights of individuals by City of Palo Alto and City of Palo Alto Police Department's agents and employees.

662)   AREVALO is informed and believes that in addition to these long-standing practices and customs, the City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and 1 thru 75, inclusive, have failed to provide adequate training, or no training at all, on the obligations of City of Palo Alto and City of

172

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Palo Alto Police Department officers, employees, agents, and the like to not engage in the suppression of free speech, and to conduct themselves as professionals charged with protecting and defending the Constitution of the United States – not merely acting as storm-troopers for City of Palo Alto and City of Palo Alto Police Department officials.

663)  The acts of the individually-identified Defendants alleged herein are the direct and proximate result of the deliberate indifference of Defendant City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, DOES 1 thru 75, inclusive, and its/their supervisory officials and employees to violations of the constitutional rights of individuals perpetrated against individuals by the individually-named Defendants and other officers, employees, agents, and the like.

664)  The City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, has/have failed to adequately seek out or stop such sadistic behavior as alleged herein by failing to properly investigate claims of free speech violations, and by further failing to adequately discipline, punish, terminate, or expel officers who have engaged in the aforementioned and/or similar conduct when handling alleged suspects.

665)  The City of Palo Alto, City of Palo Alto Police Department, CHIEF JONSEN, and DOES 1 thru 75, inclusive, has/have either provided no training at all in regard to appropriate handling, treatment, and protection of out of custody and in custody individuals, or has received wholly inadequate training with no measurable standards, or no measuring, of the training recipients understanding, retention, and application – or non-application – of training materials and subject matter.

666)  AREVALO's injuries were a foreseeable and proximate result of the deliberate indifference of the City of Palo Alto and City of Palo Alto Police Department to the constitutional violations taking place in the City of Palo Alto and City of Palo Alto Police Department, existing as a result of the patterns, practices, customs and/or policies, and/or lack of training or non-existent training, described above.

173

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

667)     As a proximate result of defendants' malicious and sadistic conduct, AREVALO suffered and continues to suffer injuries and damages as set forth in the paragraphs and subparagraphs herein.  The punitive damage allegations of paragraphs and subparagraphs herein apply in this Claim for Relief to all individually-named Defendants.

668)     As a direct and proximate consequence of these unlawful acts, AREVALO has suffered and continues to suffer loss of his personal property and is entitled to appropriate damages for the loss of and injury to his property.

669)     As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in all paragraphs of this complaint, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

670)     The misconduct described was undertaken by Defendant police officers within the course and scope of their employment and under color of law such that their employer, City of Palo Alto and City of Palo Alto Police Department are liable for their actions.

671)     The conduct of Defendants, inclusive, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

672)     Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

//

//

//

//

//

174

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**SEVENTH CAUSE OF ACTION**
**(Conspiracy to Violate and Interfere with Civil Rights, 42 U.S.C. § 1985)**
*(Against All Defendants and DOES 1 thru 75, inclusive)*

673)    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

674)    In doing the acts complained of herein, Defendants, and each of them, acted in concert and conspired to violate AREVALO's civil rights and other lawful rights.

675)    Defendants had knowledge of the wrongs conspired to be done and committed and had the power to prevent or aid in preventing the commission of the same.

676)    On information and belief, before, during and/or after the unwarranted attack on AREVALO, Agent DESTEFANO and other Defendants (known and unknown) conspired for the purpose of impeding, hindering, obstructing, and defeating, the due course of justice with regard to AREVALO's rights and civil rights and any remedies he may seek to pursue against them in relation to their coordinated and unwarranted attack on AREVALO.

677)    On information and belief, before, during and after Defendants attacked AREVALO, Defendants conspired with the intent to deny AREVALO the equal protection of the laws, and/or to injure AREVALO and/or his property for lawfully enforcing, or attempting to enforce, the right of AREVALO to the equal protection of the laws.

678)    Said Defendants conspired with the intent to deny AREVALO the opportunity to pursue a course of action against said Defendants for the purpose of preventing said officers from being held administratively, civilly, and/or criminally liable for their actions, with the intent to deny AREVALO access to the court and the ability to pursue criminal, administrative and civil remedies.

679)    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in the paragraphs within this complaint, and in a sum not yet

175

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

680)    The conduct of Defendants, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

681)    Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

**SEVENTH CAUSE OF ACTION**
**(Supervisor Liability, 42 U.S.C § 1983)**
*(Against Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive)*

682)    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

683)    Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BICCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, failed to supervise, discipline, advise, and/or properly investigate their subordinates, Defendants Agent DESTEFANO and other individual Defendants, and DOES 1 through 75, inclusive.

684)    Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BICCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, were and are tolerant of and encouraged the constitutional violations perpetrated against ALVAREZ, provide indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violations and ratified the conduct.

685)    Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, have, but their actions, tried to dissuade AREVALO and his family from taking action by providing false legal analysis to conceal CITY, PAPD, and PAPD officers' unconstitutional and unlawful conduct.

176

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

686)    Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BICCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, knowing that Agent DESTEFANO has an established history of criminal law violations, unconstitutional violations, excessive force related misconduct, and dishonestly, allow Agent DESTEFANO to continue to be on the force and continue to ratify and defend Agent DESTEFANO's dangerous and unlawful conduct, despite their knowledge of his inability to be an honest, constitutional, and lawful peace officer.

687)    Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BICCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, had actual and/or constructive knowledge of, participated in, and/or encouraged the Defendants' violations of AREVALO's rights and Defendants acquiesced in such violations. Thus, Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the violations.

688)    While acting under color of state law as a Sergeant/Supervisor in the City of Palo Alto and City of Palo Alto Department, Defendants SGT. GREEN and SGT. ALANIZ, individually and collectively knew that their subordinates, including Defendants Agent DESTEFANO and other PAPD officer defendants, were engaging in the unlawful acts alleged herein and that his or her subordinates' conduct was depriving Plaintiff of his constitutional rights.

689)    In doing the acts as alleged herein, Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive; They acquiesced in the deprivation of Plaintiff's constitutional rights and his subordinate officers' use of excessive and unreasonable force, and other constitutional violations and other violations alleged herein  and they acted in a manner that showed a reckless and callous indifference to the rights of others, specifically AREVALO.

690)    As a legal result of Defendants' PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive,  actions and omissions as described, Defendants PAPD SGT.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, individually and collectively, deprived AREVALO of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution, other state and federal constitutional provisions, and other state and local laws, and applied to state actors by the Fourteenth Amendment.

691)   As a legal result of Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, individual and collective acts and omissions as described, AREVALO suffered and suffers close to fatal injuries, extreme pain and suffering. AREVALO suffered serious physical injuries and incurred other damages, as described herein and AREVALO continues to experience pain and suffering from the injuries he sustained at the hands of Defendants.

692)   Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, individually and/or collectively, committed the herein and aforementioned acts and omissions knowingly, willfully and maliciously, and with the intent to harm, injure, vex, harass and oppress AREVALO with conscious disregard of AREVALO's known rights and by reasons thereof, AREVALO seeks punitive and exemplary damages from Defendants PAPD SGT. GREEN, SGT. ALANIZ, LT. BECCHETTI, CHIEF JONSEN and DOES 1 thru 75, inclusive, individually, in an amount according to proof.

693)   As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiff sustained injuries and damages as set forth in this complaint, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

694)   The conduct of Defendants, inclusive, and each of them, entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983.

178

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

695)    Plaintiff also claims reasonable costs and attorneys' fees under 42 U.S.C. § 1983 and as allowed by law.

### EIGHTH CAUSE OF ACTION
**(Bane Act, California Civil Code § 57.1)**
**(Against All Defendants)**

696)    Plaintiff realleges and incorporates by reference, paragraphs 1 through 280 as though fully set forth herein.

697)    The conduct of Defendants, including, but not necessarily limited to Defendants CITY, PAPD, DESTEFANO, GREEN, ALANIZ, BECCHETTI, ENBERG, CONNELLY, JOHNSON, PRIESS, SCHEFF, CHIEF JONSEN, and DOES 1 thru 75, inclusive, as described herein violated California Civil Code § 52.1, in that they interfered with AREVALO's exercise and enjoyment of his civil rights, as enumerated above, through excessive force, through unreasonable searches and seizures, through denial of proper medical care, through the violations of his First Amendment Rights, and through the other violations of his other civil rights and other law violations, as alleged herein.

698)    As a direct and proximate result of Defendants' (Defendants CITY, PAPD, DESTEFANO, GREEN, ALANIZ, BECCHETTI, ENBERG, CONNELLY, JOHNSON, PRIESS, SCHEFF, CHIEF JONSEN, and DOES 1 thru 75, inclusive) violations of Civil Code § 52.1, AREVALO suffered violations of his State and Federal constitutional rights, and suffered damages as set forth in the paragraphs contained herein and within this complaint.  The punitive damage allegations of paragraph and paragraphs apply in this Claim for Relief to all individually-named Defendants.

699)    By their acts, omissions, customs, and policies, each Defendant acting in concert/conspiracy and by threats, intimidation, or coercion, as described above, violated the Plaintiff's rights under California Civil

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Code Section §52.1, and the following clearly established rights under the United States Constitution, and the laws of the State of California and the California Constitution:

a) The deprivation of Plaintiff's constitutionally protected right(s);

b) Plaintiff was denied proper medical care when Defendants had a constitutional and statutory duty to seek timely and adequate medical care on Plaintiff's behalf and for Plaintiff, yet Defendants failed to do so;

c) The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

d) The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

e) The right to be free from wrongful government interference in one's freedom of association with others, as secured by the First, Fourth, and Fourteenth Amendments;

f) The right to be free from unlawful and unreasonable seizures of one's person, including the right to be free from unreasonable or excessive force, as secured by the California Constitution, Article 1, Section 13;

g) The right to be free from wrongful government interference in one's freedom of expression and freedom of assembly and association with others, as secured by the California Constitution, Article 1, Section 2;

h) The right to protection from bodily restraint, harm, personal insult, or injury to personal relations, as secured by California Civil Code § 43;

i) The right to receive adequate and necessary medical care while in pre-arraignment custody, rather than deliberately indifferent or objectively not reasonable or objectively not reasonable medical care during such custody, as secured by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

700)     The Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to violate AREVALO's civil rights and to injure him.

701)     As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiff has suffered physical injuries, fright, shock, pain, suffering, and/or extreme mental anguish. Accordingly, he has suffered past and future general damages in amounts to be determined by proof at trial.

702)     As a direct and proximate result of the Defendants' conduct, AREVALO required medical attention and/or missed time from employment pursuits. He suffered past and future special damages in amounts to be determined by proof at trial.

703)     Through their conduct, the individual Defendants acted maliciously and oppressively, in willful and conscious disregard for AREVALO's rights and safety and with the sole intent to harm him. AREVALO is, therefore, entitled to punitive and exemplary damages from the individual Defendants in an amount to be determined by proof at trial.

704)     As a direct and proximate result of each and every Defendants' violations of California Civil Code § 52.1 and of Plaintiff's rights under the United States Constitution and the laws and Constitution of the State of California, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at paragraphs contained herein, including punitive damages against the defendants in their individual capacities, including all damages and penalties allowed by California Civil Code §§ 52, 52.1, and California law, including costs, attorneys fees, civil penalties, and punitive damages. Further, Defendants' violations of Plaintiff's rights as guaranteed by the California Civil Code (§ 52.1) entitled Plaintiff to compensatory and punitive damages, treble damages, as well as attorney's fees, all of which are provided for in the California Civil Code §§ 52, et seq., and are requested herein.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

705)     Since the conduct of Defendant PAPD Officers and DOES 1 thru 75, inclusive, occurred in the course and scope of their employment, Defendant(s) City of Palo Alto and City of Palo Alto Police Department are therefore liable to ALVAREZ pursuant to *respondeat superior*.

706)     Under CA Civil Code §52.1, Plaintiff is entitled to punitive damages, a civil penalty of $25,000 for each violation, attorneys' fees, and injunctive relief.


### NINTH CAUSE OF ACTION
### (Ralph Act, California Civil Code § 52.1)
### (Against All Defendants)


707)     Plaintiff realleges and incorporates by reference, all prior paragraphs, as though fully set forth herein.

708)     At all relevant times, AREVALO was 23-year-old Latino male.

709)     Defendants are liable for this cause of action for committing a breach and violations in accordance with all allegations in all paragraphs of this Complaint.

710)     In performing what is alleged herein, Defendants, and each of them violated AREVALO'S right to be free from any violence or intimidation by threat of violence committed against his person because of discrimination, including but, not limited to discrimination based upon his perceived race, color, medical condition, race, color, ancestry, economic status, place of residency, familial affiliation, age, disability, primary language, and/or immigration status.

711)     The Defendants, and each of them, knowingly and willfully conspired and agreed amongst themselves to discriminate against AREVALO and to violate AREVALO's civil rights. The officers at the scene conspired to injure AREVALO, conceal their unlawful conduct, and prevent further harm to AREVALO by failing to provide him with proper medical care.

182

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

712)     Plaintiff is informed and believes, and on that basis alleges, that each of the defendants is not a member of the protected class to which AREVALO belongs (i.e. AREVALO is a Latino male).

713)     At all times relevant herein, the defendants knew that AREVALO is a Latino male.  Knowing this, and other factors related to other categories of protected classes, the defendants committed the aforementioned acts of misconduct purposely so as to discriminate against AREVALO based on these factors, making him a member of an identifiable class of individuals.

714)     Defendants mocked, made fun of and humiliated AREVALO because of his actual and/or perceived (protected) characteristics with respect to AREVALO.

715)     Plaintiff is informed and believes, and on that basis alleges, that the incidents described herein were motivated by Defendants' hatred and prejudice of Latino males and individuals who are deemed low-income.

716)     Defendants, by their use of violence and threats of violence against AREVALO because of AREVALO's protected characteristics, violated ALVAREZ's right to be free from violence or intimidation by threats of violence as guaranteed by CA Civil Code § 51.7.

717)     As a direct and proximate result of the conduct of Defendants, and each of them, plaintiff has suffered physical injuries, fright, shock, pain, suffering, and/or extreme mental anguish and will continue to suffer harm, as described herein.

718)     As a direct and proximate result of Defendants conduct, AREVALO required medical treatment and/or missed time from employment pursuits. He suffered past and future special damages in amounts to be determined at trial.

719)     Through their conduct, the individual officers acted maliciously and oppressively, in willful disregard for AREVALO's rights and safety and with the sole intent to harm him. AREVALO is, therefore entitled to punitive or exemplary damages from the individual Defendants in an amount to be determined by proof at trial.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

720)     Since the conduct of Defendants occurred in the course and scope of their employment, Defendant(s) City of Palo Alto and City of Palo Alto Police Department are therefore liable to AREVALO pursuant to *respondeat superior*.

721)     Defendants' violation of plaintiff's rights as guaranteed by CA Civil Code § 51.7 entitles plaintiff to compensatory and punitive damages, a $25,000 civil penalty, attorney's fees, and injunctive relief, all of which are provided for in CA Civil Code § 51.7 and are requested herein.

722)     In doing the acts alleged in this complaint, Defendants knew or should have known that their actions were likely to injure plaintiff. Plaintiff is informed and believes, and on that basis alleges, that defendants intended to cause injury to plaintiff and acted with a willful and conscious disregard of plaintiff's rights as secured by CA Civil Code § 51.7, thus entitling plaintiff to recover punitive damages pursuant to CA Civil Code § 52(b)(1).

723)     Wherefore, Plaintiff requests judgment for this Cause of Action as follows: general damages according to proof, special damages according to proof, punitive damages pursuant to CA Civil Code § 52(b)(1), a statutory civil penalty of $25,000 pursuant to CA Civil Code § 52(b)(1) (For each instance), reasonable attorney's fees, according to proof, pursuant to CA Civil Code § 52(b)(3), Plaintiff's cost of suit, and such other relief as the court deems just and proper.

//

//

//

//

//

//

//

184

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

### TENTH CAUSE OF ACTION
### (ASSAULT)
### (Against All Defendants, Excluding Scheff)

724)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

725)    Defendant officers, and each of them, by committing multiple act(s) of violence against Plaintiff, placed Plaintiff in immediate fear of great bodily harm. Plaintiff did not consent to such violent and offensive acts and contact by these defendants.

726)    As a proximate result of the intentional and wrongful conduct of Defendant officers, and each of them, Plaintiff suffered damages.

727)    Since the conduct of Defendants DESTEFANO, GREEN, ALANIZ, ENBERG, CONNELLY, JOHNSON, PRIESS, and DOES 1 thru 75, inclusive, and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD, CHIEF JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive, are therefore liable to ALVAREZ pursuant to *respondeat superior*.

728)    Plaintiff sustained injuries and damages as set forth in this Complaint and in each paragraph herein, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

729)    Plaintiff also requests costs and attorney's fees in accordance with any/all applicable statutes.

730)    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

731)    The conduct of Defendants, as set forth herein, brought AREVALO into offensive and unwelcomes contact with PAPD, as described above.

185

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

732)     At all relevant times, AREVALO found the contact(s) by Defendants to be offensive to his person and dignity.

733)     At no time did AREVALO consent to any of the acts by Defendants.

734)     As a direct and proximate result of Defendants conduct and actions above, AREVALO was physically harmed, emotional distress and/or experienced offensive contact with his person.

735)     As a proximate result of Defendants' wrongful conduct, AREVALO suffered injuries and damages as set forth in paragraphs 1 thru 318.  The punitive damage allegations herein apply in this Claim for Relief to Defendants DESTEFANO, ENBERG, GREEN, ALANIZ, JOHNSON, and PRIESS.

736)     Since the conduct of Defendants and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD, CHIEF JONSEN, LT. BECCHETTI, and DOES 1 thru 75, inclusive, are therefore liable to AREVALO pursuant to *respondeat superior*.

737)     Plaintiff sustained injuries and damages as set forth in this Complaint and in each paragraph, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

738)     Plaintiff also requests costs and attorney's fees in accordance with any/all applicable statutes.

//
//
//
//
//
//
//
//
//
//
//
//
//

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

### ELEVENTH CAUSE OF ACTION
### (CONVERSION)
*(Against All Defendants, Excluding Scheff)*

739)    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

740)    AREVALO was in possession of his personal property at the time that Defendants ordered that the property be seized. Defendants' agents, officers, and employees unlawfully prohibited Plaintiff from, keeping possession of his personal property.

741)    Defendants, their agents and employees, had a duty owed to AREVALO to protect his personal property, including, but not limited to the duties set forth in California Civil Code §§ 2080.2, 2080.4 and 2080.6.

742)    Plaintiffs' property was not abandoned at the time that Defendants seized the property. Defendants breached the duty to protect AREVALO's personal property when they wrongly exerted dominion and control over the property and denied AREVALO his constitutional and statutory rights.

743)    Defendants had no legitimate governmental interest that gave their agents and employees the legal right or justification to confiscate and/or damage AREVALO's property.

744)    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiff has suffered and continues to suffer loss of his personal property and is entitled to damages in an amount according to proof, to be proven at trial.

745)    Since the conduct of Defendants and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD, CHIEF JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive, are therefore liable to AREVALO pursuant to *respondeat superior*.

187

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

746)    Plaintiff sustained injuries and damages as set forth in the paragraphs in this complaint and in each and every paragraph, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

747)    Plaintiff also requests costs and attorney's fees in accordance with any/all applicable statutes.

**TWELFTH CAUSE OF ACTION**
**(TRESPASS TO CHATTELS)**
*(Against All Defendants, Excluding Scheff)*

748)    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

749)    Defendants wrongfully committed trespass against AREVALO by trespass against AREVALO's personal property.

750)    AREVALO owned, possessed, and/or had a right to possess various items of personal property.

751)    Defendants intentionally interfered with AREVALO's use and/or possession of the various items of AREVALO's personal property and/or damaged AREVALO's personal property.

752)    AREVALO did not consent.

753)    AREVALO was harmed.

754)    Defendants' conduct was a substantial factor in causing AREVALO's harm.

755)    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiff has suffered and continues to suffer loss of his real and/or personal property and is entitled to damages in an amount according to proof, to be proven at trial.

756)    Since the conduct of Defendants and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD CHIEF JONSEN, and LT. BECCHETTI are therefore liable to AREVALO pursuant to *respondeat superior*.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

757)    Plaintiff sustained injuries and damages as set forth in this complaint and in each paragraph herein, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

758)    Plaintiff also requests costs and attorney's fees in accordance with any/all applicable statutes.

### THIRTEENTH CAUSE OF ACTION
### (CIVIL CONSPIRACY)
### (Against All Defendants)

759)    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

760)    As described more fully in the preceding paragraphs, the Defendant officers and Defendant SCHEFF, acting in concert with other known and unknown co-conspirators (DOES 1 thru 75, inclusive), conspired by concerted action to accomplish an unlawful purpose by one or more unlawful means.

761)    In furtherance of the conspiracy, the Defendant officers committed overt acts and were otherwise willful participants in joint activity.

762)    Said misconduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

763)    As a proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish.

764)    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiff has suffered and continues to suffer loss of his real and/or personal property and is entitled to damages in an amount according to proof, to be proven at trial.

189

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

765) Since the conduct of Defendants and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD and CHIEF JONSEN are therefore liable to AREVALO pursuant to *respondeat superior*.

766) Plaintiff sustained injuries and damages as set forth in Paragraphs 1 thru 359, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

767) Plaintiff also requests costs and attorney's fees in accordance with any/all applicable statutes.

## FOURTEENTH CAUSE OF ACTION
### (NEGLIGENCE)
### (Against All Defendants)

768) Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

769) At all times mentioned herein, each Defendant and all Defendants owed AREVALO a duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

770) At all times, each Defendant and all Defendants owed AREVALO a duty to act with reasonable care.

771) These general duties of reasonable care and due care owed to AREVALO by each Defendant and all Defendants and DOES 4 thru 70, inclusive, include, but are not limited to the following specific obligations:

   a) to refrain from using excessive and/or unreasonable force against AREVALO;

   b) to refrain from wrongfully arresting and/or detaining AREVALO;

   c) to refrain from conduct that constitutes a substantial factor causing the violation of AREVALO's rights;

   d) to use generally accepted police procedures and tactics that are reasonable and necessary under the circumstances;

190

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

e) to refrain from abusing their authority granted to them by law;

f) to refrain from recommending criminal charges against AREVALO when they lacked probable cause;

g) to refrain from violating AREVALO's rights guaranteed by law, including but not limited to freedom of assembly, freedom of association, and freedom of expression;

h) To provide adequate and necessary medical care to citizens in pre-arraignment custody, rather than deliberately indifferent or objectively not reasonable or objectively not reasonable medical care during such custody

i) Additionally, these general duties of reasonable care and due care owed to AREVALO by each Defendant and all Defendants include, but are not limited to the following obligations: to properly and adequately hire, investigate, train, supervise, monitor and discipline their employees, agents and/or PAPD officers to ensure that those employees/agents/officers act at all times in the public interest and in conformity with law; to make, enforce, and at all times act in conformity with policies and customs that are lawful and protective of individual rights, including AREVALO's; to refrain from making, enforcing, and/or tolerating the wrongful policies and customs as set forth in the paragraphs herein and as incorporated by reference.

772) Each Defendant and all Defendants' violations of AREVALO's right to be free from detention without reasonable suspicion, arrest without probable cause, use of unnecessary, excessive, unreasonable and deadly force, violation of his right to freedom of expression and freedom of assembly and association, and all other violations committed by each defendant and all defendants against AREVALO also constitute negligence *per se*.

773) Each Defendant and all Defendants and DOES 1 thru 75, inclusive, through their aforesaid acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiff.

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

774)   Defendants CITY, PAPD, CHIEF JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive, are also vicariously liable for the negligent conduct of those other defendants herein under their respective hiring, control, and supervision, in accordance with the principle of *respondeat superior*. Under Government Code section 820(a), public employees such as police officers may be held liable to the same extent as private persons under general tort principles, and when such liability arises, the entity is typically vicariously liable under Government Code section 815.2, unless an immunity applies.

775)   As a direct and proximate result of each Defendant and all Defendants' and DOES 1 thru 75, inclusive, act(s) of negligence, AREVALO sustained injuries and damages, and is entitled to relief.

776)   Since the conduct of each Defendant and all Defendants' and DOES 1 thru 75, inclusive, and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD, CHIEF JONSEN, LT. BECCHETTI and DOES 1 thru 75, inclusive, are therefore liable to AREVALO pursuant to *respondeat superior*.

777)   Plaintiff sustained injuries and damages as set forth in this Complaint, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

**FIFTEENTH CAUSE OF ACTION**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**
**(Against All Defendants)**

778)   AREVALO incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

779)   The conduct of each Defendant and all Defendants and DOES 1 thru 75, inclusive, was intentional, outrageous, malicious, and done with ill will and with the intent to cause AREVALO to suffer humiliating mental anguish, as well as emotional and physical distress. Each Defendant and all Defendants and DOES 1

192

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

thru 75, inclusive, are liable for this cause of action for committing a breach and for the allegations addressed and alleged in all paragraphs contained within this complaint.

780)     The conduct of each Defendant and all Defendants and DOES 1 thru 75, inclusive, was so severe and outrageous that as a proximate result, AREVALO suffered humiliation, mental anguish, and emotional and physical distress. AREVALO was beaten and unlawfully detained and arrested. AREVALO has exhibited manifestations of the humiliation, mental anguish, and emotional distress he suffered, including, but not limited to, sleeplessness, anxiety, nightmares, ruminating on the events, and/or crying. Due to the harassment and abuse perpetrated by the City of Palo Alto Police Department and its officers against Plaintiff (each Defendant and all Defendants and DOES 1 through 75, inclusive), AREVALO has an extreme fear of police. He also had injuries and damages that will plague him for the rest of his life.

781)     Each Defendant and all Defendants and DOES 1 thru 75, inclusive, knowingly and willfully conspired and agreed among themselves to inflict emotional distress upon AREVALO. The officers on scene conspired to injure AREVALO, emotionally and physically abuse him, unlawfully detain and arrest him, and unlawfully damage and seize his personal property.

782)     As a direct and proximate cause and result of the conduct of each Defendant and all Defendants and DOES 1 thru 70, inclusive, as alleged herein, AREVALO suffered physical injuries, fright, shock, pain, suffering, and/or extreme mental anguish. Accordingly, he has suffered past and future general damages in amounts to be determined by proof at trial.

783)     As a direct and proximate result of each Defendant and all Defendants' and DOES 1 thru 75, inclusive, conduct, AREVALO suffered past and future special damages in amounts to be determined by proof at trial.

784)     Defendants CITY, PAPD, CHIEF JONSEN, and LT. BECCHETTI DOES 1 thru 75, inclusive, are also vicariously liable for the negligent conduct of those other defendants herein under their respective hiring, control, and supervision, in accordance with the principle of *respondeat superior*. Under Government Code

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

section 820(a), public employees such as police officers may be held liable to the same extent as private persons under general tort principles, and when such liability arises, the entity is typically vicariously liable under Government Code section 815.2, unless an immunity applies.

785)    Since the conduct of Defendants PAPD Officers and the injuries to AREVALO that they inflicted, occurred in the course and scope of their employment, Defendants CITY, PAPD, CHIEF JONSEN, and LT. BECCHETTI are therefore liable to AREVALO pursuant to *respondeat superior*.

786)    Plaintiff sustained injuries and damages as set forth in Paragraphs 152 thru 158, above, and in a sum not yet completely ascertained but in excess of $10 million or in an amount subject to proof at trial but above any jurisdictional limits/minimum of this Court.

787)    Plaintiff is also entitled to an award of his reasonable attorney's fees and costs, pursuant to 42 USC §1988 (b) and (c).

### SIXTEENTH CAUSE OF ACTION
*(Violation of 14th Amendment Equal Protection Clause: Racial/Ethnic Discrimination)*

788)    Plaintiff hereby incorporates by reference each and every allegation set forth in the paragraphs of this complaint into this Sixteenth Cause of Action.

789)    Specifically, the Defendant police officers knew that Plaintiff Latino and decided to harass, attack, detain, arrest, and injure him due in large to Plaintiff's race. Defendant Agent DESTEFANO concocted a story that JULIO touched hands with a "Hispanic male" and the surveillance footage makes clear this never occurred. The "Hispanic male" .. "hand to hand" observation was fabricated by Agent DESTEFANO.

790)    Plaintiff is a Mexican/Latino male.  As such, Plaintiff is a member of an identifiable protected class for equal protection purposes and that the Defendants (and each of them) had discriminated against him on the basis of his race or ethnic origin as a Guatemalan/Latino male.

194

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

791)    In committing each of the acts or omissions of misconduct alleged herein (as set forth in Paragraphs 1 through 393), the Defendants (and each of them) acted with the intent to discriminate against Plaintiff on the basis of his race and/or ethnic origin as a Guatemalan male.  Or, in the alternative, the Defendants discriminated against the Plaintiff with deliberate indifference.

792)    Specifically, Defendants knew that Plaintiff was a Guatemalan/Latino male when they engaged in the unlawful acts, as alleged herein.

793)    Correspondingly, the all other Defendants expressed, either expressly or impliedly, their approval of and agreement with those Defendants who made such derogatory remarks about Plaintiff's status as a Mexican/Latino male.

794)    In committing the alleged acts or omissions of misconduct, the Defendants treated the Plaintiff differently than they would have treated others similarly situated on the basis that he was a member of an identifiable protected class, a Latino male.

795)    In so doing, the Defendants violated the Plaintiff's right to Equal Protection under the Fourteenth Amendment of the US Constitution.

796)    As a result of the Defendants' unconstitutional discrimination in violating the Plaintiff's Fourteenth Amendment rights, the Plaintiff suffered damages in a sum not yet completely ascertained by in excess of $10 million or in an amount subject to proof at trial but above the jurisdictional limits/minimum of this Court.

797)    Furthermore, said wrongful acts or omissions were committed by the Defendants with malice, fraud, oppression, evil motive or intent, or with reckless/callous disregard and indifference to the Plaintiff's protected rights and well-being, entitling him to exemplary damages in a sum to be determined at trial.

798)    Plaintiff is also entitled to an award of his reasonable attorney's fees and costs, pursuant to 42 USC' 1988 (b) and (c).

195

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

### SEVENTEENTH CAUSE OF ACTION
**(Malicious Prosecution)**
**(Against all Defendants)**

799)    Plaintiff hereby incorporates by reference each and every allegation set forth in the paragraphs of this complaint into this Seventeenth Cause of Action.

800)    Defendants wrongfully caused a criminal proceeding to be brought against AREVALO.

801)    Although no criminal charges were ever filed against AREVALO for the July 10, 2019 incident, the Santa Clara County District Attorney's Office initially alleged a violation of probation against AREVALO on account of the July 10, 2019 incidents. However, on information and belief, once presented with the Happy Donuts video, upon reviewing the body-worn-camera footage, and upon further review, the District Attorney's Office struck the allegation.

802)    Defendants were actively involved in causing Plaintiff to be accused of violating his probation.

803)    The criminal proceeding ended in Plaintiff's favor (no criminal charges were ever filed against him and the probation violation allegation on account of the July 10, 2019 incident was stricken).

804)    No reasonable person in Defendants' circumstances would have believed that there were grounds for causing Plaintiff to be arrested and/or prosecuted.

805)    Defendants acted primarily for a purpose other than to bring Plaintiff to justice;

806)    Plaintiff was harmed; and

807)    That Defendants' conduct was a substantial factor in causing Plaintiff's harm.

//

//

//

//

196

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. Past and Future general damages, including, but limited to, pain and suffering, and emotional distress, in an amount to be determined according to proof at trial;

2. Past and Future special damages, including but not limited to, medical and related expenses as well lost employment pursuits and property damage in an amount to be determined according to proof at trial;

3. Costs of suit incurred herein, including expert fees and costs;

4. Punitive or exemplary damages against individual defendants, in an amount to be determined according to proof at trial;

5. Attorney fees; and

6. For such other and further relief as the court may deem proper.

7. And all other relief sought, as requested in throughout this Complaint.

//

//

//

//

//

//

//

//

//

197

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury in this matter, pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

198

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.

Dated: June 23, 2020

THE SALFEN LAW FIRM
A Professional Law Corporation

/s/
CODY B.K. SALFEN, ESQ.
*Counsel for Plaintiff*

//

Dated: June 23, 2020

THE GORDON LAW GROUP

/s/
SAMUEL J. GORDON, ESQ.
*Counsel for Plaintiff*

199

Complaint for Violations of Civil Rights
Jury Trial Demanded
Julio Arevalo v. City of Palo Alto, et al.